## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**TERENCE TRAMAINE ANDRUS,**

      Petitioner,

  v.

**LORIE DAVIS, Director,**
Texas Department of
Criminal Justice,
Correctional Institutions Division,

      Respondent.

Case No. H-19-CV-717

District Judge David Hittner

**CAPITAL CASE**

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

JASON D. HAWKINS
Federal Public Defender

JEREMY SCHEPERS
Supervisor, Capital Habeas Unit

David C. Currie (TX 24084240)
Assistant Federal Defender

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
david_currie@fd.org

**PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2254**

Petitioner Terence Tramaine Andrus, through counsel, pursuant to all rights available under the Constitution, laws, or treaties of the United States, respectfully petitions this Court for a writ of habeas corpus declaring unconstitutional and invalid his conviction for capital murder as well as the resulting death sentence.

# TABLE OF CONTENTS

PETITION FOR WRIT OF HABEAS CORPUS  PURSUANT TO 28 U.S.C. § 2254 .. i

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES ........................................................... vi

INTRODUCTORY STATEMENT .................................................. 1

PARTIES ......................................................................................... 9

JURISDICTION AND VENUE ....................................................... 9

STATEMENT OF FACTS ............................................................. 10

I.     Sid Crowley: A history of deficient performance in capital murder cases..... 10

II.    Mr. Crowley's complete failure to conduct any semblance of a proper investigation into Mr. Andrus's case. ........................................................ 18

III.   The State's elaborate plan to coerce Mr. Andrus into confessing. ................ 33

IV.    Mr. Crowley failed to make a *Batson* objection to a minority juror that the prosecutor later admitted he struck because that juror would have given Mr. Andrus "a fair trial." ......................... 43

V.     Mr. Crowley told the jury that Mr. Andrus was guilty without consulting him. ........................................................... 44

VI.    The trial court had to stop Mr. Crowley from resting after only presenting two witnesses at the punishment phase. ........................................ 46

VII.   The bailiff told that jury that they were safe from Mr. Andrus because he was wearing a shock belt that the bailiff could activate. ............................... 51

VIII.  Mr. Crowley failed to preserve claims for direct appeal ................................ 53

IX.    The judge presiding over the state post-conviction hearing described the new mitigating evidence as a "tidal wave" before recommending that Mr. Andrus receive a new punishment phase ................................... 53

X.     Mr. Crowley celebrated the CCA's refusal to adopt the trial court's recommendation of relief with the State by emailing the prosecutor that "we were right." ........................................... 102

STATEMENT REGARDING PROCEDURAL DEFENSES ................................... 104

CLAIMS FOR RELIEF ........................................................... 104

Claim 1   Mr. Andrus's Sixth Amendment right to counsel under *United States v. Cronic* was violated when trial counsel decided to concede Mr. Andrus's guilt without consulting him. ........................................... 104

    A.  Trial counsel entirely failed to subject the State's case to meaningful adversarial testing. ..................................... 105

    B.  Any default is excused by state habeas counsel's failure to raise this substantial claim. ........................................... 110

Claim 2    Mr. Andrus's Sixth Amendment right to insist that trial counsel maintain his innocence under *McCoy v. Louisiana* was violated............................................................................... 110

    A.  Mr. Andrus's Sixth Amendment right was violated. ......... 111

    B.  This claim is unexhausted. ................................................. 114

Claim 3    Mr. Andrus's Sixth Amendment right to counsel was violated when trial counsel conceded that he was guilty......... 114

    A.  Trial counsel's performance was prejudicially deficient.... 115

    B.  Any default is excused by state habeas counsel's failure to raise this substantial claim. ........................................... 117

Claim 4    Mr. Andrus's Sixth Amendment right to counsel was violated when trial counsel failed to investigate and present mitigating evidence.................................................................. 117

    A.  Trial counsel's performance was prejudicially deficient.... 118

    B.  28 U.S.C. § 2254(d) does not preclude the relitigation of this claim. .......................................................................... 125

Claim 5    Mr. Andrus's Sixth Amendment right to counsel was violated when trial counsel failed to investigate the extraneous offenses the State presented. .................................. 127

    A.  Trial counsel's performance was prejudicially deficient.... 127

    B.  Any default is excused by state habeas counsel's failure to raise this substantial claim. ........................................... 131

Claim 6    Mr. Andrus's due process rights were violated when the State elicited false testimony. .................................................. 131

|  | A. | The State's presentation of false testimony violated Mr. Andrus's due process | 132 |
|  | B. | This claim is unexhausted. | 134 |
| Claim 7 |  | Mr. Andrus's Sixth Amendment right to counsel was violated when his trial counsel failed to investigate the underlying offense | 135 |
|  | A. | Trial counsel's performance was prejudicially deficient | 135 |
|  | B. | Any default is excused by state habeas counsel's failure to raise this substantial claim. | 137 |
| Claim 8 |  | Mr. Andrus's Sixth Amendment right to counsel was violated when his trial counsel conceded the first special issue at sentencing | 137 |
|  | A. | Trial counsel's performance was prejudicially deficient | 137 |
|  | B. | 28 U.S.C. § 2254(d) does not preclude the relitigation of this claim. | 139 |
| Claim 9 |  | Mr. Andrus's due process rights were violated when the bailiff informed the jury that Mr. Andrus was wearing a shock belt and that the bailiff could activate it to keep the jurors safe. | 140 |
|  | A. | Mr. Andrus' due process rights were violated by the bailiff's comments. | 141 |
|  | B. | This Court reviews this claim de novo. | 146 |
| Claim 10 |  | Mr. Andrus's Sixth and Fourteenth Amendment rights to a trial by an impartial jury were violated | 149 |
| Claim 11 |  | Mr. Andrus's Sixth Amendment right to counsel was violated when trial counsel failed to object to his visible shackles. | 150 |
|  | A. | Trial counsel's performance was prejudicially deficient | 150 |
|  | B. | Any default is excused by state habeas counsel's failure to raise this substantial claim. | 153 |
| Claim 12 |  | Mr. Andrus's Sixth Amendment right to counsel was violated when trial counsel failed to challenge that his confession was not voluntary | 153 |

      A.  Trial counsel's performance was prejudicially deficient.... 153

      B.  Any default is excused by state habeas counsel's failure to raise this substantial claim. ............................................ 157

Claim 13  Mr. Andrus's Fifth Amendment right to remain silent was violated when the State did not scrupulously honor Mr. Andrus's invocation of that right. ............................................. 157

      A.  Mr. Andrus's Fifth Amendment right to remain silent was violated. ........................................................................ 158

      B.  28 U.S.C. § 2254(d) does not preclude the relitigation of this claim. ........................................................................... 160

Claim 14  Mr. Andrus's Fifth Amendment right to counsel was violated when the State interrogated Mr. Andrus after he asked for an attorney. ............................................................... 161

      A.  Mr. Andrus's Fifth Amendment right to counsel was violated. ......................................................................... 162

      B.  28 U.S.C. § 2254(d) does not preclude the relitigation of this claim. ........................................................................... 163

Claim 15  Mr. Andrus's Sixth Amendment right to counsel was violated when trial counsel failed to preserve *Batson* error. ... 164

      A.  Trial counsel's performance was prejudicially deficient.... 165

      B.  28 U.S.C. § 2254(d) does not preclude the relitigation of this claim. ........................................................................... 169

Claim 16  Mr. Andrus's Sixth Amendment right to counsel was violated when trial counsel failed to object to inadmissible victim impact evidence during the guilt/innocence phase. ...... 170

      A.  Trial counsel's performance was prejudicially deficient.... 170

      B.  28 U.S.C. § 2254(d) does not preclude the relitigation of this claim. ........................................................................... 172

PRAYER FOR RELIEF ....................................................................... 173

VERIFICATION BY ATTORNEY........................................................ 175

CERTIFICATE OF SERVICE .............................................................. 176

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcorta v. Texas,*
    355 U.S. 28 (1957) ................................................................... 131, 132

*Anders v. California,*
    386 U.S. 738 (1967) ....................................................................... 105

*Ex parte Andrus,*
    2018 WL 622783 ......................................................................*passim*

*Barbee v. Davis,*
    728 F. App'x 259 (5th Cir. 2018) ................................................ 106, 164

*Batson v. Kentucky,*
    476 U.S. 79 (1986) .......................................................... 165, 166, 167

*Bell v. Cone,*
    535 U.S. 685 (2002) ....................................................................... 105

*Chapman v. California,*
    386 U.S. 18 (1967) .......................................................... 160, 163, 164

*Coleman v. Thompson,*
    501 U.S. 722 (1991) ....................................................................... 146

*Colorado v. Connelly,*
    479 U.S. 157 (1986) ....................................................................... 154

*Cooks v. State,*
    844 S.W.2d 697 (Tex. Crim. App. 1992) .......................................... 152

*Davis v. United States,*
    512 U.S. 452 (1994) ....................................................................... 162

*Deck v. Missouri,*
    544 U.S. 622 (2007) ..................................................................*passim*

*Dickerson v. United States,*
    530 U.S. 428 (2000) ....................................................................... 154

*Dobbs v. Zant,*
    506 U.S. 357 (1993) ....................................................................... 147

*Douglas v. Alabama,*
380 U.S. 415 (1965) ........................................................................ 147

*Edwards v. Arizona,*
451 U.S. 477 (1981) .................................................................. 162, 164

*Evans v. State,*
601 S.W.2d 943 (Tex. Crim. App. 1980) ............................................ 136

*Florida v. Nixon,*
543 U.S. 175 (2004) .................................................................. 107, 115

*Ford v. Georgia,*
498 U.S. 1 (1984) ............................................................................ 147

*Ford v. Georgia,*
498 U.S. 411 (1991) ........................................................................ 147

*Foster v. Chatman,*
136 S. Ct. 1737 (2016) ..................................................................... 165

*Giglio v. United States,*
405 U.S. 150 (1972) .................................................................. 132, 133

*Gray v. Epps,*
616 F.3d 436 (5th Cir. 2010) ..................................................... *passim*

*Guo v. State,*
2005 WL 1706986 (Tex. App.—Corpus Christi, July 21, 2005) ............ 13

*Haynes v. Cain,*
298 F.3d 375 (5th Cir. 2002) (en banc) ............................................. 106

*Hernandez v. New York,*
500 U.S. 352 (1991) ........................................................................ 166

*Hinton v. Alabama,*
571 U.S. 263 (2014) .......................................................... 108, 116, 167

*Holbrook v. Flynn,*
475 U.S. 560 (1986) ........................................................................ 152

*Johnson v. Mississippi,*
486 U.S. 578 (1988) .......................................................... 129, 146, 147

*Jones v. Davis,*
927 F.3d 365 (5th Cir. 2019) ..................................................... 160, 163

*Jurek v. Texas,*
  428 U.S. 262 (1976) ....................................................................... 138

*Lee v. Kemna,*
  534 U.S. 362 (2002) ................................................................ 147, 148

*Long v. State,*
  823 S.W.2d 259 (Tex. Crim. App. 1991)............................................ 152

*Lyons v. McCotter,*
  770 F.2d 529 (5th Cir. 1985) ......................................................... 129

*McCoy v. Louisiana,*
  138 S. Ct. 1500 (2018) ........................................................*passim*

*Michigan v. Mosley,*
  423 U.S. 96 (1975) ................................................................ 158, 159

*Miller-El v. Cockrell,*
  537 U.S. 322 (2003) ...........................................................*passim*

*Miller-El v. Dretke,*
  545 U.S. 231 (2005) ...................................................................... 166

*Minnick v. Mississippi,*
  498 U.S. 146 (1990) ...................................................................... 162

*Miranda v. Arizona,*
  384 U.S. 436 (1966) ........................................................ 158, 159, 162

*Mooney v. Holohan,*
  294 U.S. 103 (1935) ...................................................................... 131

*Morgan v. Illinois,*
  504 U.S. 719 (1992) ...................................................................... 149

*Murray v. Carrier,*
  477 U.S. 478 (1986) ...................................................................... 148

*Napue v. Illinois,*
  360 U.S. 264 (1959) ........................................................ 131, 132, 133

*Osborn v. Shillinger,*
  861 F.2d 612 (10th Cir. 1988) ....................................................... 106

*Osborne v. Ohio,*
  495 U.S. 103 (1990) ...................................................................... 147

*Oursbourn v. State,*
    259 S.W.3d 159 (Tex. Crim. App. 2008)..................................... 154, 155

*Parker v. Gladden,*
    385 U.S. 363 (1966) ................................................................ 144, 149

*Porter v. McCollum,*
    558 U.S. 30 (2009) ........................................................... 118, 119, 122

*Rhines v. Weber,*
    544 U.S. 269 (2005) ...................................................... 114, 134, 149

*Richards v. Quarterman,*
    566 F.3d 553 (5th Cir. 2009) ...................................................... 119

*Rompilla v. Beard,*
    545 U.S. 374 (2005) ................................................................ 119, 128

*Sears v. Upton,*
    561 U.S. 945 (2010) ...................................................................... 122

*Smith v. Robbins,*
    528 U.S. 259 (2000) ................................................................ 167, 168

*Snyder v. Louisiana,*
    552 U.S. 472 (2008) ................................................................ 165, 166

*Strickland v. Washington,*
    466 U.S. 668 (1984) ................................................................*passim*

*Trevino v. Thaler,*
    569 U.S. 413 (2013) ................................................................*passim*

*Turner v. Louisiana,*
    379 U.S. 466 (1965) ................................................................ 144, 149

*United States v. Agurs,*
    427 U.S. 97 (1976) .................................................................. 133, 134

*United States v. Banegas,*
    600 F.3d 342 (5th Cir. 2010) .................................................... 141, 151

*United States. v. Barham,*
    595 F.2d 231 (5th Cir. 1979) .......................................................... 134

*United States v. Cronic,*
    466 U.S. 648 (1984) ................................................ 104, 105, 106, 109

*United States v. Hernandez,*
  574 F.2d 1362 (5th Cir. 1978) ..................................................... 156, 157, 159, 160

*United States v. Holman,*
  314 F.3d 837 (7th Cir. 2002) ............................................................................ 105

*United States v. O'Keefe,*
  169 F.3d 281 (5th Cir. 1999) ............................................................................ 133

*United States v. Swanson,*
  943 F.2d 1070 (9th Cir. 1991) ........................................................... 106, 116, 139

*Wainwright v. Sykes,*
  433 U.S. 72 (1977) ........................................................................................... 148

*Walbey v. Quarterman,*
  309 Fed. App'x 795 (5th Cir. 2009) .................................................................. 122

*Walker v. Martin,*
  562 U.S. 307 (2011) ......................................................................................... 147

*Wellons v. Hall,*
  558 U.S. 220 (2010) ......................................................................................... 147

*Wiggins v. Smith,*
  539 U.S. 510 (2003) ................................................................................. 118, 119

*Wiley v. Sanders,*
  647 F.2d 642 (6th Cir. 1981) ............................................................. 107, 117, 139

*Williams v. Taylor,*
  529 U.S. 362 (2000) ................................................................................. *passim*

*Yarborough v. Gentry,*
  540 U.S. 1 (2003) ............................................................................................ 115

*Young v. State,*
  8 S.W.3d 656 (Tex. Crim. App. 2000) ........................................................ 108, 116

**Statutes**

28 U.S.C. § 1331 ...................................................................................................... 9

28 U.S.C. § 2241 ...................................................................................................... 9

28 U.S.C. § 2254 .............................................................................................. *passim*

TEX. CODE CRIM. PROC. art. 11.071 ................................................................. 53, 74, 79

TEX. CODE CRIM. PROC. art. 15.17 ......................................................................... 42

TEX. CODE CRIM. PROC. art. 26.052(d)(2)(C).............................................. 16, 17, 34, 35

TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1) ....................................................... 138, 145

TEX. CODE CRIM. PROC. art. 38.22 ................................................................... 154, 155

## Other Authorities

TEX. R. EVID. 606(b) ......................................................................................... 146

U.S. CONST. amend. V .............................................................................. *passim*

U.S. CONST. amend. VI ............................................................................. *passim*

U.S. CONST. amend. XIV ................................................................. 131, 149, 154

## INTRODUCTORY STATEMENT

On November 8, 2012, James "Sid" Crowley met Cynthia Andrus for the first time. Cynthia's son, Terence Andrus, had just been found guilty of capital murder. Mr. Crowley was Terence's[1] court-appointed attorney. The punishment phase of the trial had been ongoing for nearly a week and the state would rest later that day. Then it would be Terence's turn to persuade the jury to spare his life. Despite never having met Cynthia—who had bragged about having a life insurance policy on Terence that she could cash in if he was executed—Mr. Crowley decided that she would be the star punishment phase witness.

Cynthia had not come willingly to the courthouse. She had refused to appear and had to be subpoenaed. Cynthia had spent most of her adult life as a drug dealer and a prostitute. She sold crack and "drank," a concoction consisting of prescription pain killers and soda, out of her house in the Third Ward where her five children (all from different fathers) slept in a single bed.

A rotating cast of violent men and drug dealers lived there as well, several of whom fathered children with Cynthia before disappearing from their children's lives, often to prison and sometimes to young deaths on the street. Before doing so, however, they would help Cynthia terrorize the children, holding them down while she beat them with a board wrapped in duct tape and then taking up the beatings themselves

---

[1] In this section, first names will be used to avoid confusion between Andrus family members with the same last name.

1

when Cynthia had exhausted herself. One of them fathered a daughter with Cynthia and then raped her while she was a young child.

Cynthia mostly left the children to feed and raise themselves. She was frequently out selling sex or partying. Sometimes she would set up in a hotel room by herself to binge on drugs for weeks at a time. In her absence, Terence, her second child, was left to care for and raise his mentally-disabled older half-brother and three younger half-siblings. By the age of 10, Terence was running the household, cooking the family meals, leading the children on treks to the convenience store to acquire food, supervising his half-siblings, getting them to school, helping them with their homework, comforting them, and keeping them out of trouble.

All the while, Terence desperately sought a father figure. His biological father was 16-years old when Terence was born and swiftly landed in prison, where he would remain for most of Terence's life. Terence became close with a neighborhood drug dealer who, unlike Cynthia's other boyfriends, refused to help her beat the children; but he was killed on the street when Terence was 12. His father briefly reappeared in his life, a period when—finally removed from Cynthia's house—Terence thrived and did extremely well. But his father quickly reoffended, and Terence was sent back to Cynthia's by his stepmother.

Once again surrounded by drugs, crime, and gangs, Terence landed in the juvenile justice system in the 9th grade. At age 15, he was reported as a runaway. By 16, he was incarcerated in the Texas Youth Commission, a dysfunctional organization that was abolished shortly after Terence was released due to its inhumane conditions

and complete failure to rehabilitate youth. Terence spent much of his time at TYC in solitary confinement, sometimes for up to 90 days as a punishment for "disruptive behavior" such as throwing paper clips. Other times, he would be sent to isolation for telling the staff he felt suicidal. Sometimes he asked to be placed in isolation to escape the violence and exploitation that permeated the "dorms," where the youths slept 20 to a room with little adult supervision. At TYC, Terence was also regularly given powerful psychotropic and antipsychotic drugs, but not as part of any sort of mental health treatment. Rather, the drugs were part of TYC's brutal and now-abandoned use of "medical restraints" to pacify youth. During Terence's time at TYC, Cynthia never came to visit him. Not on his birthday. Not on Christmas. Never.

After his release, Terence moved in with the brother of the drug dealer who had been kind to him as a child. The two worked together at the Houston Ship Channel and Terence experienced another rare period of stability and normality during which he did well. The brother, however, was a former drug dealer himself. After he reoffended, Terence was once again back with Cynthia. Sucked back into the world of violence, crime and drugs, and unable to find gainful employment, Terence dealt with his despair the way he had learned to at TYC: with powerful drugs.

At age 20, he made a tragic attempt to steal a car at a Kroger parking lot while high on a cocktail of cocaine, PCP, marijuana, and alcohol. He tried to back out of the carjacking when he saw that the car was a stick shift, but when the owner grabbed the unlicensed handgun he kept in the car, Terence shot him. A few moments later, as he escaped on foot through the parking lot, a car sped toward Terence and he

opened fire again, killing another person. Within a month, he had confessed to everything, albeit through an interrogation process that made a mockery of the Constitution.

Mr. Crowley knew virtually none of this history when he met with Cynthia just before she was set to be his star witness. Despite having been appointed as Terence's counsel nearly four years before trial, Mr. Crowley spent almost no time preparing for trial. He would later try to justify this approach by claiming that Terence was obviously guilty, so there was not much need for an investigation.

Indeed, after the guilt phase ended, Mr. Crowley dedicated his short closing argument to conceding that the State had proven all the elements of capital murder beyond a reasonable doubt. And, he did so without ever consulting with Terence about that decision.

Yet, Mr. Crowley promised the jury they would see more of a fight at the punishment phase. That fight never materialized. While the prosecution trotted out witness after witness who told stories that were not true or were grossly misleading, Mr. Crowley silently watched from counsel table and offered no rebuttal. When the prosecutors argued that the murders had not been the result of a carjacking gone horribly wrong, but were instead the work of a cold-blooded executioner who deliberately set out to kill people because he was a "sociopath," Mr. Crowley said nothing—despite the physical evidence telling a very different story. Indeed, when Mr. Crowley would give his closing argument, he would tell the jury that, yes, Terence was obviously a future danger to society.

That left mitigation as the only issue in the case. And Mr. Crowley's plan for mitigation was Cynthia Andrus. Mr. Crowley prepared Cynthia to testify by speaking with her for ten or fifteen minutes before she took the stand. Perhaps unsurprisingly, given that she had refused to testify on her son's behalf and had to be subpoenaed, she was not an enthusiastic witness. She delivered a clear message to Mr. Crowley: although she "may have had problems in [her] own life," her "life was not on trial" and she "was not about to tell any stories about [her]self." Mr. Crowley made her his star witness anyway.

True to her promise, Cynthia did not testify about her drug dealing, drug use, prostitution, violent boyfriends, or neglect of her children. Instead, she presented herself as a hardworking single mom who did her level best to steer Terence away from drugs and crime, but got stuck with a bad apple. None of this should have come as a surprise to Mr. Crowley, and it would not have if he had performed an adequate mitigation investigation.

Perhaps sensing that Mr. Crowley's performance as trial counsel would not withstand scrutiny, the State brought Terence's father, Michael Davis, to the courtroom from prison. His testimony only made matters worse. He confirmed for the jury that he had been incarcerated for most of Terence's life. But he assured the jury that he somehow always made sure Terence was looked after by good people.

After that, Mr. Crowley rested. That would be the mitigation case, the "fight" that Mr. Crowley promised the jury: a mother who said her child was just a bad kid

and a father who knew very little about his childhood, but was happy to offer his wildly optimistic, and self-serving, speculation about it.

Perplexed, and no doubt concerned about the counsel he had appointed, the trial judge suggested to Mr. Crowley that perhaps he did have at least one more witness he planned to call, hopefully an expert of some kind. Mr. Crowley initially agreed, but later clarified to the judge that "I don't think we're going to need him." An unrecorded bench conference was then held, the result of which was that Mr. Crowley would not rest, would be calling an expert, and the trial would be continued for five days.

When the trial resumed, the expert turned out to be Dr. John Roache, a psychiatrist and pharmacologist. Dr. Roache had barely spoken with Terence and knew very little about his life history. He testified generally as to the adverse effects of drugs on adolescent brain development. He was mocked on cross-examination for having come all the way to Fort Bend County to tell the jury what they already knew: that drugs are bad for you. He also testified that he could not rebut the prosecutor's suggestion that Terence was a sociopath. Mr. Crowley offered no objection and no response.

Mr. Crowley's final witness was James Martin, a jail counselor, who said he had gotten to know Terence while he was awaiting trial. Mr. Martin testified that Terence's behavior in jail had improved and that he was starting to show remorse and make progress. On cross-examination, however, Mr. Martin volunteered his "expert" opinion that Terence suffered from anti-social personality disorder.

Realizing that the only part of his trial where his counsel had "fought" had been a catastrophe, Terence himself took the stand to try to save his own life. He testified to some of the deplorable conditions of his childhood, but it was now his word against Cynthia's. The prosecutor's cross-examination was a brutal attempt to shed him of credibility and to paint him as a serial liar who took joy in killing people.

In his closing, Mr. Crowley had no choice but argue that his star witness, Cynthia, was actually a liar. But he had no evidence that Cynthia had lied or to support Terence's version of events because he had not performed a mitigation investigation. The prosecution painted Terence as a remorseless monster whose goal had always been wanton bloodshed and who had been given every opportunity in life, but was just an evil person. The jury assessed the punishment at death. As he did frequently with other cases he lost, Mr. Crowley worked closely with the prosecutors to make sure Terence's death sentence was not reversed on collateral review.

Mr. Crowley's dismal performance as Terence's counsel did not come as surprise to many in the legal community. Although he began his career as a promising prosecutor, the last decade of Mr. Crowley's career had left a trail of human wreckage behind it. His poor performance in capital cases led several defense lawyers to try to have him removed from capital appointments. At least one judge had removed him from a death penalty case just before trial, shocked by Mr. Crowley's lack of preparation and indifference to his client's interest. Mr. Crowley himself had admitted that, when he began handling capital post-conviction cases, he did not know what he was doing.

Mr. Crowley was also battling personal demons. By the time he was appointed as Terence's attorney, he had a serious alcohol abuse problem and according to a Spec's employee he was visiting his local liquor store to buy vodka and wine twice a day, five days a week. In the mid-2000s, Mr. Crowley lost his mother, father, and brother in quick succession. By the time of Terence's trial, he was in no shape to try a capital murder case.[2]

Over a multi-day evidentiary hearing in state court, a significant amount of evidence was presented establishing Mr. Crowley's deficient performance and what the trial court referred to as a "tidal wave" of mitigating evidence. The jury never heard this tidal wave; instead, the jury heard from an unlikely and improper source weighing in on the side of a death sentence. The bailiff told the jury, off record, that Terence was wearing a shock belt, which the bailiff could remotely operate to keep the jurors "safe" from Terence. In light of Mr. Crowley's grossly deficient performance and the powerful, readily available mitigation evidence that was not presented at trial, the trial court recommended relief in the form of a new punishment phase.

The Texas Court of Criminal Appeals ("CCA"), however, denied relief. After a four-page recitation of the facts, which ignored virtually all of the evidence presented at the evidentiary hearing, the CCA stated that Mr. Andrus had not met his burden under *Strickland v. Washington*, 466 U.S. 668 (1984).

---

[2] Mr. Crowley died in 2019.

8

## PARTIES

Petitioner Terence Tramaine Andrus is an inmate of the Texas Department of Criminal Justice (TDCJ). Mr. Andrus's TDCJ number is 999578 and he is housed at the Polunsky Unit, Livingston, Texas.

Respondent Lorie Davis is the Director of TDCJ's Correctional Institutions Division and an agent of the State that has custody of Mr. Andrus. She has custody pursuant to the judgment and sentence of death entered against Mr. Andrus on November 16, 2012, in *Texas v. Terence Tramaine Andrus*, No. 09-DCR-051034 (Tex. 240th Dist. Ct.—Fort Bend County).

## JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a). Venue is proper in the United States District Court for the Southern District of Texas under 28 U.S.C. § 2241(d) because it is the court for the district within which Mr. Andrus was convicted and sentenced and the district where he remains in custody.

## STATEMENT OF FACTS

I.   **Sid Crowley: A history of deficient performance in capital murder cases.**

    **A. Mr. Crowley began his career as a prosecutor.**

Mr. Crowley began his legal career as a prosecutor in the Harris County District Attorney's Office ("HCDAO"). 2 RR 169.[3] He quickly developed a reputation as a brilliant prosecutor and seemed poised to rise through the ranks at the HCDAO, but eventually lost his job there around 1990.

    **B. Mr. Crowley briefly practiced on his own, but much preferred playing the role of prosecutor than defense attorney.**

For a few years, Mr. Crowley practiced on his own. In 1993, however, he found another job working as prosecutor, this time in Fort Bend County. 2 SHRR 169. Mr. Crowley was elated to once again be a prosecutor, telling a local newspaper that he much preferred prosecuting people than serving as a defense attorney. Exh. 3. During his time at the Fort Bend County District Attorney's Office ("FBCDAO") he became close with fellow prosecutor Fred Felcman, who would later be the lead prosecutor on Mr. Andrus's case. Mr. Crowley's time at the FBCDAO did not last long, however. By 1995, he had been let go yet again. 2 SHRR 169.

---

[3] The Clerk's Record from Mr. Andrus's trial is cited as "CR" and the Reporter's Record from trial as "RR". The Clerk's Record from the state post-conviction proceedings is cited as "SHCR" and the Reporter's Record from that proceeding as "SHRR". "Exh" refers to attached to this petition.

### C. After returning again to private practice, Mr. Crowley began taking capital habeas cases, although he later admitted he had no idea how to handle them.

Once again in private practice, Mr. Crowley mostly took court appointments. Increasingly, his practice turned to death penalty cases where he would seek appointment as state writ counsel, work he subsequently admitted he did not know anything about. The results were disastrous. In 2002, he was identified as one of the worst capital defense lawyers in the State of Texas. Exh. 4 at 35–37.[4]

For example, in *Ex parte Nenno*, Mr. Crowley filed a state habeas petition consisting of only eight pages. He raised only two claims, both of which were purely record-based. Yet, it was clear from the eight-page petition that he had not even read the record. One of the claims was that trial counsel had failed to request a lesser included offense in the jury charge. A basic review of the record, however, would have shown that the trial counsel *had* requested *and* received the lesser included offense in the charge *and* that the defense attorney had argued in favor of lesser included offense at closing. Exh. 4 at 35–36. Similarly, in *Ex parte Arthur*, Mr. Crowley filed a 14-page petition containing no extra-record claims and no supporting evidence. Exh. 4 at 36. In *Ex parte Villareal*, Mr. Crowley submitted a 9-page petition that did not contain any extra-record claims or materials. *Id*. In *Ex parte Smith*, Mr. Crowley filed another 9-page petition. *Id*.

---

[4] Mr. Crowley is not specifically named in this report, although he was counsel in these cases.

Mr. Crowley came to recognize his deficiencies. In *Ex parte Rousseau*, Mr.

Crowley filed a ten-page petition. Later in that case, he would concede that:

> At the time I was appointed, I was not familiar with how to litigate a
> capital habeas corpus case and was not aware of the need to investigate
> facts outside the trial record. I also did not have enough time to devote
> to the case. As such, my representation of [the inmate] consisted of
> reading the trial record, meeting with [the inmate], conducting legal
> research on the claims I had identified from the record and drafting the
> application.

*Id.*

### D. Mr. Crowley's deplorable performance as a death penalty attorney was widely reported.

Mr. Crowley's acknowledged deficiencies as a capital attorney were widely

reported in the media in articles about Texas capital defense lawyers. A 2006

newspaper article noted that although "[Mr. Crowley] admitted that his first death

row writ, a skimpy 10-page document, lacked substance because he didn't understand

the rules of habeas corpus," his "following writs were equally scant – seven, none, 14

and 15 pages." Chuck Lindell, *Sloppy Lawyers Failing Clients on Death Row*, AUSTIN-

AMERICAN STATESMAN, Oct. 29, 2006. The following year, an article noted that

"[h]aving Sid Crowley as one's state habeas counsel was tantamount to having no

counsel at all." Chuck Lindell, *Often-Criticized System of Private Lawyers Still in

Place, After Legislation's Demise in Last Days of Session*, AUSTIN AMERICAN-

STATESMAN, June 9, 2007.

### E. Mr. Crowley was sanctioned by the State Bar of Texas for multiple violations of Texas Disciplinary Rules of Conduct.

In 2006, Mr. Crowley was sued by the State Bar of Texas and publically

reprimanded by the 240th Judicial District Court in Fort Bend County. Mr. Crowley

had been appointed to represent George S. Guo, who had been convicted of burglary of a habitation with intent to commit sexual assault and was facing 14 years in prison. 14 SHRR 143; *Guo v. State*, 2005 WL 1706986, at *1 (Tex. App.—Corpus Christi, July 21, 2005). The appellant's brief was due on or about October 6, 2003. 14 SHRR 143. Mr. Crowley failed to timely file the brief, stating that he "was occupied with several other legal matters," and failed to file a Motion to Extend Time to File the brief on or before October 21, 2003. *Id.* at 143. Moreover, Mr. Crowley failed to apprise Mr. Guo regarding the status of his appeal or notify him that he had failed to timely file the brief. *Id.* at 143–44.

In March of 2004, Mr. Guo sent two letters to Mr. Crowley demanding that he file the now exceedingly late brief. *Id.* at 144. On or about March 12, 2004, Mr. Crowley filed a Motion to Extend Time to File the brief, and the time was extended to April 8, 2004. *Id.* at 144. Yet, Mr. Crowley did not file the appellant's brief by the new deadline. *Id.* at 144. Rather, he filed it another 3 weeks late, on April 29, 2004. *Id.* at 144.

Ultimately, a Fort Bend district court found that Mr. Crowley had violated multiple Texas Disciplinary Rules of Professional Conduct, including Rule 1.01(b)(1) (neglecting a legal matter entrusted to a client); Rule 1.01(b)(2) (frequently failing to carry out completely the obligations owed to a client), and Rule 1.03(a) (failing to keep a client reasonably informed about the status of a matter and failing to promptly comply with reasonable requests for information). At the urging of the Texas State Bar, the court entered a judgment of public reprimand against Mr. Crowley.

### F. Mr. Crowley was found to be constitutionally ineffective by a court in Matagorda County and was removed as counsel on the eve of trial.

Around the same time, Mr. Crowley received an even more serious reprimand from the 130th Judicial District Court in Matagorda County. Mr. Crowley had been appointed to represent Francisco Castellano in a death penalty case that was set for trial on March 20, 2006. On December 15, 2005, the trial court held a hearing at which it found Mr. Crowley ineffective and removed him from the case. 14 SHRR 108–09. The court noted that as of November 23, 2005—about four months before trial—"no work had been done on this case in which a man's life is at stake." *Id.* at 104. Disgusted, the court found that "Mr. Crowley's defense provided to the defendant to date has been ineffective and that his plan for providing a defense to the defendant would be ineffective if allowed to be put into place." *Id.* at 108–09. Accordingly, the court reached "the conclusion that Mr. Crowley is ineffective in his defense of Mr. Castellano." *Id.* at 109. "[T]herefore, I am removing and will remove Sidney Crowley as first chair counsel and as counsel for the defendant Francisco Castellano on grounds of ineffectiveness." *Id.*

The court also found reason to believe that Mr. Crowley was in contempt of court based on his failure to meet the obligations of first chair counsel in a death penalty case and stated its intention to initiate contempt proceedings against him. *Id.* at 107–08. In assessing Mr. Crowley's overall performance, the court reflected: "to state that you have done a monumental disservice to this court and to the profession is an understatement." *Id.* at 112.

14

After Mr. Crowley was removed from the case, James Stafford was appointed as first chair. The new defense team was then able to reach a plea agreement with the State, for which the State waived the death penalty.

### G. Multiple Texas defense attorneys tried to warn courts not to appoint Mr. Crowley as counsel in death penalty cases.

As Mr. Crowley's record of deficient performance grew, Texas defense attorneys tried to bring it to the attention of the courts to prevent further damage. In December of 2011, attorney Katherine Scardino, in her capacity as a representative of the Mexican Capital Legal Assistance Program ("MCLAP"), wrote to a Harris County court to express her "very serious concerns" about the appointment of Mr. Crowley as counsel for a Mexican national named Rolando Resindiz, who was facing trial for capital murder.  13 SHRR 242, 244–46. Ms. Scardino noted that she could "state without reservation that [Mr. Crowley's] reputation in our community as a competent criminal defense lawyer is not good." *Id.* at 244. Ms. Scardino cited several instances of Mr. Crowley's deficient performance in capital and other serious felony cases and expressly requested, on behalf of the Mexican government, that Mr. Crowley be removed and an "experienced, competent defense attorney be appointed." *Id.* at 245. "It is clear that Mr. Crowley should be not representing a Mexican national defendant in a capital murder case," she wrote. *Id.* at 245.

In support of Ms. Scardino's letter, attorney Tom Tickler, who had been co-counsel on the Castellano case, wrote his own letter to the judge recounting the facts of Mr. Crowley's removal from that case and stating his belief that "Mr. Crowley is an incompetent lawyer and should not be representing any defendant accused of a

case as serious as a capital murder where a person's life is at stake." *Id.* at 248, 250. Mr. Resindiz ultimately was able to retain his own lawyer to replace Mr. Crowley, and the case was dismissed.

Another attorney who took note of Mr. Crowley's repeated failure to adequately represent his clients was Philip Wischkaemper. At that time, Mr. Wischkaemper was a highly experienced death penalty attorney from Lubbock who served as the Capital Assistance Attorney for the Texas Criminal Defense Lawyers Association, where he provided training, resources, and technical assistance to attorneys representing people accused of capital crimes. 14 SHRR 247. Mr. Wischkaemper wrote to the Presiding Judge of the Second Administrative Judicial Region of Texas to inform him that Mr. Crowley had been found to be ineffective in the Castellano case. *Id.* at 219. Despite the fact that the court in the Castellano case expressly found that Mr. Crowley had rendered ineffective assistance in that case—and, as a result, removed him as counsel—Mr. Crowley continued to represent to the Second Region that he had "not been found by a federal or state court to have rendered ineffective assistance of counsel during the trial or appeal of any criminal case." *Id.* at 162, 169, 178, 186, 192, 199, 206. The Second Region's application makes clear that, pursuant to Article 26.052(d)(2)(C) of the Texas Code of Criminal Procedure, a finding of ineffective assistance in a death penalty case renders an attorney ineligible for further capital appointments. *Id.* at 162, 169, 178, 186, 192, 199. (It is also telling that when asked to list references, Mr. Crowley never identified another defense attorney, but instead listed only prosecutors).  *Id.* at 207, 210

Unfortunately for Mr. Andrus, Mr. Wischkaemper's attempt to sound the alarm on Mr. Crowley fell on deaf ears. The committee of the Second Region decided that the "mere remarks of a trial judge will not disqualify an attorney from being placed on the list of qualified death penalty counsel." *Id.* at 219. Of course, the committee's reading of Article 26.052 seems incongruous with its plain language and its purpose. Yet, Mr. Crowley remained on the capital appointments list.

### H. After losing cases, Mr. Crowley would work closely with prosecutors to ensure that the verdict was not overturned.

Unsurprisingly, Mr. Crowley's cases would often end up in post-conviction review. Frequently, Mr. Crowley would work closely with the state to ensure that his client's conviction and sentence were not reversed. For example, in connection with a client named Tamina Hamid, Mr. Crowley directly assisted the prosecutors in assembling their answer and developing their litigation strategy against his client. Exh. 5; 18 SHRR 277–78. In connection with claims made by George Guo, the state reminded Mr. Crowley to submit his court-ordered affidavit and offered to help him however they could, including by giving him access to their files. Exh. 6.

Frequently, the prosecutors would draft affidavits for Mr. Crowley to submit in support of their efforts to preserve the convictions. 18 SHRR 277–78, 280–81; 2 SHRR 163–64. Mr. Andrus' case would be no different. The prosecutors prepared a 72-paragraph affidavit for Mr. Crowley to sign, complete with record citations and explanations of what "in my mind" the key issues in case were and what his strategic decisions were. *Id.* at 204–19. Only in a few places would Mr. Crowley need to literally "fill in the blanks" with information such as how many years he had been practicing

17

law. *Id.* at 198–219. Mr. Crowley was in regular email communication with the prosecutors throughout the state writ process and met with them extensively before he testified at the evidentiary hearing. *Id.* at 198–202; 2 SHRR 142–43.

## I. Mr. Crowley suffered from severe substance abuse and personal loss.

Mr. Crowley's history of deficient performance may at first seem perplexing, particularly given that when he started his career he impressed many of his colleagues and the legal community had high hopes for him. Mr. Crowley, however, battled substance abuse issues, including during the time that he represented Mr. Andrus. By the time he was appointed as Mr. Andrus's counsel, Mr. Crowley was visiting his local liquor store twice a day, five days a week to buy vodka and wine. Exh. 6. Sometimes, he would smell of urine while in the store; other times, he would have visible signs of human waste on his clothing. Exh. 6. Mr. Crowley also experienced a run of personal tragedies around this time, losing his brother, father, and mother.

## II. Mr. Crowley's complete failure to conduct any semblance of a proper investigation into Mr. Andrus's case.

### A. After Mr. Crowley was appointed Mr. Andrus's attorney, he did not visit him for eight months. Meanwhile, Mr. Andrus tried to kill himself in jail.

Mr. Crowley was appointed lead counsel for Mr. Andrus on February 17, 2009, about two weeks after Mr. Andrus was indicted. 1 CR 2; 14 SHRR 82. Mr. Crowley accepted the appointment, even though he was already representing several other capital murder defendants in Fort Bend County. 2 SHRR 181–84; 18 SHRR 223-54. Mr. Crowley would go on to accept even more capital appointments as Mr. Andrus s

trial approached, not to mention a multitude of other criminal appointments. 2 SHRR 181–184; 18 SHRR 223-54.

After being appointed as Mr. Andrus's trial counsel, Mr. Crowley did nothing. He did not visit Mr. Andrus in jail or do anything else on the case for at least seven months. 14 SHRR 6. On August 26, 2009, he briefly appeared in court on behalf of Mr. Andrus, despite never having met him. *Id.* at 6. At the time, Mr. Crowley officed at the Lyric Center in downtown Houston, a few blocks away from the jail where Mr. Andrus was being held.

Over the three-and-a-half years Mr. Crowley represented Mr. Andrus, he recorded only six visits to Mr. Andrus in his billing statements—less than twice a year. 2 SHRR 184. He spent less than 150 hours outside the courtroom preparing the case—less than a month's worth of work. 14 SHRR 6–14. Ms. Olvera, who was appointed as second chair in June of 2012, three months before voir dire, ended up billing more time on the case than Mr. Crowley did in almost four years. 3 SHRR 139; 14 SHRR 17–26.

Meanwhile, Mr. Andrus was struggling in pretrial detention. He reported suicidal impulses and visual and auditory hallucinations (including seeing the dead bodies of the victims and a voice telling him that his life was over). He assaulted several guards and had to be extracted from his cell several times. He even attempted suicide, slitting his wrists and writing "I want to die" in blood on the walls of his cell. 28 SHRR 32, 54, 56; 29 SHRR 241.

Mr. Crowley finally visited Mr. Andrus for the first time on October 4, 2009, over eight months after he was appointed. 14 SHRR 78. By that time, Mr. Andrus had been moved from the Harris County jail to Fort Bend County. *Id.* During this initial visit, Mr. Crowley did not explain to Mr. Andrus—and never would—that his conduct in jail could and would be used against him at the punishment phase of his trial or that it might influence whether the State would seek the death penalty. 2 SHRR 191–92, 199.

Nor did Mr. Crowley perform any investigation as to what had happened to his client in the Harris County jail that caused him to attempt suicide. 2 SHRR 194. Indeed, he would later profess that he had no idea Mr. Andrus had tried to kill himself, even though the event was clearly indicated in Mr. Andrus's jail records. *Id.* at 191–92, 199. Instead, Mr. Crowley simply assumed that any problems Mr. Andrus seemed to be experiencing were malingering on his part, despite his jail records reflecting diagnoses for schizophrenia, mood disorder, schizophrenia affective disorder, and bipolar disorder. 2 SHRR 196; 3 SHRR at 264–65, 300.

As of February of 2010, a year into his appointment as Mr. Andrus's attorney, Mr. Crowley had not filed a single motion. Mr. Andrus, recognizing that no work had been done on his case, began filing handwritten motions, including a motion for exculpatory evidence and a motion to suppress his confession. CR 14–18. As it did with Mr. Andrus's later motion to remove Mr. Crowley as his attorney, the court simply ignored the motions and did not rule on them.

### B. After the State decided to seek the death penalty, Jerome Godinich and Amy Martin were appointed to the case.

On May 17, 2010, the State gave notice that it intended to seek the death penalty. CR 19. Over a year would pass, however, before Mr. Crowley would visit Mr. Andrus to discuss that with him. 14 SHRR 78–79. A second chair counsel, Jerome Godinich, was appointed by the trial court on May 19, 2010. CR 61. Mr. Godinich immediately brought in a mitigation specialist, attorney (and now district court judge) Amy Martin. 14 SHRR 35. Both Mr. Godinich and Ms. Martin would ultimately end up withdrawing from the case due to Mr. Crowley's unwillingness to adequately prepare for Mr. Andrus's trial. 13 SHRR 224.

### 1. Mr. Godinich began to regularly visit Mr. Andrus, while Ms. Martin worked as the mitigation specialist; Mr. Crowley did nothing.

Mr. Godinich immediately began having regular meetings with Mr. Andrus. 13 SHRR 228; 14 SHRR 253. Mr. Godinich worked on establishing a rapport with Mr. Andrus, discussing possible mitigation themes, and discussing the possibility of a plea deal. 13 SHRR 228–29. Ms. Martin, meanwhile, began a preliminary mitigation investigation. Initially, Ms. Martin planned on developing a mitigation case that would persuade the State not to seek the death penalty. Mr. Crowley, however, informed Ms. Martin that he did not want her to create a mitigation packet to give to the State. *Id.* at 236. He seemed to be in denial that Mr. Andrus was actually on trial for his life, telling her as late as September of 2011 that he did not know if the State would seek death. *Id.* at 234. But, the State had filed its notice of intention to seek the death penalty over a year earlier. CR 19.

### 2. Ms. Martin met Cynthia, who told her she was hoping to collect a $10,000 life insurance policy when her son was executed.

Nonetheless, Ms. Martin continued to gather documents and attempt to locate members of Mr. Andrus's immediate family. Early on, both she and Mr. Godinich understood that it would take some time and effort to find people who could tell them about Mr. Andrus's life and get them to open up. 13 SHRR 229, 233–38. Ms. Martin did eventually manage to secure an interview with Cynthia. Cynthia would only agree to meet at a diner and only on the condition that Ms. Martin pay for her food. *Id.* at 237. Cynthia brought one of her daughters with her, but would not allow the daughter to speak with Ms. Martin. *Id.* In front of her daughter, Cynthia told Ms. Martin that she "had too many kids." *Id.* She also told Ms. Martin that she had a $10,000 life insurance policy on Mr. Andrus and that she would be able to collect on the policy when Mr. Andrus was executed. *Id.*

### C. The team stops work on Mr. Andrus's case to handle the Howe case.

During the time that Mr. Godinich and Ms. Martin worked on the case, Mr. Crowley did no work on the case. Mr. Godinich and Ms. Martin, however, could not carry the entire load on Mr. Andrus's case because they were doing just that in another death penalty case in which they had been appointed together with Mr. Crowley. The defendant in that case was a man named Richard Howe. 13 SHRR 234.

### 1. As with Mr. Andrus's case, Mr. Crowley did nothing on Mr. Howe's case.

The Howe case was set for trial before Mr. Andrus's. As with Mr. Andrus's case, Mr. Crowley did virtually no work on Mr. Howe's case, instead leaving all the work

to Mr. Godinich and Ms. Martin. 13 SHRR 225–26. When voir dire began in Mr. Howe's case, Mr. Crowley had not spoken to a single witness, consulted with a single expert, or conferred with a mitigation specialist, despite nominally being lead counsel. *Id.* He claimed that he would hire an investigator, but he refused to share the investigator's name with Mr. Godinich or Ms. Martin. *Id.*

Nona Dodson, an experienced jury consultant who had been appointed on the Howe case, also observed that Mr. Crowley had done little to no work on the case prior to the start of trial. *Id.* at 221. Ms. Dodson would send Mr. Crowley pages of notes and questions to ask prospective jurors, identifying particular issues that arose from the jurors' answers to the questionnaires, but Mr. Crowley "was completely disinterested in, and indifferent to, receiving assistance from me or anyone else on the defense team." *Id.* at 220–21. "It was painfully obvious that Mr. Crowley had not done any preparation before coming into court each day." *Id.* at 221.

### 2. Mr. Crowley ultimately agreed to withdraw from the Howe case.

Mr. Godinich became "increasingly concerned about Mr. Crowley's representation of Mr. Howe." 13 SHRR 226. Mr. Crowley simply refused to "participate in any trial preparation" and it was clear to Mr. Godinich that "Mr. Crowley was not providing effective representation of Mr. Howe." *Id.* Mr. Godinich asked Mr. Crowley to withdraw from the case. Mr. Crowley was suffering from serious health issues at the time, and Mr. Godinich and the rest of the team suggested to Mr. Crowley that they would support a motion to withdraw based on health reasons. *Id.* Mr. Crowley agreed and filed a motion to withdraw. *Id.*

### 3. After speaking with Fort Bend prosecutor Fred Felcman, Mr. Crowley rescinded his withdrawal, and asked that the case still be tried soon because he needed money.

Shortly thereafter, however, Mr. Crowley spoke to Fred Felcman, the lead prosecutor on both the Howe case and Mr. Andrus's case. Mr. Felcman convinced Mr. Crowley that he had lied to the court when he cited "back pain" as the ground for withdrawing from the case. 4 SHRR 21–22. On Mr. Felcman's advice, Mr. Crowley sought to rescind his motion to withdraw. He would later testify that Mr. Godinich and Ms. Martin "blackmailed" him into withdrawing by threatening to inform the trial judge of his removal on ineffectiveness grounds in the Castellano case. 3 SHRR 11–12.

After Mr. Crowley rescinded his motion to withdraw, the court held a hearing in the Howe case. Mr. Godinich and Ms. Dodson both expressed to the court their serious concerns about Mr. Crowley. 13 SHRR 226; *id.* at 221. Ultimately, however, the court permitted Mr. Crowley to remain on the case. At the same time, however, he determined that the defense team was clearly not ready to try the case, dismissed the seated jurors and the remaining venire panel, and reset the case for a new trial date. 3 SHRR 14. Mr. Crowley demanded that the trial be reset for some time before the end of the year because he owed the IRS money, but the court refused to do so. 13 SHRR 235.

24

### 4. The Court assigned Mr. Crowley specific tasks to perform as defense counsel, but Mr. Crowley was incapable of accomplishing them.

The trial judge held a special meeting with the defense team. To address their concerns about Mr. Crowley, the judge proposed that specific tasks be assigned to Mr. Crowley and that there be weekly meetings to monitor Mr. Crowley's progress. 13 SHRR 227. Specifically, Mr. Crowley was assigned to take the lead on handling extraneous offenses, which were critical to the case because there appeared to be several opportunities to have at least some of the offenses excluded. *Id.* Yet, Mr. Crowley failed to show up for the first check-in meeting. *Id.* Nor did he attend any of the defense team meetings or join any conferences with experts for either phase of the trial. *Id.*

### 5. Mr. Crowley received multiple offers from the prosecution for Mr. Howe to plead to a life sentence, but kept the offers to himself.

Before closing arguments in the guilt phase of Mr. Howe's second trial, Mr. Crowley informed Mr. Godinich that the State had offered a plea deal to Mr. Howe. 13 SHRR 227. Incredibly, Mr. Crowley then questioned whether the defense team should tell Mr. Howe about the plea offer. *Id.* Mr. Crowley then revealed that the prosecution had made multiple offers in the past that Mr. Crowley had not informed the defense team or the client of. *Id.* Mr. Howe ultimately accepted the plea agreement. *Id.*

### D. Mr. Crowley excised Mr. Godinich and Ms. Martin from Mr. Andrus's case by secretly agreeing to a trial date when Mr. Godinich had a conflict.

Because Mr. Crowley, Mr. Godinich, and Ms. Martin were all appointed to Mr. Howe's case and it was scheduled for trial before Mr. Andrus's case, virtually no work was done by anyone on Mr. Andrus's case while the Howe case was pending. 2 SHRR 187, 215–16; 3 SHRR 6, 20, 146; 13 SHRR 228–29. Yet, shortly before the Howe case reached a conclusion, Mr. Crowley informed Mr. Godinich and Ms. Martin that in January of 2012 he had met with Judge Culver, who was presiding over Mr. Andrus's case, and agreed to set Mr. Andrus's case for trial in November of 2012, with voir dire to begin on October 1, 2012. 13 SHRR 228. Mr. Crowley did so without consulting with either Mr. Godinich or Ms. Martin. *Id.*

Mr. Godinich informed Judge Culver that he had a conflict in November of 2012 and could not possibly try the case then. *Id.* Judge Culver then asked Mr. Crowley, "Sid, are you asking me for more time?" *Id.* Mr. Crowley responded "no." *Id.* With that, Mr. Crowley forced Mr. Godinich off the case. Disgusted by Mr. Crowley's behavior in both the Howe case and Mr. Andrus's case, Mr. Godinich and Ms. Martin both withdrew in late January of 2012. *Id.* Mr. Crowley would never retain a mitigation specialist to replace Ms. Martin.

### E. At the time that Mr. Godinich and Ms. Martin withdrew, the case was nowhere near ready for trial.

Prior to withdrawing from the case, Ms. Martin had begun preliminary work on the mitigation side of the case and had developed some promising leads. But the case was far from ready for trial. According to Mr. Godinich, "the case was not ready

26

to go to trial" when he and Ms. Martin withdrew, because "[t]here was still a significant amount of investigation to be done in order to develop and prepare a punishment phase presentation." 13 SHRR 230. This incomplete work including needing to conduct "repeated interviews with immediate family members, if possible, as well as people outside the family who had known Andrus well, and retention of experts and development of their testimony for trial." *Id.* Ms. Martin agreed

> As of the time Mr. Godinich and I left Andrus's case, the case was not ready to go to trial. There was still a significant amount of investigation to be done in order to develop and prepare a punishment phase presentation, including repeated interviews with immediate family members, locating and interviewing significant people in Andrus's life, including teachers, medical professionals, and individuals in the legal system, etc. Document collection needed to continue and information needed to be provided to experts. Had the case gone to trial prematurely, with only the amount of investigation that had been done as of the time I withdrew, I would not have considered it to have met the standard of care for mitigation investigations in a capital case.

*Id.* at 229.

### F. Mr. Godinich and Ms. Martin convinced Mr. Andrus to plead to life without parole, but Mr. Crowley never brought the offer to the prosecution.

One thing that had been accomplished before Mr. Godinich and Ms. Martin withdrew from the case was that they had convinced Mr. Andrus to plead guilty with a sentence of life without parole. 13 SHRR 233. Mr. Crowley was the only member of the defense team who communicated with counsel for the State about Mr. Andrus's case. 2 SHRR 176. Although Mr. Crowley later testified that he did go to the State with Mr. Andrus's offer of life without parole, Mr. Felcman contradicted him, confirming that Mr. Crowley never told him Mr. Andrus would have agreed to life without parole. *Id.* at 210–12; 218; 5 SHRR 25.

### G. After agreeing to a short trial schedule, Mr. Crowley once again did nothing on Mr. Andrus's case for five months.

Having expelled the only two people from his team who did any work on Mr. Andrus's case and facing an October 1, 2012 start date for vior dire, Mr. Crowley again did nothing. Over the following five months, from February to July of 2012, Mr. Crowley worked a total of five hours on the case. 14 SHRR 8. Mr. Crowley also never met with Mr. Andrus to discuss the withdrawal of Mr. Godinich and Ms. Martin.

### H. Mr. Andrus sought to have Mr. Crowley removed as counsel, but the court refused to take up his Pro Se motion.

In June of 2012, after learning that Mr. Godinich and Ms. Martin had stopped working on his case, Mr. Andrus filed a pro se motion requesting that the Court dismiss Mr. Crowley as appointed counsel. 3 SHRR 39; CR 65–67. Mr. Andrus also wrote letters to the trial judge and to the disciplinary counsel of the State Bar of Texas, explaining that Mr. Crowley had not been visiting him or consulting with him about his defense. 14 SHRR 87–91, 93–95. Mr. Crowley would later admit that he did not meet with Mr. Andrus after these pro se motions were filed to discuss his client's concerns. 3 SHRR 40. Mr. Andrus's motion to remove Mr. Crowley as his appointed attorney was never heard or ruled on by the trial court.

### I. In June of 2012, three months before the state of voir dire, Diana Olvera was appointed as second chair counsel.

For the first half of 2012, while Mr. Crowley spent less than an hour a month on Mr. Andrus's case, there was also no second chair attorney. In June of 2012, Mr. Crowley finally secured a new second chair, Diana Olvera. CR 64. Despite having

joined the team less than three months before the start of voir dire, they did not seek a continuance.

### J. Most of Ms. Olvera's pre-trial work consisted of reviewing the case documents that had been provided by the state or by Ms. Martin.

Ms. Olvera's role was circumscribed. She would later testify that she "didn't do mitigation," did not investigate the facts of the underlying offenses, and did not investigate the State's extraneous offenses. 4 SHRR 22, 24, 28, 105. Her knowledge of the history of the case was also limited. For instance, she did not know that Mr. Andrus had filed a pro se motion to suppress his confession a year and a half before Mr. Crowley filed a similar motion. *Id.* at 117–18. Most of Ms. Olvera's time prior to trial was spent reviewing documents that had been collected by Ms. Martin and the State's discovery. *Id.* at 22–26.

### K. Mr. Crowley did not seek any experts until one month before voir dire.

Mr. Crowley was responsible for finding and working with appropriate experts. 4 SHRR 30. Although he had been appointed to the case for over three and a half years, Mr. Crowley did not contact a single expert until late August, a few weeks before voir dire began. 13 SHRR 50; *id.* at 97; 14 SHRR 57. Ultimately, Mr. Crowley contacted three experts, only one of whom he called at trial. Ms. Olvera later testified that it was "not reasonable" for Mr. Crowley to have waited until right before voir dire to contact potential experts. 4 SHRR 35.

29

### 1. Mr. Crowley retained a clinical psychologist who concluded that Mr. Andrus suffered from a serious mental health condition, but Mr. Crowley did not read his report.

One expert that Mr. Crowley eventually contacted was Dr. Jerome Brown, a clinical psychologist. Mr. Crowley initially contacted Dr. Brown in September of 2012, less than one month before the start of voir dire, to conduct a psychological evaluation of Mr. Andrus. 13 SHRR 32. Mr. Crowley provided Dr. Brown with "limited life history documents to review." *Id.* at 32. Dr. Brown interviewed Mr. Andrus once on September 20, 2012, less than two weeks before voir dire commenced. *Id.*

Based on his limited evaluation, Dr. Brown concluded that Mr. Andrus suffered from "symptoms of severe mental illness" and that he had "multiple psychiatric problems." 10 SHRR 178. Dr. Brown found that the shootings "appear to have been the result of extreme provocation that took place both at the time of the offense [sic]." *Id.* According to Dr. Brown, Mr. Andrus "was paranoid and frightened when he saw the complainant draw a weapon," that "his first instinct was to fire shots from his own weapon," that "[w]hile in this paranoid and agitated state, he fired shots at another car that was approaching him and that he perceived to be a threat at the time," and that "[t]his resulted in a combination of events that would not have occurred except for these unusual circumstances." *Id.* Finally, Dr. Brown concluded that Mr. Andrus might suffer from "Schizophrenia, Paranoid type." *Id.* at 179.

On October 12, 2012, Dr. Brown submitted his report to Mr. Crowley by regular mail, email, and fax. 13 SHRR 50. Yet, by his own admission, Mr. Crowley never read Dr. Brown's report. Mr. Crowley blamed this on the fact that Dr. Brown sent the

report to Mr. Crowley's "old office address," even though that was the address Mr. Crowley had given Dr. Brown. 3 SHRR 131–32, 256. Mr. Crowley never followed up with Dr. Brown. *Id.* at 131–33. He blamed his failure to do so on a conversation with Dr. Brown, of which there is no record, in which Dr. Brown purportedly told him, contrary to the conclusions in his report, that Mr. Andrus showed no signs of mental illness. *Id.* at 132–33. Mr. Crowley never contacted Dr. Brown again and did not read his report until after trial. *Id.* at 131–33.

### 2. Mr. Crowley retained Dr. Roache, but provided him with little information and urged him to talk freely with Mr. Felcman.

The only expert who would end up testifying was Dr. John Roache, a psychiatrist and pharmacologist. Mr. Crowley contacted Dr. Roache for the first time on August 23, 2012, just over a month before the start of voir dire. 13 SHRR 97. Dr. Roache was provided with limited life history records and the offense reports. *Id.* at 98. Dr. Roache had previously worked on several capital cases, all in Texas, and typically received information about a defendant's life history from a mitigation specialist retained by the defense team, often in the form of a mitigation report. *Id.* Dr. Roache informed Mr. Crowley that social history and childhood development information would be valuable to inform his evaluation and testimony. *Id.* at 99. However, because there was no mitigation specialist on the case, Dr. Roache was never put in touch with one. *Id.* at 98. Nor was Dr. Roache provided with a mitigation report or any documentation of interviews with family and friends (since none existed). 3 SHRR 106; 13 SHRR 98.

Dr. Roache interviewed Mr. Andrus briefly at the Fort Bend County jail on September 28, 2012, three days before the start of voir dire. 13 SHRR 99. He debriefed with trial counsel that same day and was "struck by the extent to which Mr. Crowley appeared unfamiliar or naïve with issues relating to brain development, drug addiction, and other such mitigation issues relative to other capital attorneys [he] h[ad] worked with." *Id.*

Mr. Crowley then made a very unusual request to Dr. Roache. He asked him to speak with Mr. Felcman, the prosecutor, about his intended testimony. *Id.* at 99–100. During the call with Mr. Felcman, Dr. Roache was "very uncomfortable with the extent to which the prosecutor wanted to go broadly into the subject of [his] testimony." *Id.* The "conversation was certainly not limited merely to [his] own qualifications to testify." *Id.* Mr. Crowley would later admit that he saw no problem with having his client's experts have unmonitored conversations with Mr. Felcman. *Id.* at 109–10.  Indeed, he had Mr. Feclman speak with Dr. Brown as well. 5 SHRR 36.

### L. Ms. Olvera did not do any substantive mitigation work; Mr. Crowley did none.

Despite being someone who "didn't do mitigation," Ms. Olvera performed the only tasks that seem to have had any relation to a possible mitigation defense. The only interviews that Ms. Olvera performed relating to mitigation were to have a couple of phone conversations with Cynthia, Mr. Andrus's grandfather, and possibly Mr. Andrus's younger brother Trevion, who was 13 years old at the time. 4 SHRR 15–25. She never met any of the family members in person. *Id.* at 26. One potentially

helpful thing Ms. Olvera did do was to talk to the Texas Defender Service ("TDS") about retaining an expert on the Texas Youth Commission ("TYC"). *Id.* at 31. Although TDS found a willing expert, Mr. Crowley never followed up with him. 3 SHRR 124.

No other mitigation investigation was done on the case. As Mr. Crowley would later admit at the writ hearing, he did not investigate Mr. Andrus's neighborhood or his childhood experiences. *Id.* at 119–20. He did not interview Mr. Andrus's older brother, Torad; his sister, Tafarrah; his sister, NormaRaye; his stepmother (with whom he had lived for a time), Rosalind Cummings; his stepbrother, Jamontrell Seals; the family of Cynthia's live-in boyfriend Senecca Booker; or family friends such as Stephanie Booker. *Id.* at 135–36. Mr. Crowley also admitted that he did not investigate any of the facts underlying the offense that resulted in Mr. Andrus's incarceration at TYC and, despite the widely-known scandal that lead to the abolition of TYC which occurred prior to trial, Mr. Crowley never consulted with an expert on TYC. *Id.* at 122–23. Meanwhile, Mr. Andrus remained in pretrial detention in Fort Bend County, where his mental state continued to deteriorate.

## III.    The State's elaborate plan to coerce Mr. Andrus into confessing.

Before trial could begin, there was one issue that had to be taken up, which was the motion to suppress Mr. Andrus's confession—that he had initially filed *pro se* before Mr. Felcman had asked Mr. Crowley to "refile" the motion. Exh. 18 at 7. After some time, Mr. Crowley did so, filing a one page motion to suppress the confession. A hearing was held on the motion prior to trial.  CR 97.

### A. Mr. Andrus becomes a suspect.

After the shooting occurred, the Fort Bend County Sheriff's Office ("FBCSO") obtained video footage from a nearby business of a suspect. FBSCO then sent an image from the video tape to local television stations. 40 RR 49. FBSCO received several crime stoppers tips identifying Mr. Andrus as the suspect. *Id.*

### B. The police talk with Charaya Williams, who they contend implicated Mr. Andrus in the robbery of a dry cleaners.

Detectives with FBCSCO began trying to locate Mr. Andrus by interviewing his family and acquaintances. Mr. Andrus's former girlfriend, Charaya Williams, told a detective that several months ago, Mr. Andrus told her that he robbed a Washateria with a fake gun. Exh. 9 at 3. She may also have mentioned something about a dry cleaners being robbed, but it is unclear whether she connected Mr. Andrus to that event. *Id.*

### C. The police find a dry cleaners that was recently robbed.

In any event, FBSCO identified a dry cleaners near Charaya's apartment that had been robbed two months earlier by a black man with a long knife. Exh. 10 at 5. Because the dry cleaners was located in Houston, the Houston Police Department ("HPD") responded to the robbery when it initially occurred and opened an investigation into the robbery. *Id.*

### D. The police claim they showed Mr. Tran a six person photo array; Mr. Tran contends that he was shown binders full of photos.

What happened next is a matter of dispute. FBSCO Detective Mark Williams testified that he brought a photo array to the dry cleaners and that the owner, Tuan Tran, immediately identified Mr. Andrus. Exh. 11 at 7. Even if Detective Williams's

story were true, it raises a number of serious red flags. The photo array used black and white photos with shadowing concealing the features of some of the individuals. Detective Williams knew which photo was Mr. Andrus and had already showed the line up to at least one other person. Exh. 11; State's Trial Exhibit 183. Moreover, the affidavit that accompanied the photo array, in which Mr. Tran purportedly affirmed that he had identified Mr. Andrus, was both (1) written in English and (2) contained an affirmation by Mr. Tran that he cannot read or write the English Language. Exh. 12

According to Mr. Tran, he was never shown a photo array. Exh. 13. Rather, the police brought him binders of photos. *Id.* The pages of the binder had one or two photos and they were divided by race. *Id.* The binder had about 100 to 200 photos in it, like a photo album. *Id.* Mr. Tran reviewed the binder twice before identifying someone. *Id.* He does not recall signing an affidavit for law enforcement. *Id.* Mr. Tran never saw a black and white six pack photo array. *Id.*

Although Mr. Tran testified differently at trial, no one from the defense team had spoken with him to confirm his story.

### E. The police obtain an arrest warrant with an affidavit containing inaccurate information.

FBCSO informed HPD that they had solved the robbery and that the perpetrator was Mr. Andrus. In doing so, however, they told HPD that Mr. Andrus had been fingered for the crime not by Charaya Williams, but by an anonymous crime stoppers tip. Exh. 10 at 7.  FBCSO also repeated the story about the photo array to HPD which Mr. Tran now disavows. *Id.*

Nonetheless, HPD packaged the misinformation it received from FBSCO into a warrant application. *Id.* An arrest warrant was issued by a Houston municipal court judge and Mr. Andrus was indicted for aggravated robbery in Harris County District Court. *Id.*

### F. Mr. Andrus is arrested in New Orleans.

In early November, FBSCO learned that Mr. Andrus might be in New Orleans. They contacted the New Orleans Police Department to notify them that Mr. Andrus might be there and that he had an arrest warrant out of Harris County. Exh. 15 at 2.

On Friday, November 7, 2008, Mr. Andrus was arrested by the New Orleans Police Department on the Harris County aggravated robbery warrant. Exh. 17. He was then held at the Orleans Parish Jail. Detective Jeffrey Martin of FBSCO and Texas Ranger Kip Westmoreland, who had been assisting on the murder investigation, traveled to New Orleans to interrogate Mr. Andrus at the New Orleans Parish Jail. Exh. 15 at 2.

### G. Mr. Andrus invokes his Fifth Amendment right to remain silent.

Ranger Westmoreland began the interrogation by asking Mr. Andrus questions about his background, what he was doing in New Orleans, and why he had been arrested. Exh. 14 at 1–12. Only after questioning him for some time, did Ranger Westmoreland read Mr. Andrus his *Miranda* warnings. *Id.* at 13–14. He then began asking Mr. Andrus about the murders. Mr. Andrus denied involvement in the murders and terminated the interview. *Id.* at 19. The State would later concede that,

at this point, Mr. Andrus had invoked his Fifth Amendment right to remain silent. Exh. 18 at 14.

### H. Mr. Andrus is appointed counsel in New Orleans.

Detective Martin and Ranger Westmoreland remained in New Orleans and continued to investigate Mr. Andrus by interviewing his current girlfriend and the people Mr. Andrus was staying with. Exh. 14 at 3–5. Meanwhile, Mr. Andrus had a hearing in New Orleans on Harris County's request to extradite him on the aggravated robbery warrant. Exh. 16. An attorney from the Orleans Parish Public Defender's office represented Mr. Andrus at the hearing. *Id*. Mr. Andrus ultimately waived extradition. *Id*. The waiver was signed by both Mr. Andrus and his attorney. Exh. 17 at 2.

### I. Detective Martin and Ranger Westmoreland hatch a plan to re-interrogate Mr. Andrus by superseding the extradition process.

When Detective Martin and Ranger Westmoreland learned that Mr. Andrus had waived extradition, they hatched a plan to continue their interrogation of him, despite Mr. Andrus's clear invocation of his right to remain silent. First, they contacted Harris County and told them to cancel their plan to bring Mr. Andrus back to Texas. Exh. 17 at 5. Instead, Detective Westmoreland and Ranger Martin would handle the extradition themselves. *Id*. They then informed the Orleans Parish Jail that they would personally extradite Mr. Andrus and to have him ready for them to pick up. Ranger Westmoreland and Detective Martin then went to an electronics store and purchased a long-duration digital recorder, which they concealed in their car. Exh. 18 at 11.

Neither Ranger Westmoreland nor Detective Martin ever informed Mr. Andrus's attorney that they had superseded the normal extradition process and that Mr. Andrus would be interrogated by the very same officers he had declined to speak with as part of the extradition process.

Part of what happened next is, again, a matter of dispute. Mr. Andrus would later testify that, before Ranger Westmoreland placed him in the car, he read the *Miranda* warnings, and in response, Mr. Andrus told him "I'm going to need that attorney now." Exh. 18 at 19. Ranger Westmoreland denied it and the court credited Ranger Westmoreland's testimony.

### J. Mr. Andrus, clearly confused by the situation, asks where he is going; the detectives take this to mean he has waived his Fifth Amendment right.

Immediately upon being placed in the car, Mr. Andrus asked where he was going and why. Exh. 19 at 3. Specifically, he asked whether he had been indicted and, if so, what for. *Id.* Ranger Westmoreland responded Mr. Andrus had been indicted for aggravated robbery. *Id.* Mr. Andrus then asked if he had a court date, to which Ranger Westmoreland told him that they had to get Mr. Andrus "in the system first." *Id.* Mr. Andrus then asked if any attorney had been appointed to represent him. *Id.* Ranger Westmoreland made no effort to clarify whether Mr. Andrus was requesting an attorney. *Id.*

Mr. Andrus then attempted to make small talk with the Ranger and the Detective, asking where they were staying. *Id.* In response, they began questioning him again about subject matter relating to the murders, asking him where he had

been staying in New Orleans and whether he has spoken to his girlfriend since he's been in jail. *Id.*

Detective Martin then Mirandized Mr. Andrus. *Id.* at 4. In response, Mr. Andrus again sought to clarify where he was going and why two officers who had been interrogating him about a murder in Fort Bend County were taking him to Harris County in connection with a purported aggravated robbery. *Id.*

### K. The detectives prohibit Mr. Andrus from sleeping, although it is late at night.

A few minutes later, Ranger Westmoreland told Mr. Andrus that one of the "rules" of the ad hoc extradition was that he was not allowed to sleep—even though it was already late at night when they left New Orleans. *Id.* at 13. After some additional small talk, Mr. Andrus told the officers that he planned to marry his girlfriend. *Id.* at 15. In response, Ranger Westmoreland told Mr. Andrus he needed to change his plans because "that Fort Bend County deal ain't going to go away." *Id.* at 16. He then told Mr. Andrus, "I know what happened, but I got to hear from you." *Id.*

### L. Just after crossing into Texas, the detectives urge Mr. Andrus to confess.

After being confined in the car for nearly five hours with the Detective and Ranger, the Detective "engaged [Mr. Andrus] in conversation about the case." Exh. 15 at 7. Just after the car crossed into Texas from Louisiana, when the subject of the murders had not been discussed for hours, Detective Martin launched into a lengthy speech to Mr. Andrus urging him to confess immediately. Exh. 19 at 42. The Detective emphasized to Mr. Andrus that until he confessed, the police would have no choice

but to go after those he was closest to, stating: "Everybody you talked to, everybody that you – that may be close to you, maybe a family member, maybe your girlfriend, maybe a friend, whatever, that you caused to participate in this thing after the fact is going to have some trouble." *Id*. at 41.

Detective Martin then told Mr. Andrus that unless he provided his side of the story, "it just looks like cold blooded murder.*" Id*. He also told Mr. Andrus that he and Ranger Westmoreland "knew what's down inside" of Mr. Andrus, but that "it's going to be hard to convince a judge or 12 people in the jury of all that when it's too late, after the fact, when they've seen that we've given you ample opportunity to do the right thing." *Id*. Ranger Westmoreland emphasized that "there's no judge, there's no prosecutor, there's no defense attorney, for that matter, that would argue with the fact that acceptance of responsibility and remorse, doesn't play a big part in sentencing." *Id*. at 42.

Finally, Mr. Andrus asked "if I was to make confession, what role would that play?" *Id*. at 42. Detective Martin answered: "[A] huge one. It would show that, you know, at some point, you accepted responsibility for what – what happened. But not only that, Terence, but it would also clear up some specific details about what exactly did happen. And it may have a difference between what – what your intent was, because without – without your side of the story, like I said earlier, it just looks like cold-blooded murder." *Id*. at 42–43.

### M. Mr. Andrus confesses.

Mr. Andrus told the Detective Martin and Ranger Westmoreland that he had gone to the Kroger to steal a car. *Id*. at 45. He saw a women get out of a car and he approached the car. *Id*. With a gun in his hand, he opened the door and asked the driver, whose name was Avelino Diaz, whether the car was a manual or automatic transmission, telling him further that he could not drive a manual transmission. *Id*. Seeing that it was a manual transmission, Mr. Andrus turned away to disengage from the carjacking. *Id*. But Mr. Diaz exited the car, saying "Okay, I get out of here, I get out." *Id*. Mr. Diaz had removed the firearm he kept in the car and was about to pull the pistol out of its holster. *Id*. Mr. Andrus shot him. *Id*. As Mr. Andrus ran away through the parking lot, a car approached him. *Id*. It appeared to Mr. Andrus that the car was speeding up and trying to hit him. *Id*. Mr. Andrus shot again, this time killing Kim Bui. *Id*.

After Mr. Andrus confessed, Detective Martin and Ranger Westmoreland took Mr. Andrus to the Fort Bend County Sheriff's Office, rather than their original destination of Harris County. They took Mr. Andrus to an interview room, where Mr. Andrus once again confessed. Exh. 22. Detective Martin and Ranger Westmoreland failed to mirandize Mr. Andrus again until the interrogation was almost complete. *Id*. at 42. Mr. Andrus then signed a written confession. State's Trial Exhibit 147. By that time, it was nearly 3 a.m. *Id*.

**N. Mr. Felcman directs Mr. Crowley to file a motion to suppress.**

In the motion filed by Mr. Crowley, he asserted three grounds for suppressing the confession: (1) that Mr. Andrus had invoked his right to remain silent under the Fifth Amendment; (2) that prior to questioning, Mr. Andrus requested the assistance of counsel; and (3) that he was not taken before a magistrate judge without undue delay in violation of Article 15.17 of the Texas Code of Criminal Procedure. CR 91.

The hearing on the motion to suppress did not occur until September 5, 2012, less than a month before vior dire began. At the beginning of the hearing, Mr. Felcman, the prosecutor, explained to court that Mr. Crowley would be dropping his third ground for suppressing the confession: that it was obtained in violation of Article 15.17. Exh. 18 at 6. Mr. Felcman stated that he had talked to Mr. Crowley and explained to Mr. Crowley that the third ground was wholly lacking in merit. *Id.*

Mr. Felcman also explained to the court that there was no issue as to whether the confession was involuntarily obtained and no issue as to whether there was probable cause for the warrant. *Id.* at 6. Mr. Crowley did not rebut this. Finally, Mr. Felcman revealed that Mr. Crowley had actually filed the motion at Mr. Felcman's request. *Id.* at 7. Mr. Felcman stated that there were "good grounds" to file the motion, although he urged the judge to deny it. *Id.*

**O. Mr. Crowley makes virtually no effort at the suppression hearing.**

Detective Martin and Ranger Westmoreland both testified at the hearing. They confirmed their scheme to re-interrogate Mr. Andrus by superseding the extradition process. They testified that Mr. Andrus impliedly waived his right to not be re-interrogated by "asking us about the case." *Id.* at 13. Of course, by placing him in the

car with his two interrogators under extremely confusing circumstances, it was inevitable that Mr. Andrus would ask them about the case. Indeed, Mr. Andrus's first question when he was placed in the car to ask where he was going and why.  Exh. 19 at 3.

Mr. Crowley limited his advocacy to putting Mr. Andrus on the stand and having him put his word against Ranger Westmoreland's as to whether Mr. Andrus requested an attorney before entering the car. Mr. Crowley conceded that Mr. Andrus's inquiry as to whether he had been appointed an attorney in Houston was too "ambiguous" to constitute a request for counsel. Exh. 18 at 23.

Ultimately, the court decided that it had heard enough at the hearing and decided that "I don't believe there is any need for me to read the remainder of the transcript." *Id.* at 24. The court denied the motion to suppress.  *Id.*

### IV. Mr. Crowley failed to make a *Batson* objection to a minority juror that the prosecutor later admitted he struck because that juror would have given Mr. Andrus "a fair trial."

Jury selection started on October 1, 2012. Mr. Felcman and Mr. Crowley agreed, in an off the record discussion, on a process for jury selection they had used in the past but the mechanics of which are nowhere in the record. This process somehow narrowed down the venire panel to 57 venire members. CR 287–99. Five of the qualified venire members were black, and six were Hispanic. CR 287–99; 2 Supp. CR 16–27.

The State used peremptory strikes to remove three black jurors and two Hispanic jurors. CR 287–99; 2 Supp. CR 16–27. Mr. Crowley began to make a *Batson* challenge. The courtroom was cleared. He then told the court that he had changed

his mind and would not be making a *Batson* challenge after all. 37 RR 41. He provided no reason as to why. When Mr. Felcman would later be required to give his race neutral reasons for striking some of these jurors, he stated that one juror was objectionable because she admired Barack Obama for being "the first African-American president." 5 SHRR 53. Another juror saw Oprah Winfrey as a "well respected African-American woman that is a success." *Id.* at 53. Yet another "race-neutral" reason cited by Mr. Felcman was that a juror said being "African-American was important to her." *Id.* Perhaps most perplexing of all, Mr. Felcman testified that he struck one juror for stating that he would give Mr. Andrus "a fair trial." *Id.*

## V. Mr. Crowley told the jury that Mr. Andrus was guilty without consulting him.

Mr. Crowley elected not to give an opening statement. The State's first witness was Patty Diaz, the widow of Avelino Diaz. Her testimony contained a substantial amount of victim impact subject matter that had nothing to do with guilt or innocence. Mr. Crowley remained silent. The same dynamic played out at the end of the State's case, when the widower of Kim Bui testified. 38 RR 39–40; 61–62; 43 RR 30–33; 53–54.

### A. The state argued that Mr. Andrus fabricated his confession.

Mr. Andrus's confession was, of course, a key piece of evidence at the guilt phase. The State's theory was that Mr. Andrus had not been looking to steal a car, but simply to shoot people. The State attempted to undermine the idea that Mr. Andrus was afraid for his life when Mr. Diaz drew his firearm. Instead, the State contended that Mr. Andrus shot Mr. Diaz in the back before he could have seen the

44

gun. Likewise, the State attempted to show that Mr. Andrus could not have possibly believed the Buis car was speeding toward him, but that Mr. Andrus instead simply executed Ms. Bui for no reason other than to commit a wanton killing. Had Mr. Crowley retained a qualified shooting reconstruction expert, he would have known the physical evidence actually supported Mr. Andrus's version of events. Exh. 20.

### C. Mr. Crowley conceded Mr. Andrus was guilty of capital murder without consulting with Mr. Andrus.

Having failed to investigate the circumstances of the offense, Mr. Crowley was left to asking a couple of questions here and there during the guilt phase that might inferentially support Mr. Andrus's confession. In a closing argument that lasted less than three pages in the reporter's record, Mr. Crowley spoke as if he and the prosecutors were all on the same team. In light of trial counsel's wholesale failure to mount any defense, the State began its closing argument by asking "[l]adies and gentlemen, you have to be thinking to yourself right now, what are we doing? For three days of testimony, what's the issue?" 45 RR 7. Mr. Crowley told the jury that "[y]ou've heard pretty overwhelming evidence" of guilt, and that he was not intending to argue that Mr. Andrus was "not guilty because he was drunk, he was on drugs, anything like that." *Id.* at 16. Mr. Crowley thought then that the jurors "might ask, why did you not just plead guilty?" He implored the jury to "[l]ook at the whole case" and the statement from Mr. Andrus, which, "even under those facts . . . it still established their elements." *Id.* In final summation, the State repeatedly commended Mr. Crowley for conceding Mr. Andrus's guilt. "Thank you, Mr. Crowley. I appreciate your comments. Sid and I go back a long way. And he's right. . . . guilt or innocence

is really not going to be an issue." *Id.* at 18; *see also id.* at 25 ("Mr. Crowley, I appreciate your comments."). The State argued that Mr. Andrus "did exactly what he is charged with, and even Mr. Crowley knows that." *Id.* at 25.

As reflected in the record, Mr. Crowley admitted during the state post-conviction hearing that he conceded Mr. Andrus's guilt. 2 SHRR 59–60. He admitted that he did so without consulting with Mr. Andrus in regards to this decision, or without gaining his consent to concede his guilt. Mr. Crowley unequivocally testified "no" when asked whether he had asked Mr. Andrus for consent to do so, and instead said that "[b]asically I [just] made my argument." *Id.* at 63–64.

## VI. The trial court had to stop Mr. Crowley from resting after only presenting two witnesses at the punishment phase.

### A. The state created the false impression that Mr. Andrus had been the gunman in a robbery, which Mr. Crowley failed to rebut.

Mr. Crowley had promised that the jury would see more of a fight in punishment phase. But that fight never materialized. The State's first two witness were the complainant and investigating officer in the robbery that had landed Mr. Andrus in TYC at age 16. The robbery involved three culprits, one who pointed a gun at the complainant, one who demanded her purse, and one who remained in the car that the three had arrived in. Mr. Andrus was initially suspected of being the gunman, but it was later determined that the gunman was Derrick McGowan. 19 SHRR 101. Mr. Andrus ultimately pleaded not to participating in the robbery itself, but to having solicited McGowan to commit the robbery. *Id.* The obvious implication is that Mr. Andrus was the third person who stayed in the car.

The State, however, portrayed Mr. Andrus as the gunman—the exact theory it had abandoned when it prosecuted the case. 46 RR 15, 20, 25; 52 SHRR 24. Yet, Mr. Crowley did not object to the testimony or use the police and court records from the case to show that Mr. Andrus could not have been the gunman.

### B. A state's witness testified concerning a robbery that Mr. Andrus was completely uninvolved with, which Mr. Crowley failed to rebut.

The next witness was Farida Faheem. She had a kiosk at Sharpstown Mall. She was robbed several times while at the mall. In the instance that Mr. Andrus was involved in, someone took her purse and it eventually came into the possession of Mr. Andrus and his older brother Torad. Exh. 21 at 4. As Torad was going through the purse, a security guard saw them, took the purse, and returned it to Ms. Faheem. *Id.*

That, however, was not the incident Ms. Faheem testified to. She testified to a completely different incident, in which a man followed her to a dark parking lot late at night, fought her for her purse, and then made off with a substantial amount of money. 46 RR 30–32. It is undisputed that Mr. Andrus had nothing to do with that event. Yet, neither the prosecutor, nor Mr. Crowley made any effort to show that Ms. Faheem was testifying about a robbery that had nothing to do with Mr. Andrus.

### C. Another state's witness testified concerning an identification process he now claims never happened.

The final extraneous offense presented by the State was the aggravated robbery at the dry cleaners. As discussed earlier, the State presented a version of events that is completely at odds with Mr. Tran's recollection. Exh. 13. Had Mr. Crowley investigated the offense, he would have been able to show that the

identification process actually employed by the State was completely different from what the State described at trial.

### D. A state's witness from TYC testified that Mr. Andrus squandered his chance at rehabilitation, which Mr. Crowley failed to rebut.

The State also brought a witness to testify concerning Mr. Andrus's time at TYC. The witness testified that Mr. Andrus had failed to advance through the TYC rehabilitation program, despite being given every opportunity. 48 RR 63–74. Shortly after Mr. Andrus left TYC, it was revealed that TYC was wholly ineffective at rehabilitating youth. 13 SHRR 60–67. TYC was abolished and the facilities where Mr. Andrus was housed were closed forever. *Id.* In fact, as described in detail below, Mr. Andrus had experienced a living hell at TYC. Yet, because Mr. Crowley had not investigated Mr. Andrus's time at TYC or retained an expert on TYC (despite Ms. Olvera having sourced one), he offered no rebuttal to the State's witness.

### E. Mr. Crowley failed to contextualize the evidence concerning Mr. Andrus's behavior in pre-trial detention or offer evidence concerning his serious mental health problems.

Much of the remainder of the State's punishment phase case concerned Mr. Andrus's behavior in pretrial detention. Unbeknownst to the jury, Mr. Andrus had suffered from serious mental health problems prior to trial. He attempted suicide at least once, and was being given a potent cocktail of antipsychotic drugs. 28 SHRR 32, 54, 56; 29 SHRR 241. Mr. Crowley, however, had made no investigation into Mr. Andrus's mental health, the diagnoses he had received, or the powerful drugs that had been administered to him starting from his time in TYC. Indeed, he had chosen

to not even read the report of the psychologist he retained, which identified serious

mental health problems and suggested that Mr. Andrus was schizophrenic.

### F. Mr. Crowley was completely unprepared to present a case in mitigation, and ended up instead presenting a case in aggravation.

Mr. Crowley put on almost no case at the punishment phase. He thought his

star witness would be Cynthia Andrus; yet, Mr. Crowley did not talk with her until a

few minutes before trial. 3 SHRR 88. During that conversation, she told him that her

life was not on trial and that she would not "tell stories about [her]self." 13 SHRR

140. True to her word, she lied about Mr. Andrus's childhood and instead presented

a sanitized version that, if anything, was aggravating rather than mitigation. 49 RR

54, 57, 67, 79. Mr. Andrus's biological father, provided similarly non-mitigating

testimony. He testified that although he had been incarcerated for most of Mr.

Andrus's life, Mr. Andrus had always been raised by "good people." 50 RR 14-15.

Mr. Crowley then tried to rest for the defense. *Id.* at 20. When the judge

inquired whether Mr. Crowley intended to call an additional witness, Mr. Crowley at

first agreed, but then said "I don't think we're going to need him." *Id.* at 20–22. An

off the record bench conference was held, seemingly about whether Mr. Crowley

would call any other witnesses. The result of the bench conference was that Mr.

Crowley would be calling an expert and that the trial would be continued for five days.

*Id.*

Mr. Crowley's sole expert was Dr. John Roache, the psychiatrist and

pharmacologist. Dr. Roache testified briefly about drug addiction and drug abuse and

how these could have impacted Mr. Andrus's cognitive ability and decision-making at

the time of the crime. 51 RR 6–19. While cross-examining Dr. Roache, Mr. Felcman mocked him: "So you drove three hours from San Antonio to tell the jury panel that, that people change their behavior when they use drugs?" *Id.* at 21. Mr. Felcman also offered his lay opinion that Mr. Andrus was a "sociopath," to which Mr. Crowley did not object. *Id.* at 20–26; 4 SHRR 111; 5 SHRR 29. When Mr. Felcman attempted to induce Dr. Roache to agree with this lay opinion, Mr. Crowley did not object although Dr. Roache had not conducted a psychological assessment of Mr. Andrus and thus was not qualified to offer any mental health diagnosis of him. 51 RR 20–26; 3 SHRR 111–13.

After Dr. Roache's testimony, Mr. Crowley called a lay witness, James Martin, a jail counsel. During his brief direct examination, Mr. Martin testified that Mr. Andrus's behavior had changed and that he had been showing remorse and making progress. 51 RR 30–35. But because neither Mr. Crowley nor Mr. Martin were sufficiently prepared, the witness was exploited by the State on cross-examination. Mr. Martin volunteered an "expert" opinion about Mr. Andrus having anti-social personality disorder before he started to show remorse. *Id.* at 34. Mr. Crowley did not provide Mr. Martin with a chance during any re-direct to elaborate on the mental health issues that he had observed while working with Mr. Andrus in jail. *Id.* at 35–41.

After this, Mr. Andrus took the stand himself and testified that he had first been exposed to drugs between the ages of six and eight through his mother who had sold drugs out of their home for a living. *Id.* at 48–49. He also testified that he and

his siblings were often left alone for long periods of time while his mother was out in the streets or at work. *Id.* at 49. Mr. Andrus stated he was left to raise his younger siblings while his mother was absent. *Id.* While Mr. Andrus's testimony would later be corroborated in the "tidal wave" of mitigation evidence that was introduced at his state writ hearing, at trial his testimony directly contradicted his mother and father's testimony.

Most of the time Mr. Andrus spent on the stand was devoted to a cross-examination by Mr. Felcman, who strongly questioned Mr. Andrus's testimony regarding his desire to express remorse for the crime to the victims' families. 51 RR 45–46; 51 RR 62–75.

The jury assessed Mr. Andrus's punishment as death.

## VII.   The bailiff told that jury that they were safe from Mr. Andrus because he was wearing a shock belt that the bailiff could activate.

At a pretrial hearing, the trial court granted a defense motion requesting that Mr. Andrus not appear before the jury in visible restraints, in part because he "behaved like a gentleman" at the hearing, but determined that he would wear an electronic shock belt during trial. Exh. 18 at 25. According to one bailiff, Mr. Andrus wore a device "called a 'Bandit' . . . . [which] provide[s] an electric shock to the person wearing it when activated remotely." 2 SHCR 788. The shock belt was placed on Mr. Andrus's leg under his clothes. *Id.* No specific finding of the necessity of this restraint was ever made on the record.

During trial, a bailiff informed the jury that Mr. Andrus was wearing the shock belt. Multiple jurors recall that the bailiff told them he could shock Mr. Andrus in

order to keep the jury safe from him. Juror Modi stated in an affidavit that "the bailiff told us that we were safe because he had a taser button that he could push to tase" Mr. Andrus and juror Modi "felt safer knowing that during the trial Andrus was wearing a taser." 1 SHCR 305. Similarly, juror Moon averred that "the bailiff told us not to worry" because Mr. Andrus "was wearing a taser," and that there was a button he "could push if Andrus did anything and Andrus would be tased." *Id.* at 308. Juror Patrick remembers this too, specifically recalling that "the bailiff told us about a taser button on his holster. He told us that if Andrus did anything, all he would have to do was push the button and Terence would drop to the ground." *Id.* at 312. In addition, Jurors Flakes and Guilbeau also remember the bailiff telling them about the shock belt. *Id.* at 296 ("[T]he bailiff told the jurors that he had a button he could push to tase Andrus if he needed to."); *id.* at 302 ("I remember the bailiff at some point making a comment about Andrus wearing a taser."). Most jurors remembered hearing about this just before Mr. Andrus took the stand at the punishment phase of trial, although not all of the jurors remembered exactly when the bailiff made this comment. *Id.* at 305 ("The bailiff told us about the taser before Andrus took the stand."); *id.* at 312 ("[B]efore Andrus testified, the bailiff told us about a taser button on his holster."); *id.* at 296 ("I think the bailiff made this comment around the time Andrus was going to get on the stand.").

Mr. Andrus did not discover that the bailiff had made these comments until post-conviction investigation. Trial counsel were not aware at the time of trial that the bailiff made these comments to the jury, and it does not appear in the record.

### VIII.  Mr. Crowley failed to preserve claims for direct appeal.

Mr. Andrus was represented on direct appeal by Carey Faden. Among other issues, Mr. Faden litigated whether Mr. Andrus's confession should have been suppressed. His appellate counsel attempted to argue that the confession should have been suppressed because it was the result of an "improper pressure tactic." Exh. 1 at 24. The CCA held that this argument had been waived, as it was not presented by Mr. Crowley. *Id.* The CCA rejected the argument that Mr. Andrus had invoked his right to counsel on the ground that it would not disturb the trial court's credibility determination and that Mr. Andrus's inquiry about a lawyer on the recording had been ambiguous, as Mr. Crowley had conceded. *Id.* at 22. Finally, the CCA concluded that Mr. Andrus had waived any Fifth Amendment protection because the detectives never raised the subject of the murders during the car ride. *Id.* at 22-24. Rather, the CCA concluded that every time the murders were discussed, it was because Mr. Andrus began asking about them. *Id.* The CCA affirmed Mr. Andrus's conviction and sentence of death and entered its final opinion on March 23, 2016. Exh. 1.

### IX.  The judge presiding over the state post-conviction hearing described the new mitigating evidence as a "tidal wave" before recommending that Mr. Andrus receive a new punishment phase.

Mr. Andrus was represented by the Office of Capital and Forensic Writs for his state post-conviction proceedings, who filed an application for relief under Texas Code of Criminal Procedure Article 11.071 on March 4, 2015. 1 SHCR 28. The trial court held a multi-day evidentiary hearing, the Reporter's Record of which spans over 40 volumes. Much of the evidence from that hearing has been described above. During this hearing, the trial court referenced the volume of mitigating evidence as a "tidal

wave." 6 SHRR 101. That evidence is described below. By this specific reference, Mr. Andrus incorporates all facts presented in the state court proceedings into this petition.

### A. The case for mitigation that Mr. Crowley could have made.

#### 1. Terence was born in Houston's Third Ward in 1988, a historically African-American community.

Terence[5] was born on March 26, 1988 in Houston's Third Ward neighborhood at Jefferson Davis Hospital, historically referred to as the "negro hospital." 4 SHRR 216. At one time, the Third Ward was a thriving African-American community. Its roots as a black neighborhood go back to Reconstruction, when the parishioners of Antioch Baptist Church raised money to acquire the land that became Emancipation Park, around which the Third Ward neighborhood developed. *Id.* at 210. This was the first public property purchased by African-Americans in Houston. *Id.*

Particularly after the instigation of Jim Crow laws in the 1890s, the heavily African-American Third Ward sought to develop its own business district and community so that its residents would not have to endure the discrimination and ill-treatment that routinely accompanied visits to downtown and other parts of the city. *Id.* at 210–13, 217–19. In the post-World War I period, the Ku Klux Klan had an active presence in Houston, counting the mayor, many police officers, and even a chapter of Rice University students as members. *Id.* at 217–18.  Mob violence and

---

[5] First names will be used in this section to avoid confusion regarding individuals with the same last name.

police brutality were common features of African-American life. *Id.* at 217–18. Indeed, Houston did not have a black police officer until World War II, and he was not permitted to arrest white people or even carry a weapon. *Id.* at 218

Several schools were constructed in the Third Ward around this time, including Douglass Elementary School and Yates High School, both of which Terence attended. Specifically intended to serve the black community during the era of segregation, the schools were chronically underfunded and relied on underpaid teachers, volunteers, and second-hand instructional materials. *Id.* at 214.

Even as legal segregation came to an end in the post-war period, the Third Ward became more, not less, isolated from the rest of Houston. Part of the reason for this was that Interstate 45 cut through the neighborhood, thereby limiting transportation options for those without an automobile. The Interstate itself also "wiped out entire parts" of the Third Ward. *Id.* at 220. "[B]usinesses in many cases had to close down or people had to move to other parts if they were able." *Id.* at 220–21.



41 SHRR 10.

The post-war period also saw an explosion of vice-related crime in the Third

Ward. With the closing of the Reservation—Houston's red light district—drugs and

prostitution began to infect the area. *Id.* at 223–24. In the 1960s and 1970s, people

from across Houston seeking heroin or illicit sex would come to the Third Ward. *Id.*



19 SHRR 62.

### B. The Third Ward was devastated by the crack epidemic.

The 1980s, in turn, ushered in the crack epidemic, which formed the backdrop of Terence's childhood. Crack is a cheap form of smokable cocaine that induces a temporary, intense high lasting about 15 minutes. 4 SHRR 225–26. Although a single crack rock might cost only $5.00, the short duration of the sensation experienced by the user, plus its highly addictive chemical nature leads an addict to quickly deplete their available resources to acquire more of the drug. *Id.* Houston, like other port cities, was one of the first places hit by the crack epidemic, which began in the early 1980s and continued for several decades. *Id.* at 225.

The crack epidemic had catastrophic effects on the Third Ward. Crime rates rose dramatically, as those addicted to the drug engaged in everything from robbery,

to prostitution, to murder to support their addictions. *Id.* at 226–29. The illegal drug trade likewise brought violence, as rival dealers and gangs battled each other. The area around Emancipation Park—once the center of a thriving African-American community—became a center of prostitution and crime. *Id.* One former crack dealer, who was close with Terence when he was growing up, testified that he realized the crack-selling business would be lucrative when "this lady came up to us with a newborn baby trying to sell us the baby for some crack." 6 SHRR 33. "No one took the baby but we gave her some crack anyway." *Id.* at 33–34.

Another drug that became prevalent in the Third Ward was painkillers mixed with soda. 4 SHRR 226–28. The concoction went by the street names "sizzurp," "lean," or "drank." *Id.* Like crack, it surfaced in the 1980s and continued in popularity for decades. PCP-laced joints, called "wet" or "fry," were also popular in the Third Ward. 13 SHRR 153.

As drugs, crime, and violence overran the Third Ward, those with sufficient financial resources moved out, often relocating to safer, more prosperous areas like Missouri City and Sugarland. 4 SHRR 229–30. Only the poorest residents remained in the Third Ward. The area depopulated and grew severely economically depressed. Businesses abandoned the neighborhood. Supermarkets closed. Without any class diversity, the tax base collapsed, which resulted in defunding for public resources such as schools. *Id.* at 228–32. HIV and AIDS also began to afflict the area. 13 SHRR 53.

The consequences of the Third Ward's devastation on young people was tragic but unsurprising. Children were exposed to crime, drug abuse, and alcohol abuse at very young ages, resulting in the normalization of these behaviors. *Id.* at 53. The Third Ward also saw low performing schools and deteriorating home environments, with many children being raised below the poverty line by single parents who were often very young themselves. *Id.* at 53–54.

Even today, children in the Third Ward are "more likely to have poor grades and disciplinary problems in school, leading to overall disinterest in scholastic achievement." *Id.* at 54. Third Ward youth are also "more likely to engage in early experimentation with substance abuse." *Id.* Indeed, "many youth in the Third Ward will choose to leave school, leading to high dropout rates in the area," which in turn "leads to further delinquency and involvement in the juvenile justice system and (later) the adult criminal system." *Id.*

"[B]y the time a child is in fifth grade, many of the functional habits that will determine their success in life have already been established." *Id.* at 56. Thus, without intervention, children in Third Ward "have a high probability of following the path that leads to academic failure, disinterest in school, a distorted self-concept of normal life, poor life-choices, and eventually juvenile delinquency." *Id.*

### C. Terence's childhood amidst the backdrop of the crumbling, crack infested Third Ward.

By the time Terence was born in 1988, the crack epidemic was in full swing and the deterioration of the Third Ward had been ongoing for several decades. As one drug dealer who was involved in Terence's childhood remembers, life consisted

largely of "selling crack, smoking crack, popping pills, selling pills, selling drank, doing drank, robbing, a few killings, in a nutshell." 6 SHRR 65.

Terence's mother, Cynthia Andrus, was a 17-year old high school student when Terence was born. Terence was her second child. When Cynthia was 16, she had given birth to Terence's older brother, Torad. Despite being a year younger, Terence was generally viewed as being cognitively more advanced than Torad, who was described as "slow" compared to his younger brother. *Id.* at 41, 89–90. By the time he was 17, Torad would be on disability insurance due to mental illness. 6 SHRR 41; 18 SHRR 158; 25 SHRR 58.

Terence's father, Michael Davis, was a year younger than Cynthia and lived a few houses down from hers in the Third Ward. His older brother was the father of Torad, Cynthia's first child. Terence and Torad were therefore both half-siblings and cousins. Michael was not listed as the father on Terence's birth certificate and did not know that he was Terence's father until three years later. Within a year of Terence being born, Michael was in prison, where he would remain for the vast majority of Terence's life. Around the same time, Torad's father, like his younger brother Michael, found himself in prison on drug charges.

For a time, Cynthia's father paid for daycare while Cynthia completed high school at the Contemporary Learning Center. When she was 19, however, Cynthia moved away from her parents, who were "strict" and disapproved of her having children out of wedlock.

### D. Terence's life began under the influence of a traumatized caretaker who struggled with crack addiction.

Cynthia, Torad, and Terence moved in with Michael's mother, LaRuth York Davis (who was both Terence and Torad's paternal grandmother, as their fathers were brothers). LaRuth was a crack addict who at times had been completely unable to care for her children such that they had to go live with their grandparents. 6 SHRR 198-99. The children could not go to LaRuth's parents because her father had murdered her mother. *Id.* Michael recalled that LaRuth would get drunk, cry, and tell Michael about how her father had killed her mother. *Id.* The same year that Cynthia, Torad, and Terence moved in with LaRuth, she was arrested and convicted of cocaine possession. She was again convicted of cocaine possession six years later.

### E. The vast majority of adults in Terence's life had regular contact with drug users, drug dealers, or both and were individuals continually involved with the criminal justice system.

#### 1. Senecca Booker, a well-known Third Ward drug dealer, was the most influential male figure during Terence's childhood.

When Terence was around five, Cynthia moved the family to a house in the Third Ward, eventually settling on McIlhenny Street. Around that time, she began dating a man named Senecca Booker, who moved in with Cynthia and the kids. 13 SHRR 20. Senecca was a drug dealer, who mainly sold crack and drank. *Id.* That Senecca was by far the most positive influence in Terence's home life speaks volumes about Terence's childhood.



19 SHRR 68. A contemporary photo of McIlhenny house where Cynthia, Terence, and his half-siblings lived. During the time they lived there, the windows were boarded up to prevent crack addicts from breaking in. There was also no railing around the stairs, no landscaping, and no fence. The house has also been repainted, as depicted in the photo. 6 SHRR 22.



19 SHRR 60, 72.  Contemporary photos of the area near the McIlhenny house. 6 SHRR 157.



Senecca was "very much part of drug life" in the Third Ward and was "really good at hustling." 13 SHRR 20. Proud of his hustling lifestyle, he once sent a photo of himself holding all of his drug money to his mother. *Id.* Senecca would go to a clinic run by a corrupt doctor who would sell drug prescriptions to acquire the ingredients to make drank. *Id.* at 153. Senecca and Cynthia both sold drugs out of Cynthia's house, mainly crack, drank, and marijuana. *Id.* at 164.

Yet, Senecca was something of a positive influence in the area. He was known as "Cookie Monster" because he used to buy cookies and give them to the kids in the neighborhood. 6 SHRR 44. Indeed, although Senecca was a drug dealer by trade, he had positive attributes that distinguished him from the others Cynthia brought into her home. First, unlike Cynthia's other boyfriends, Senecca refused to help Cynthia beat Terence. 7 SHRR 127. Cynthia kept a board wrapped in duct tape that she would use to hit the children. *Id.* She would have her other boyfriends hold the children down while she beat them with the board. *Id.* When she grew tired from administering a beating, the boyfriends would take over and continue striking the children. *Id.* Senecca refused to participate in this abuse.

Second, Senecca seemed to genuinely care about Terence. Terence's brother Torad recalls that Senecca was "the only one I remember ever showing us love and providing for us like a father." 13 SHRR 144. Senecca would take the kids to get free Christmas presents from churches and charitable groups. *Id.* He also found ways to celebrate the children's birthdays. *Id.* He would babysit them, cook with them, and taught them how to make simple things. 13 SHRR 163. Despite the fact that he was

a career criminal, Senecca was a role model for Terence and Torad looked up to him as a provider. *Id.* at 144.

### 2. Tafarrah Andrus' father, Danyel Sims, was a crack dealer who sexually assaulted Tafarrah.

Senecca, however, was an inconsistent presence in Terence's life due to his frequent stints of incarceration. When Senecca was in jail, Cynthia would take up with other drug dealers who lacked Senecca's redeeming qualities. One such individual was Danyel Sims, who was the father of Cynthia's third child, a daughter named Tafarrah who was born in 1992. Like Cynthia, Danyel was a crack dealer. 6 SHRR 39. He used PCP recreationally. *Id.* At one point Danyel was arrested for murder, but was never formally charged. *Id.* at 178. He did rack up numerous convictions for drug related offenses, however, and was eventually sentenced to 18 years in prison for aggravated robbery with a firearm. 36 SHRR 228.

Danyel sexually assaulted Tafarrah, his daughter and Terence's half-sister, when she was between 4 and 6 years old. 6 SHRR 187–88. Her medical records also indicate the she was physically abused by Danyel. 33 SHRR 197. Due to the sexual assault, CPS removed Tafarrah from Cynthia's home and separated her from her half-siblings. 6 SHRR 187–88. Although she later attempted to move back in with the family, she clashed with Cynthia, who kicked her out of the house. Tafarrah eventually ended up homeless. As a child, she would cut herself on her thighs with razors, forks, and spoons. She described the cutting as making her feel joyful and happy because she had been raped and beaten. By the end of her teenage years, she had attempted suicide five times by, among other things, trying to drown herself in

65

the shower, trying to hang herself, and throwing herself into oncoming traffic. 7 SHRR 17–21.

### 3. Norman Williams and Orentherus Norman, who fathered Cynthia's fourth and fifth children, both had criminal histories.

Another man who lived in Cynthia's home for a time was Norman Williams, who fathered Cynthia's fourth child, NormaRaye, in 1995. He would subsequently be convicted of assault (bodily injury) and possession of cocaine. Norman was followed by Orentherus "Sean" Norman, who fathered Cynthia's fifth child, Trevion, in 1998. Orentherus had convictions and parole violations for drug crimes going back to his teenage years. 38 SHRR 189, 227, 232. Less than a year after Trevion was born, Orentherus was murdered in a revenge killing at the age of 21. *Id.* Trevion, his son and Terence's half-brother, would later be killed at the age of 20.

### F. Cynthia Andrus supported herself and the family by selling drugs and sex.

None of the fathers of Cynthia's five children were constructively involved in their children's lives. While at times Cynthia had occasional periods of legitimate employment, she mostly supported the family by dealing drugs and selling sex. 6 SHRR 85–86. Cynthia ran the drug operation out of her house. 13 SHRR 143–44. To obtain the ingredients to make drank, Cynthia would go to a doctor who would sell codeine prescriptions for $100. She later taught others how to leverage the prescription scam so that they could also get into the illegal drug trade. 6 SHRR 56–57.

Cynthia sold crack and drank directly out of her home and in front of her children. 13 SHRR 143–45. Torad, Terence's brother, remembers that addicts would come to their house when he was a child and go into a backroom with Cynthia, where she would chop up crack rock or mix up drank. *Id.* The addicts sometimes stole from the children while they were in the house. *Id.* At least one addict attempted to break into the home to obtain drugs, which is why the windows were later boarded up. 6 SHRR 22.

On November 20, 1997, officers from the Houston Police Department's Narcotics Division executed a search warrant on an apartment located between McIlhenny, where the Andrus family lived, and Bremond Street, in the Third Ward. As they forced entry into the apartment, officers found three adult women and three small children, along with a diaper containing crack cocaine, a razor blade with cocaine crumbs, and a gun. Suspect number one, a friend of Cynthia Andrus, was arrested on charges of possession with intent to deliver. Suspect number two, Cynthia Andrus, was released, taking custody of the three small children. Cynthia was six months pregnant with her last child, Trevion, at the time. 31 SHRR 187–91.

Cynthia also made money from prostitution. She typically sold sex either by soliciting men to pick her up so that she could spend the night with them or by finding willing customers at night clubs. 6 SHRR 38, 85–86, 104–08. She would also bring men home to the McIlhenny house. 13 SHRR 180.

### G. Cynthia was a heavy drug user who could not care for her five children.

In addition to dealing drugs, Cynthia was herself a heavy drug user. She was often high on weed, drank, or pills and not in the home taking care of the kids. 6 SHR 84–86, 104. Frequently, she was out using drugs, going to a club, or otherwise away from the children. *Id.* As one childhood visitor to Cynthia's home recalled, the house stank of smoke and was "disgusting and dirty," with piles of dirty clothes laying all over. 13 SHRR 179. The house had two large rooms. Cynthia slept in one room. Her five children slept in one bed in the other room. *Id.* Although Cynthia received food stamps, she often sold them. 13 SHRR 86–87. As a result, food was scarce, with nutritious food being virtually non-existent. The children would make do with what they had available to them, which involved making noodles, weenies, and butter sandwiches. 13 SHRR 145, 179. One childhood visitor recalled walking with the children, at the age of five or six, to a local convenience store because there was no food in the house. *Id.* at 179.

### H. In the absence of a responsible adult, Terence was forced to parent his four siblings.

In the absence of a responsible adult, Terence became the de facto parent of the house, although he himself was still a child. Although Torad was older, he did not possess the mental capacity to help his younger siblings. Rather, it was Terence who would make sure Torad woke up in the morning, got ready, and went to school. Both Terence's siblings and adult visitors to the house recall Terence functioning as the

parent of the household when Terence was as young as ten. 6 SHRR 102–03; 13 SHRR 179, 183–85.

He would cook breakfast for the children in the morning and dinner at night. The kids would sit together and eat the meals Terence had prepared. Terence was also responsible for keeping the house clean. He would help the children with their homework, make sure they got to school, help them stay out of trouble, and generally watch over them. 6 SHRR 42, 102–03; 13 SHRR 179, 183–85.

He would also help the kids find ways to entertain themselves. One Christmas, Terence taught the children how to make cakes with an easy bake oven. Torad recalls one instance when Terence "found an old crate, and he punched out the bottom of the crate to make a basketball goal." 13 SHRR 143–45.

Although Terence, as child, filled the parental role for his half-siblings, he himself longed for a father figure in his life—something Terence talked openly about at a young age. 6 SHRR 42–43; 13 SHRR 163, 184. When Senecca was in jail, Terence asked Senecca's brother if he could call him "Dad." 6 SHRR 42–43.

Through his pre-teen years, Terence was generally viewed as a happy, good natured child by adults. 13 SHRR 154, 163. On the occasions when an adult, such as Senecca, would take on a parental role with respect to Terence, he was joyful and a "normal kid." Indeed, Terence appeared to relish these opportunities to have a break from serving as a surrogate parent to his half-siblings and get to be a kid himself. *Id*. at 184.

**I. Terence was diagnosed with affective psychosis at age ten.**

Still, the trauma of being the parentified child of a drug-addicted single mother living in a poverty-stricken neighborhood overrun by the crack epidemic clearly affected Terence. At the age of 10, Terence was diagnosed with affective psychosis. 31 SHRR 118. For at least nine months, he received counseling, with each session lasting between 45 and 50 minutes. 6 SHRR 216–20. The counseling most likely resulted from the CPS intervention that followed Danyel Sims sexual abuse of his daughter and Terence's half-sister, Tafarrah. *Id.*

**J. The murder of Senecca Booker deeply affected the Andrus family.**

On August 23, 2000, just before Terence started middle school, his circumstances changed dramatically and for the worse. Cynthia entered the home that day covered in blood. 6 SHRR 194. Senecca Booker had just been shot and killed on a nearby street corner. 13 SHRR 153; 6 SHRR 194.

With Senecca's death, the children lost the only person who ever "show[ed] us love and provid[ed] for us like a father." 13 SHRR 144–45. As Torad testified, the family completely fell apart after Senecca was killed. *Id.* Cynthia fell into a deep depression and completely abandoned the children for a week and half while she binged on drugs and alcohol in a motel room. *Id.* at 184. Cynthia's drug binges in motel rooms became a repeated occurrence. *Id.* at 164. When she was at the house, she would lie around and not do anything. *Id.* at 144–45. Indeed, "she started drinking and using drugs constantly." *Id.* Cynthia had a particular affinity for drank during this period. *Id.*

70

By all accounts, the loss of Senecca deeply affected Terence. 13 SHRR 146, 154. He had lost a caring father figure and role model. And, with Cynthia completely non-functional, he now bore virtually the entire burden of taking care of his siblings.

About a year after Senecca's murder, the family briefly moved to the Fifth Ward, another economically depressed area of Houston that, like the Third Ward, had been ravaged by the crack epidemic. A few months later, however, Cynthia moved the family to the Park Village apartments in Southwest Houston. With Cynthia, her boyfriends, and the children, the apartment was cramped. 6 SHRR 85.

### K. The Park Village Apartments were infested with gangs, drugs, and violence.

Park Village was not an improvement over the Third Ward. As one witness described it, "The apartments were better, but those type of things that was going on in Third Ward was going on there. . . . Hustling, selling drugs, popping pills, selling pills." 7 SHRR 46. It was infested with gangs, drugs, and other crime. 6 SHRR 46–47, 83–84. The smell of marijuana permeated the complex, with gang members hanging around in their respective colors. *Id.* at 83–84. One witness described how nervous she felt when she had to visit the Andrus household, as she had to pass grown men and teenagers smoking marijuana and hanging about the complex. *Id.* When asked to describe Park Village, she responded: "Drug related, gangs. It was a pretty bad area." *Id.* at 83. Another described how, when he drove up to the apartments, he would see gangs of men "out in their same colors." *Id.* at 47.

71

### L. Cynthia's relationship with Damon Sias, a violent, aggressive, drug dealing, sex offender.

Around this time, Cynthia took up with a man named Damon Sias, who subsequently moved into the apartment. Damon was a violent crack dealer who smoked a lot of "water," which is a street name for PCP. 6 SHRR 40–41, 88. He would frequently use weed, pills, and "water" in front of the kids. *Id.* Damon was "very, very arrogant, very loud, very aggressive, [and] abusive verbally, mentally, [and] physically." As one witness put it, "[h]e was not a good guy at all." *Id.* at 93.

Damon had recently been charged with indecency with a child, before pleading out to a reduced charge to receive a one-year jail sentence. Two years later, he pled guilty to attempted injury to a child and was sentenced to another year. According to the complainant in that case, Damon beat her, forced her to perform oral sex on him, and beat her 3-year old child. He then contacted the woman by phone and threatened to kill her and her child if she didn't get back together with him. 35 SHRR 163, 178.

Damon and Cynthia both took drugs in front of the children. One frequent visitor said that, more often than not, Cynthia was high when she was at the apartment with the kids. 6 SHRR 88–89. Smoking "wet" would make Damon "[v]ery aggressive" and "paranoid." *Id.* Damon was a "mean ugly person" under normal conditions. *Id.* at 94. When he took drugs, "[h]e was mean and that just intensified it." 6 SHRR 94. When Cynthia was on drugs, she would become "loud" and "a little aggressive." *Id.* at 88. She also "was more standoffish when she was on drugs" and would act like she didn't want her children around her. *Id.*

Frequently, Damon and Cynthia physically fought each other. *Id.* at 93. Cynthia would often show up to a friend's house with a black eye, a swollen lip, or scratches on her body. *Id.* To escape Damon's abuse, she would stay for days on end, leaving the children behind. *Id.* Problems between Damon and Cynthia persisted throughout their time together. At one point, Damon was arrested for trespassing at the Park Village apartments. A few years later, Damon pled guilty to assault (family violence confirmed). He and Cynthia had been in a motel for several days and a fight ensued between them when Cynthia refused to have sex with him. 31 SHRR 211, 223; 35 SHRR 10. Later that same year, Damon was sent to a neuropsychiatric center because he had become a threat to himself and others. The police report noted that he had a history of mental illness.

In the midst of losing Senecca, moving to the Park Villages, and having to raise his half-siblings, Terence's grades declined significantly. He also began to experience behavior problems in school. 6 SHRR 215; 22 SHRR 232-33. Terence had to repeat the seventh grade. *Id.* While still a middle-schooler, he began to use drugs. 13 SHRR 146.

### M. Terence's newly found relationship with his father and hope for a better, more structured life.

In 2003, however, Terence finally caught a break. His father, Michael Davis, was released from prison and married a woman named Rosalind Cummings. Rosalind testified that, starting in about 2002 or 2003, she and Michael would pick up Terence from the Village Apartments for weekend visits. "The environment that Terence was living in at his mother's, Cynthia's, house was horrible." 13 SHRR 157. "Cynthia's

73

house was nasty and filthy, and there were piles of dirty clothes everywhere." *Id.* Oftentimes when Rosalind would go to pick up Terence, Cynthia "would not be home, and the children would be there by themselves." *Id.* Instead of taking care of her kids, Cynthia would be "out in the streets drinking syrup." *Id.* When she was home, Cynthia "had different men around" and would be "high on weed, syrup, or pills." *Id.*

When Rosalind picked up Terence, he would tell her that he was hungry and there was no food in the house. Even on days when Terence was not at Rosalind's house, he would call to tell her that he was hungry. Rosalind would then go over to the house and find the children alone. *Id.* at 157–60.

Often, the first thing Terence would want to do when he got to Rosalind's house was to wash his clothes. He never wanted to go back to Cynthia's. Instead, he would tell Rosalind and Michael that he wanted to stay with them. Terence would say about his mother's house, "That's not right, the stuff they are doing," and "I love my mama, but she's always doing messed up things and leaving us there alone." Terence told Rosalind he did not want to be around the kinds of things his mother was doing. *Id.*

In light of Terence's deplorable home situation, Rosalind and Michael invited Terence to come live with them, which Terence readily accepted. At Rosalind and Michael's, Terence thrived. Rosalind had a solid job at MD Anderson and a son of her own, who was eight years younger than Terence. He would soon have a half-sister, as Rosalind gave birth to Michael's child. Still, Terence was able to have his own room at Rosalind's house. *Id.*

Rosalind ran a tight ship. Terence had chores he was required to do, like cutting the grass, cleaning up around the house, cleaning his room, and washing the family car. If he skipped class, he would lose privileges. *Id.*

Terence liked the stability of Rosalind and Michael's home. He like to play with his step-brother. *Id.* The family would do things together, like movie nights or trips to places like Galveston. The family would also go out to eat, to the park, to other kids' parties in the neighborhood, or barbecues at friends' houses. During these trips, Terence was happy and got along well with people. Terence told her that when he was living with Cynthia, she had never taken the children anywhere. *Id.* at 157–60.

Rosalind describes Terence during this time as "a good, sweet kid." "He was very loving, and he liked to play jokes." She noted that after moving in with them, he would smile more, was more talkative, and generally seemed happier. His grades and behavior in school began to improve. *Id.*

While Terence was living with Rosalind and Michael, Rosalind gave birth to Terence's half-sister. As Rosalind noted, Terence "loved her" and was "so excited." "He made her a big poster with himself, his dad, and [his stepbrother] Jamontrell on it. He helped with diapers and feeding. He talked about her to everyone." Terence also grew close with his father, Michael, who had not been a significant part of Terence's life up until that point. *Id.*

### N. Terence's father goes back to prison, leaving Terence back under Cynthia's roof.

Since Michael was sixteen, he had been a drug dealer, which was what got him sent to prison when Terence was an infant. Unfortunately, after Terence moved in

with him, Michael reoffended and was sent back to jail on another drug offense. Terence was devastated. He became emotionally withdrawn and began to act out. He also began using marijuana. *Id.*

Things took a further turn for the worse when Rosalind divorced the now-reincarcerated Michael. Due to the divorce and the arrival of Terence's half-sister, Rosalind decided Terence could not live in her house anymore. She sent Terence back to live with Cynthia. *Id.*

Terence did not fare well back at Cynthia's. The move required him to switch high schools. His behavior at school continued to deteriorate. Terence also began to succumb to the culture of drugs and gangs that surrounded the Park Village apartments. He began to use marijuana daily. 51 RR 9. He used other drugs, as well, including Xanax. 22 SHRR 233. Terence and Torad joined the Bounty Hunter Bloods gang. 13 SHRR 145.

In February of 2004, when Terence was 15 and in ninth grade, he was caught with Xanax at school. 22 SHR 233. Terence had obtained the pills from Cynthia's bathroom. 7 SHRR 27. He was sent to the Juvenile Justice Center and sentenced to 1-year of probation. He was reassigned to yet another high school. After that, Terence was frequently absent from school. Cynthia had no idea where Terence was. On April 15, 2004, Terence was reported as a runaway. 22 SHRR 228.

### O. Shortly after returning to Cynthia's house, Terence is arrested in connection with an aggravated robbery.

On May 16, 2004, Terence was arrested in connection with an aggravated robbery. The victim told police that as she exited her car, another car stopped near

her, from which two young black men exited and approached her. A third man remained in the car in the backseat. One of the two men who approached her had a do-rag on his head. The other had a gun. The man with the do-rag demanded her purse and bag. After she gave him the bag, the men got back in the car and left. 46 RR 13–19.

After Terence was arrested, he was held in Fort Bend County Juvenile Detention Center. He was held there for nearly 9 months while his case remained pending. Neither Cynthia, nor any of the rest of the family, came to visit him. 25 SHRR 60. His mental health deteriorated rapidly. In October of 2004, he was placed in a padded cell after he was found hitting his head against a wall. 23 SHRR 279, 300. On November 1, 2004, he told a counselor "I feel like I want to kill myself. My life is hell. Out in the free world my life is hell and it's hell here in lock-up." *Id.* at 223. He reported having manufactured a shank to stab himself with. *Id.* at 182. He also reported that he planned to stand on the sink and bust his head in. *Id.* Although he remained on suicide watch during December of 2004 and January of 2005, he did not receive any treatment other than counseling. *Id.* at 191; 24 SHRR 189.

Terence was initially indicted for theft and charged as the gunman. However, it was later determined that the gunman was someone named Dereck McGowan. Ultimately, Terence did not plead guilty to being the gunman or to robbing the victim. Rather, he pled guilty to solicitation to commit robbery on the ground that he "request[ed], demand[ed], or attempt[ed] to induce Dereck McGowan to rob the

victim." 19 SHRR 101. Terence was sentenced a three-year determinant sentence in the Texas Youth Commission ("TYC") in February of 2005. He was 16 years old.

> **P. Around the time Terence Left TYC, an investigation revealed that children like Terence had been subjected to cruel and inhumane treatment while under confinement within TYC.**

Ultimately, Terence was confined at TYC for 17 months, before being transferred to the Texas Department of Criminal Justice ("TDCJ") to serve the remainder of his sentence on June 28, 2006. Terence was first sent to the Marlin Unit, which was the general intake location, and then transferred to the Crockett facility where he would remain for the duration of his time at TYC.

Around the time Terence *left* TYC, it was revealed that child inmates like Terence were subject to inhumane conditions and received virtually no rehabilitative treatment. The conditions were so horrendous, that TYC was subsequently abolished by the Texas Legislature. Will Harrell, the ombudsman appointed by Governor Rick Perry to reform the juvenile justice system, testified at Terence's writ hearing and told a harrowing tale about the conditions at TYC and Terence's specific experience there.

For years prior to 2007, incarcerated children and their families routinely complained about the conditions in TYC. 5 SHRR 128–29; 13 SHRR 60. The complaints related to, among other things, youth-on-youth and staff-on-youth violence, inadequate medical and mental health care, gang violence, extortion by gangs, an overreliance on seclusion and isolation for discipline, sexual abuse, poor

food quality, inadequate education, and "a complete lack of rehabilitative programming." 13 SHRR 60.

### 1. After an extensive investigation into the deplorable conditions in TYC, TYC was placed in a conservatorship, with monitoring by an ombudsmen.

While the families had obtained some support for reform from the United States Department of Justice and State Senator Juan Hinojosa, the reform movement accelerated dramatically in 2007—a year after Terence left TYC—when a Texas Ranger investigation began to reveal just how dysfunctional and deplorable the TYC system had become. *Id.* at 60–61. The investigation revealed that the assistant superintendent of a TYC facility in West Texas would bribe child inmates with offers of candy, pornography, and early release to entice the youth to engage in sexual conduct with him or with each other in front of him. 5 SHRR 130–31.

The Ranger investigation, and other shocking revelations that followed it, created a political firestorm. TYC leadership was before the Legislature on a weekly basis. *Id.* at 132. Governor Perry exercised his constitutional authority, which had almost never been invoked, to place TYC in conservatorship. *Id.* He removed the board of directors, fired hundreds of TYC personnel, and appointed his chief of staff as conservator. *Id.* at 132–33. The conservator, in turn, appointed Mr. Harrell as ombudsman. *Id.* at 135–56. As ombudsman, Mr. Harrell was tasked with evaluating individual complaints about TYC and also making broader recommendations to reform the system. *Id.* at 136.

As ombudsman, Mr. Harrell was given 24/7 access to every part of every TYC facility. *Id.* He would sometimes show up at 2 a.m. and spend days walking each facility door to door. *Id.* He spent significant amounts of time in the security units. *Id.* He also spoke confidentially with the youths confined at TYC, as well as with staff whistleblowers. *Id.* at 136–37.

### 2. The ombudsman, Will Harrell, uncovered many issues within TYC, the most egregious being the overreliance on solitary confinement.

Through his review, Mr. Harrell uncovered numerous problems in TYC. There was "a serious failure to provide education." 5 SHRR 138. One of the biggest problems was an overreliance on using isolation (i.e., solitary confinement) as a disciplinary tool. *Id.* There were also serious violence issues. The gang intervention and prevention program was inadequate. *Id.* The use of pepper spray by staff on youth was "out of control." *Id.*

The staff and facilities were grossly inadequate for the number of youths TYC housed. "It was not uncommon to see one staff in an open big dorm managing 20 or more youths. The national standard is one to six." *Id.* TYC was simply "oversaturated." *Id.* at 133.

### 3. TYC utilized a now discredited program that relied heavily on rote memorization and disciplinary infractions called 225s.

The "resocialization" program, which was subsequently discredited and completely scrapped by the state, was an ineffective cookie-cutter regime imposed on every youth. 5 SHRR 121, 143–44. It relied primarily on rote memorization and then counting the number of "225s" each youth was issued. *Id.* at 144. A 225 was

essentially a disciplinary action taken by the TYC staff against the youth. The resocialization focused almost exclusively on the quantity of 225s a youth was issued, not the degree of infraction or the underlying behavior. *Id.* at 173. Talking out of turn would earn you a 225. *Id.* at 174. So would throwing a paperclip, shooting a rubber band, talking while standing in line, talking in the lunch room, or even eating a cookie in class. *Id.* In one instance, a youth was given a 225 for "gang activity" because the staff overheard him speaking Mandarin to his grandmother. *Id.* at 236.

Even more troublingly, youths would be issued 225s when they asked for help. Self-referring to get out of the crowded and dangerous dorms earned you a 225. *Id.* at 174. If you expressed concern that you might harm yourself, you got a 225. *Id.* Actually harming yourself or otherwise exhibiting suicidal behavior also meant you got a 225. *Id.*

The staff had "complete discretion on the spot" to issue a 225. 5 SHRR 175. They received very little training in general and even less on the conduct issues 225s had originally been meant to address. *Id.* at 175. Moreover, the staff "felt pressure to issue 225s for minor disciplinary things so that their supervisor would see they were busy at work paying attention." *Id.* at 176.

Ultimately, Terence ended up with a little more than 300 225s during his 17 months in TYC. *Id.* at 177. This actually put him in the "pretty low" to average range. *Id.* Terence also had a surprisingly low number of 225s relating to altercations "given the chaos that was constant in Texas Youth Commission facilities, particularly at Crockett, and particularly in the dorms where he was." *Id.* at 189. Crockett had "a

violent atmosphere." *Id.* "[V]iolence begets violence, and sometimes kids don't really have a choice." *Id.*

Leonard Cuculo's office was in the same building as Harrell's, who knew Cuculo personally. *Id.* at 236. Cuculo's job consisted of going to county courts and testifying on behalf of TYC as to why a youth should be transferred to TDCJ. *Id.* The file that he would have reviewed prior to Terence's trial would have been limited to Terence's 225s, plus his psychological evaluations. *Id.* at 237.

Many of the youth were frequently transferred among the dorms at a facility and among the facilities themselves. *Id.* at 146. This made it impossible for them to develop a real therapeutic relationship with their case workers, who were assigned based on which dorm the youth occupied. *Id.* Moreover, the caseworkers were undertrained, particularly when it came to mental health. *Id.* at 146–47. Their training lasted less than one week, with only a half of a day dedicated to mental health. *Id.* at 147. Texas law now requires over one hundred hours of training. *Id.* at 148. Moreover, there was no follow-up or ongoing training once a caseworker started working at TYC. *Id.* at 148–49.

The rest of the resocialization program "was merely memorization and repetition of certain terms," called "thinking errors." *Id.* at 149. If you could memorize 50 or 60 "thinking errors" then you would advance. *Id.* Youth with lower IQs or other mental health issues often couldn't accomplish this. *Id.* "Smarter kids" would nonetheless advance if their behavior did not reflect having internalized the "thinking errors." *Id.*

As later acknowledged by the Texas Legislature and TYC itself, the resocialization program was completely debunked. *Id.* at 200. In fact, it's "exactly what you're not supposed to do to youth." *Id.* "It's destructive." *Id.*

Indeed, one of the most perverse aspects of TYC resocialization program was that the youth who actually exhibited improved behavior were often not released, while those that behaved poorly were more likely to "advance" through the program. 5 SHRR 150. The reason had nothing to do with the interest of the child, but rather the interest of TYC personnel. "[T]he positive youth would stay longer because they were - - they were a positive influence on a dorm or a particular environment. The campus simply didn't want the kid to leave because they were active - - they were a benefit." *Id.* On the other hand, "the more problematic youth would be would be advanced to get rid of them." *Id.*

The recidivism rate at TYC under the resocialization program was an astonishing 60 percent, which was "way over the national average." *Id.* at 151.

The Marlin Unit, where Terence started off, had originally been an adult jail and had never been intended to hold juveniles. *Id.* at 153. It was used as an orientation and assessment unit. *Id.* at 153. Based on TYC's assessment of a youth's mental health and education, the youth would then be placed in one of the other TYC facilities. *Id.* at 153.

Mr. Harrell visited the Marlin unit a few years after Terence had been there. "It was a really horrible place." *Id.* at 153. TYC had no safe housing policy. So, youth were housed together with all types of offenders of various ages. *Id.* The dorm rooms

were small and each contained about 20 bunk beds with a small common area. *Id.*
The rooms had no windows or natural light. *Id.* The rooms were dark and "really
noisy because there was echo." *Id.*

### 4. Many children in TYC self-referred to the security unit to escape the conditions of the general population dorms.

The situation in the dorms was so bad, that many youth would "self-refer." 5
H.C. 155–56. A self-referral is "when a youth has to request that staff remove them
from general population and place them in the security unit." *Id.* at 156. "They seek
isolation to get away from the dorm." *Id.*

When Mr. Harrell visited the security unit, he was "deeply disturbed" by what
he saw. *Id.* at 154. The unit was "constantly full." *Id.* "And it was so loud because of
the acoustics of the room and kids banging. But the guards would actually play
classical music so loud . . . both to overcome the noise of the kids banging on the - -
on the steel doors of the cells, but also to punish the kids for banging on their cells."
*Id.* The Marlin isolation unit was "dark" and windowless" with "no natural light." *Id.*
The youths were in cells with steel doors with a window that would open and close
from outside, a "bean slot" where food trays would be passed, concrete walls, a cement
block floor, a toilet, and a sleeping pad. *Id.* at 154–55. Staff generally did not observe
the youth in their cells, except sometimes if they were on suicide watch. *Id.* at 155.

When in the isolation unit, the youths would get virtually no education. *Id.* at
244. Rather, "education" in the isolation unit consisted of "a teacher showing up
maybe once a day with a word problem or a math problem, that they slide through

the bean slot." *Id.* "And that's it. And if a kid wants to do it they could, without any help. But that's school." *Id.* at 244.

Terence was given an initial screening at the Marlin unit. He was diagnosed with "conduct disorder." *Id.* at 157–58. Conduct disorder was "a meaningless diagnosis" because it was given to everyone who had a criminal record and everyone who was in TYC was there because they had been convicted of a crime. *Id.* at 158. Terence was also placed in the standard "resocialization" program. *Id.*

### 5. Terence was confined to the Crockett School, a facility designated for children with mental health issues and low IQs.

Terence was placed in the Crockett State School. Like the Marlin unit, the Crockett State School would be one of the first to be closed after the TYC scandal broke. Crockett "was oriented towards youth with mental health needs . . . and youth with low IQ." 5 SHRR 160. Terence's IQ was tested at 86. He was assigned to the psychiatric dorm at Crockett. 41 SHRR 102.

### 6. The Crockett School was one of the worst facilities ombudsman Harrell ever saw.

Crockett was "an old facility" that had "a poor design." 5 SHRR 160. Specifically, "[i]t allowed for just a remarkable array of what's called black spots or areas that can't be seen, that staff can't view youth, which is where a lot of the violence and dangerous situations occur." *Id.* Indeed, Crockett was one of the most dangerous and violent facilities that Harrell ever saw. *Id.* "[I]t was just a violent 'Lord of the Flies' scenario." *Id.* at 189. There was a "brutal pecking order" in the dorms. *Id.*

at 204–05. Food extortion was common. *Id.* "[S]ometimes you had to fight to get by" in places like Crockett. *Id.* at 189. Crockett was simply "a savage environment." *Id.*

Crockett was chronically understaffed. *Id.* at 160. The staff were often very young themselves. *Id.* Indeed, many of the correctional officers were as young as 18 and had not graduated from high school. *Id.* at 176. All that was required to become a correctional officer at Crockett was a G.E.D. *Id.* Moreover, many of the correctional officers were from "the very community that people like Mr. Andrus would come from." *Id.* at 161. The correctional officers frequently had gang affiliations themselves, often the same gangs the incarcerated youth belonged to. *Id.* Indeed, Crockett was "notorious" for having gang members as correctional officers. *Id.* Perhaps unsurprisingly, more youths would leave TYC with a gang affiliation than enter it. *Id.* at 244.

Additionally, while the staff were told that they should try to deescalate violent situations, they received no training on how to do so. *Id.* at 189–90. Rather, they were "trained in physical altercations." *Id.* The prevailing attitude was "we versus they." *Id.* at 190. "[T]hey acted like prison guards." *Id.*

### 7. Sexual abuse was rampant at the Crockett School.

Sexual abuse was also a major problem at Crockett; both "[s]taff on youth" and "youth on youth." 5 SHRR 199. Indeed, a number of staff were terminated and criminally prosecuted for inappropriate sexual contact with youth at Crockett. *Id.*

### 8. Though the Crockett School was designated a facility for children with mental health issues, its mental health care was grossly inadequate.

The mental health care available at Crockett was grossly insufficient. 5 SHRR 161. The facility lacked mental health professionals and instead contracted out to local providers. *Id.* The "local" providers, however, often lived far away. *Id.*. Moreover, they prioritized their private, paying clientele. *Id.* The TYC youths were treated as "secondary" by the local providers, who would often simply ignore calls from Crockett. *Id.* As a result, there was not an "ongoing relationship" between a mental health professional and the youth. *Id.* at 162. Without real observation of the youth by a mental health professional, there also were not adequate assessments of mental health issues necessary for treatment and prescriptions. *Id.*

This is not to say that youth were not prescribed medications in Crockett. They were, but the prescriptions were not based on clinically appropriate observation and criteria. Rather, Crockett used powerful anti-psychotic and psychotropic drugs on the youth as a form of "medical restraints." *Id.* at 162. That is, the drugs would be prescribed "to slow down and to pacify the youth population as a matter of social control," rather than to treat actual mental health conditions. *Id.*

To make matters worse, after administering these powerful drugs to the youth, the staff at Crockett would abruptly discontinue the medication. *Id.* at 163. "[A]t Crockett in particular there was a real problem with cold - - cold turkey discontinuation of medication." *Id.* Such "cold turkey discontinuation" could be

extremely hazardous to the youth, even resulting in death. *Id.* "You're supposed to taper it down." *Id.*

Part of the reason for this was that if a youth even once refused to take prescribed medication, the medication would immediately be cut off. *Id.* at 163. Youth, of course, had legitimate reasons to be hesitant to take the medication. 5 SHRR 163. In many cases, "there's side effects that kids didn't like." *Id.* For example, Seroquel, an antipsychotic used to treat schizophrenia, causes weight gain. *Id.* Additionally, Seroquel became a commodity at Crockett. *Id.* at 163–64. The youths who were prescribed Seroquel would often be exploited by other youths who want to get their hands on it. *Id.* To avoid the exploitation, some youths would simply refuse the medication. *Id.*

### 9. Terence was prescribed multiple anti-psychotics while at the Crockett School.

During his time at Crockett, Terence was prescribed Seroquel, Concerta (a nervous system stimulant used to treat ADHD), Clonidine (an anti-hypertensive also used for ADHD), Strattera (another ADHD medication), Adderall (an amphetamine used to treat ADHD), and Prozac (an anti-depressant), among others. 41 SHRR 7–8 (demonstrative). In many cases, the medications he was prescribed were abruptly discontinued or changed. *Id.* The prescriptions were often unsupported by a valid diagnosis and included drugs that were not meant to be taken together. 1 SHCR 152–60.

### 10. The Crockett School, like the Marlin Unit, utilized solitary confinement in the form of a security unit, where children either self-referred or were relegated to as punishment.

Just as in the Marlin unit, Crockett had a security unit where the youths were kept in solitary confinement. 5 SHRR 167. The Crockett security unit, like the Marlin one, was "dark and loud." *Id.* It smelled horrible. *Id.* "It was not a place you'd want - - anybody would want to be." *Id.*

The youths could end up in the security unit in two ways. The first was if they were placed in the "behavioral management program." *Id.* at 166–67. Despite its name, the behavioral management program consisted of punishing youth by placing them in long-term isolation. *Id.* at 167. The youth also could "self-refer" into the security unit to get out of the dangerous, overcrowded dorms. *Id.*

Almost immediately after being placed in the psychiatric dorm in Crockett, Terence began to self-refer to the security unit. In the first several months, he asked to be sent to isolation every few days. *Id.* at 168; 41 SHRR 7–8. Among other reasons, Terence self-referred because he "had family problems and needed time to himself," "was feeling depressed and needed time alone to himself," "[wa]s depressed and cannot maintain on the dorm right now" and "due to not hearing from his family since the hurricane (Rita)." 41 SHRR 12–15. Although one "would think that there would have been a more appropriate, more holistic intervention" when a youth consistently asks to be placed in isolation, that was not the response. 5 SHRR 168. Instead, the response was "[t]o place him in security, isolation, lock him up in a dark room all by himself." *Id.* at 179.

### 11. Terence self-referred to the security unit frequently.

It total, Terence self-referred 38 times. 5 SHRR 181. Such frequent self-referrals indicate that Terence was not high in the "brutal pecking order" that predominated in the dorms. *Id.* at 232. It also indicated that Terence was not some kind of gang leader at Crockett. *Id.* at 242. "[Y]ou're not going to find a Crips leader or Bloods leader, excuse me, on self-referral in the way he was." *Id.*

### 12. Terence was placed in a behavioral management program that was essentially solitary confinement for disruptive, non-violent behavior.

Terence was also placed in the behavior management program. *Id.* at 168–69. The first time was in August of 2005. *Id.* at 168. He was placed in the program due to chronic disruption of a non-violent nature; things like "talking out of turn, not standing in line, talking after lights are out, things like that." *Id.* at 169. Pursuant to the behavior management program, Terence was punished for these infractions by being placed in isolation for three months. *Id.* He was placed in the behavior management program again in April of 2006. *Id.* at 170. Placing youths in isolation for 90 days due to "chronic disruption" "would horrify most current professionals in our justice field today, but it was not unusual at the Texas Youth Commission at the time." *Id.* at 169.

### 13. While in the behavior management program, Terence mentally unraveled and began exhibiting suicidal behavior.

While in isolation on the behavior management program, Terence exhibited suicidal behavior and began "decompensating, becoming unhinged." 5 SHRR 170. "Ninety days in a dark, damp room with no communication, school, will do things."

*Id.* Indeed, Terence repeatedly pleaded for help due to suicidal thoughts. On April 15, 2005, he wrote a letter to the Assistant Principal stating that he was hearing voices telling him to do bad things and that he needed help. 41 SHRR 17. In response, he was issued a 225 and sent to isolation. *Id.* On April 18, 2006, while in isolation under the behavior management program, Terence told TYC staff that "he felt like killing himself" and asked that his caseworker be told that "he doesn't want to kill himself but is having thoughts about it." *Id.* at 18. Terence was issued a 225. On February 13, 2006, while en route to isolation, Terence began violently hitting his head against the wall. *Id.* at 20. He was placed in manual restraints and issued a 225. *Id.*

Sadly, injury-to-self citations were "more common than you can imagine" at TYC. 5 SHRR 187. Part of the problem was that there are "not many ways to express your pain and remorse" for having ended up at TYC. *Id.* It was also "a reflection of trauma that kids have experience in carrying with them, [as well as] the trauma they experience on a daily basis in these facilities." *Id.*

Terence spent his last few months at TYC in isolation, both through self-referrals and the behavior management program. *Id.* at 239. Terence began to exhibit increasingly erratic and bizarre behavior. *Id.* "He's self-referring to get off the dorm. He's – he's lost all hope. He's coming unhinged." *Id.* at 240. This was unsurprising to Mr. Harrell. *Id.* at 239. That was because:

> There's no surprise at all, especially in the diagnosis that's in the record. He's ADHD. Any any – the indication – the associations that they made by issuing these medications are ones that would suggest the last place for someone like Mr. Andrus is in an isolation environment. They will decompensate and become compulsive and incidents like this are bound to surface.

91

*Id.* at 241.

Terence was transferred from TYC to TDCJ after just eighteen months due to his purported failure to "advance" in TYC's program. *Id.* at 190–91. Crockett had attempted to transfer him earlier, but the request was denied on the ground that he had been given medical prescriptions without any appropriate diagnosis *Id.* at 190. Ultimately, TYC "failed Mr. Andrus." Mr. Harrell concluded that "it's unfair that he was held accountable and transferred to TDCJ for not advancing in a program that's debunked, discredited, and thrown out the window." *Id.* at 191.

During Terence's entire time in TYC, Cynthia did not come to visit him once.

> **Q. After being released from TDCJ, Terence attempted to put his life together by moving in with Senecca Booker's brother, Sean and getting a job with him.**

Terence was in TDCJ for less than two months before being released. Terence did not go back to living with Cynthia. Instead, he was offered a place to live by Sean Gilbow and his wife, Phyllis Garner. Sean was Senecca Booker's brother. Through Senecca, Sean had known Terence from the time he was a child. Indeed, they developed a strong bond after Senecca's death. When Terence was a child, he talked a lot with Sean about how Terence "really wanted a father figure." 13 SHRR 163. Terence even told Sean he wished Sean were his father. 6 SHRR 42–43. He began to call Sean "Dad," which Sean was happy for him to do. *Id.* Sean and Phyllis had always thought Terence was a good kid, and felt bad that he had been raised in such a deplorable environment. 13 SHRR 165.

### R. Terence excelled during his time living and working with Sean.

Terence did extremely well during his time with Sean and Phyllis. "Terence was a good houseguest. He was respectful, kind, quiet, and followed the rules of the house. Terence minded his curfew and was always home by ten or eleven at night." 13 SHRR 169. Sean and Phyllis had a daughter, who was a teenager at the time. *Id.* at 165. She remembers Terence fondly. "When he lived with us, he was totally incorporated into the family. . . . [W]e never had any problems with him. . . . He was almost always home. . . . A day in the life living with Terence was really normal. We would watch television, mostly music videos. Terence would take part in meal times where we usually just sat around the television eating." *Id.* at 172.

As Sean Gilbow testified, "We all got along. Terence was very respectful. He liked to cook, and he would clean up after himself." *Id.* at 165. Terence and Sean grew to be very close. As his daughter testified: "[Terence] was extremely close to Sean, and he really looked up to him. Terence would spend a lot of time with him, and they would go to the mall, or they would go out to eat, or they would go play basketball. They would have their own guy time where they would have guy talks." *Id.* at 172.

### S. Terence also started a relationship with a woman whose child he took on as his own.

Terence also developed a relationship with a woman named Charaya Williams. 41 SHRR 100. Charaya had a six-month old daughter named Kemora. *Id.* Kemora's father had abandoned Kemora and Charaya. *Id.* Terence stepped into the role of a father figure. *Id.* As Charaya testified, "Terence loved my daughter and was very good to her. Even though he was not her father, she called him 'Daddy.' Kemora took a

long time to start crawling, and Terence used to get down on the floor with her and try to help her learn to crawl. They had a special bond." *Id.*

### T. Just as had happened with his father years earlier, Sean was arrested and sent back to prison.

Terence got a job working at the Houston Ship Channel with Sean. 6 SHRR 97. Sean would drive Terence to work every day. *Id.* Sean, however, like his brother Senecca, had previously been a crack dealer and had a substantial criminal record. *Id.* About six months after Terence moved in with Sean and Phyllis, Sean re-offended and went back to prison on a drug charge. *Id.*

Losing Sean to prison, just as he had earlier lost his biological father, Michael, was devastating for Terence. 13 SHRR 169. At the same time, Terence also lost his job. There was no public transportation to the ship channel and, without Sean, Terence could not get to work. 6 SHRR 97. Phyllis tried to get Terence a job at her work, but his criminal record made that impossible. 13 SHRR 169. Although Terence applied to many jobs, including working at Jack-In-The-Box and McDonald's, his criminal record got in the way. 6 SHRR 98.

### U. Terence found a job on an offshore oil rig, but lost that job after fighting with racist co-worker.

Eventually, however, Terence found work on an offshore oil rig in the Gulf of Mexico. 13 SHRR 169. Terence was very excited to start a new job. *Id.* Torad came with Terence and worked there, too. *Id.* at 146. Terence was very happy with the job. *Id.* However, he was harassed by a racist co-worker, who called Terence a "nigger." *Id.* A fight broke out and Terence was fired. *Id.* Torad left, too. *Id.*

After losing his job on the oil rig, Terence ended up in the worst possible place for him: Cynthia's house. *Id.* According to Charaya, when Terence came home from the rig, he "seemed different." 41 SHRR 100. "He was skinny, and he was depressed. I would also say he seemed beaten down. He could not find another job and I could see that that took a toll on him and really bothered him." *Id.*

Terence desperately tried to find work to help Charaya and Kemora. *Id.* at 101. "He used to wake up at four in the morning every day to go to the labor center to try to get work. The labor center gave out work to the people who arrived earliest." *Id.* When he couldn't find work, "Terence used to donate blood plasma to get money because he was so desperate to provide for us." *Id.*

### V. Finding no meaningful employment to support his girlfriend and her child, Terence turned to drugs to deal with his depression.

With no economic opportunities and once again surrounded by drugs and crime at Cynthia's house, Terence approached his problems that same way TYC had: with drugs. Terence began using PCP, ecstasy, and cocaine. 41 SHRR 101. He lost over fifty pounds. *Id.* As Charaya testified, "It was as if he gave up." *Id.*

Although Terence had escaped the violence of TYC, violence continued to follow him in his old neighborhood. In 2007, he and Torad were attacked in gang-related violence as they walked down the street. Although Terence was unharmed, the rival gang members shot Torad at close range. Torad was rushed to the hospital where he underwent multiple surgeries to save his life. 6 SHRR 47; 13 SHRR 146.

95

The following year, Terence was attacked in the apartment complex where he was living. Exh. 22 at 9. The attackers believed Terence had some role in one of their brother's recent arrests. *Id*. When Terence resisted the attack, one of them pulled out a gun and pointed it directly at Terence. *Id*.  Terence was able to exit the situation without being further harmed, but he became so concerned for his own safety that he made the fateful choice to acquire a gun of his own. *Id*.

Not long afterward, Terence and Torad were snorting coke and taking other drugs when Terence decided to "go get a car." *Id*. Less than an hour later, the underlying offense occurred.

> ### W. Dr. Scott Hammel testified at the state writ hearing regarding the impact Terence's adverse childhood experiences had on his neurological, emotional, and social development.

The final applicant's witness at the state writ hearing was Dr. Scott Hammel. Dr. Hammel is a clinical psychologist and neuropsychologist. 6 SHRR 118–19. He had extensive experience with TYC, having worked there fulltime for several years as a psychologist. *Id.* at 123. During his time at TYC, he worked in the Giddings unit— the one which Mr. Harrell said was the only well-run facility at TYC—which housed youth who were capital offenders. *Id.* at 124–25. Indeed, during Dr. Hammel's time at Giddings, the facility earned a national reputation for its treatment program, which had a recidivism rate well below the national average. *Id.* at 123–125.

Dr. Hammel provided an assessment of Terence's individual and family history from the perspective of a trained psychologist. To do so, it was important for him to gather information about Terence's biological, social, emotional, and psychological

history. *Id.* at 128–29. In conducting his investigation of Terence's social history, Dr. Hammel reviewed thousands of pages of records from Terence's 20-year life history before the murders. He interviewed multiple members of Terence's family, reviewed the testimony of others who knew Terence well during his childhood, and visited Terence's childhood home in Third Ward. 6 SHRR 132–51, 156–57; 22 SHRR 203–04. Dr. Hammel also interviewed Terence on three occasions. *Id.*

Dr. Hammel explained the psychological concept of adverse childhood experiences or "ACEs." Examples of ACEs include abuse, neglect, and household dysfunction. ACEs are important because they are predictive of long-term problems in a subject's psychological, physical, and emotional development. Indeed, there is a demonstrated correlation between the number and intensity of ACEs a person experiences and the risks of mental illness, social problems and incarceration. Because of this strong correlation, ACEs have been widely studied to assess the risks and protective factors associated with social problems and the resulting financial, legal, and emotional costs. 6 SHRR 152–53. Dr. Hammel identified several key scholarly articles and public documents concerning ACEs that were readily available well before Terence was arrested in 2009. *Id.* at 153–55; 39 SHRR 145–222; 40 SHRR 6–251.

The mirror-image or ACEs are known as resiliencies, which are characteristics that enable an individual to withstand adverse childhood experiences. Resiliencies includes both factors that may be intrinsic to a particular person as well as factors

that come from the presences of supportive individuals in that person's life. 6 SHRR 191.

ACEs are also connected to trauma, a clinically significant term defined in the DSM-V (the Diagnostic and Statistical Manual used by mental health professionals for assessing mental disorders). A person experiences trauma when he has "an experience that is outside the normal limits of human functions and in which the person generally feels that their life has been threatened or their wellbeing has been seriously threatened." *Id.* at 165–66. Trauma can consist of a single event or, more often, can be the result of long-term exposure to abuse or neglect. *Id.*

Trauma affects neurological, emotional, and social development. 7 SHRR 45. Exposure to violence and early trauma especially impedes emotional development, making it harder for the individual to learn "to self-soothe and modulate their own emotions" in response to stressful circumstances." *Id.* at 25. Dr. Hammel explained that "the expectation in normal development is that the individual increasingly learns to self-soothe and modulate and manage their emotions." *Id.* Further, he testified that:

> [W]hen there's a history of trauma that process gets disrupted and often people experience emotions as confusing and overwhelming, [and] are unable to identify specific emotional states in response to even normal human interactions. And, in fact, then their emotions become a liability rather than a source of information that they could use to understand themselves and the world around them more effectively.

*Id.*

Traumatic events induce hyper-vigilance and hyper-arousal in the form of a physiological "fight-or-flight" reaction. The person's body produces an excessive

amount of adrenaline, "heightening reactions, and shifting cognition from the high order parts of the brain to the survival part of the brain and the lower portions of the brain." That neurological response diminishes a person's ability to reason. 6 SHRR 166–67; 7 SHRR 25.

Traumatized children "often act inwardly on themselves when they feel overwhelmed and/or they act outwardly." 7 SHRR 26. As a result, they may have external behavior problems or they may self-harm. *Id.* "Females tend to act more on themselves. Males tend to act more externally." *Id.*

It is common for a person who has endured trauma to seek ways to self-soothe, for instance, by abusing substances that dampen the nervous system—such as marijuana, alcohol, Xanax, and promethazine. *Id.* at 27. This kind of self-medication is, of course, only a short-term solution. When the drugs wear off, the person feels worse, creating a cycle that further affects brain chemistry, perception, and judgment. *Id.* at 28–29, 97.

Terence experienced clinically significant trauma throughout his life, including emotional neglect, physical abuse, parental substance abuse, food insecurity, the incarceration of parental figures, the murders of adults close to his family, domestic violence, a single parent household, exposure to violence, exposure to mental illness, and the trauma of being thrust at a young age into the parental role, caring for siblings absent a parent's guidance.

Being thrust into the parental role while a small child causes an individual to adopt "a stance of excessive self-sufficiency," and feel that his survival depends on

accepting that he cannot trust anyone. 6 SHRR 168. "Young children are not emotionally equipped to meet the emotional needs of their younger siblings. And so while they're trying their best to make everyone happy and do the right thing, they are necessarily going to fail in their efforts." *Id.* at 183.

Cynthia's drug abuse and drug dealing, as well as her choice of partners, normalized drugs and crime for Terence. *Id.* at 211, 221–24. Her choice of drug dealers and other negative role models as partners also underscores just how unstable his home was throughout his childhood. *Id.*

The sexual abuse that Tafarrah—Terence's half-sister—endured at a very young age at the hands of her biological father also likely damaged Terence, even if he was not aware of the details of precisely what happened. *Id.* at 187–89, 217–18. Indeed, Terence and his extended family were rampant with trauma-related risk factors, which also adversely affected Terence. *Id.* at 168–69, 171–75, 177.

Dr. Hammel testified that it was common for the youths in TYC to underreport mental health problems. 7 SHRR 146. The youths did so because of the brutal environment at TYC, where showing any kind of weakness could lead to exploitation and victimization. *Id.*

Dr. Hammel also reviewed a psychiatric assessment conducted by Dr. Julie Alonso-Katzowitz regarding TYC's use of psychotropic drugs on Terence. Dr. Hammel confirmed that, as Dr. Alonso-Katzowtiz found, TYC records show that Terence was given a variety of psychotropic drugs, including Seroquel, that did not correspond to any of the diagnoses he received. For example, Seroquel is an antipsychotic used to

treat bipolar disorder. But Terence never received a diagnosis of bipolar disorder. Moreover, if he had been diagnosed as bipolar, then he should not have been prescribed Prozac, which can have adverse side effects including mania, aggression, and psychosis. 6 SHRR 158–63; 1 SHCR 152–60.

Additionally, Terence's medications were frequently changed and cutoff in a way that could itself have numerous adverse consequences. The effects of the frequent changes to and abrupt discontinuations of his mediations helped explain much of his behavior while in TYC. Indeed, even TYC's central administration recognized that Terence was being prescribed medications without any appropriate diagnosis. 6 SHRR 158–63; 1 SHCR 152–60.

In Dr. Hammel's opinion, Terence likely suffers from a long-standing mood disorder that has never been properly diagnosed or treated. The term "mood disorder" is a bit of a misnomer in that mood disorder is both a well-defined and extremely serious mental health affliction. The DSM defines mood disorder as "a biological disruption in mood functions that results in clinical levels of depression or anxiety or mania." 7 SHRR 71–72. "[I]n order to get a diagnosis of mood disorder, you have to have clinically significant levels of depression or clinically significant levels of anxiety that are not just outside the norm but are causing substantial impairment in functioning." *Id.* at 72.

Dr. Hammel emphasized that the kind of analysis he performed is not about making excuses or arguing for biological or cultural destiny. Rather, his point was to explain how exposure to certain kinds of traumatic events in childhood increases the

probability that an individual will engage in more destructive behaviors including substance abuse as a means to self-medicate. 6 SHRR 193. Moreover, when the process of self-medicating through substance abuse suddenly ceases, it can take up to a year for a person's neurobiology to normalize. In the interim, the person can experience psychotic breaks and serious depression. 7 SHRR 29.

Terence's behavior while incarcerated awaiting trial may have resulted from a sudden withdrawal following long-term substance abuse, a common response to long-term trauma, and a problem TYC recognized but did not treat. That abrupt withdrawal left him completely overwhelmed by emotions that he had tried to manage by abusing mood-altering substances. *Id.* at 28–30.

Dr. Hammel also rebutted the State's assertion at Terence's trial that he was a "sociopath." 51 RR 20, 27; 52 RR 50. The lay term "sociopath" is, in the scientific community, understood as a synonym for a person with psychopathy, which is completely different from someone who is a victim of childhood trauma. 7 SHRR 36–40. Trauma victims have a delay in their neurological, emotional, and social development that "affects their ability to manage their emotions and make decisions and cope in a world." *Id.* at 39. By contrast, "individuals with psychopathy don't necessarily have a history of trauma and tend to exhibit sadism, pleasure harming others, in addition to criminal behavior." *Id.*

## X.   Mr. Crowley celebrated the CCA's refusal to adopt the trial court's recommendation of relief with the State by emailing the prosecutor that "we were right."

Long before any ineffective assistance of counsel claims were raised in Mr. Andrus's state habeas application, he began conferring with the State about possible

102

issues that may be raised. At the state post-conviction hearing, he admitted that he conferred with the State regarding these matters absent any court order to do so. 1 SHRR 147–66. Yet, Mr. Crowley did not stop there. He allowed the State to draft an affidavit for him, in which the State offered up various "strategic" reasons on behalf of Mr. Crowley, including suggesting ways to justify his failure to present mitigating evidence.[6] *Id.*; *see also* 34 SHRR 202–21. He admitted that he did not have personal knowledge of some of the "facts" in his affidavit. 1 SHRR 161. He also told the court he expected to be paid for his time testifying. 3 SHRR 254.

After a lengthy evidentiary hearing was held, the trial court entered detailed findings of fact and conclusions of law on this claim, recommending that relief be granted in the form of a new punishment phase. 1 Sup. SHCR 6–18. However, on February 13, 2019, the CCA held that Mr. Andrus "fail[ed] to meet his burden under *Strickland*" and denied relief on the merits without further explanation. *Ex parte Andrus*, 2018 WL 622783 at \*2. Further, it rejected all findings of fact and conclusions of law entered by the trial court judge. *Id.* at \*3. It did not explain its wholesale rejection of the trial court's findings of fact and conclusions of law.

Tellingly, when Mr. Crowley learned from the prosecutors that the CCA had wiped out the trial court's recommendation to grant relief, he responded: "I knew we were right." Exh. 7.

---

[6] Ms. Olvera also admitted that the State prepared the first draft of her affidavit. 3 SHRR 6.

## STATEMENT REGARDING PROCEDURAL DEFENSES

Federal habeas petitioners are usually, but not always, required to exhaust available state court remedies to obtain relief. 28 U.S.C. § 2254(b)(1). All of the claims in Mr. Andrus's petition are either exhausted or fall within an exception to the exhaustion requirement.

In federal habeas proceedings, the respondent must plead procedural defenses under Rule 5(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Under Rule 5(b), the respondent, by way of the Answer, "must address the allegations in the petition. In addition, [the answer] must state whether any claim in the petition is barred by a failure to exhaust state remedies, a procedural bar, non-retroactivity, or a statute of limitations." Mr. Andrus explicitly reserves the right to reply to any potential procedural defenses raised by the Director regarding every claim in this petition.

## CLAIMS FOR RELIEF

**Claim 1**     **Mr. Andrus's Sixth Amendment right to counsel under *United States v. Cronic* was violated when trial counsel decided to concede Mr. Andrus's guilt without consulting him.**

During closing argument, trial counsel made a complete concession that Mr. Andrus was guilty of capital murder. 45 RR 16–18. Trial counsel admitted Mr. Andrus's guilt without ever consulting with him about whether he agreed with the decision to concede guilt. 2 SHRR 63–64. In so doing, trial counsel entirely failed to subject the State's case to meaningful adversarial testing in violation of Mr. Andrus's Sixth Amendment rights. *United States v. Cronic*, 466 U.S. 648, 659 (1984). This

claim was not presented to the state courts but any default can be excused by state habeas counsel's failure to raise this substantial claim. *Trevino v. Thaler*, 569 U.S. 413 (2013). This violation entitles Mr. Andrus to a new trial without needing to show harm.

### A. Trial counsel entirely failed to subject the State's case to meaningful adversarial testing.

When trial counsel completely concedes all charged elements without consulting with the client, a *Cronic* violation has occurred. *See* 466 U.S. at 656–59. Trial counsel conceded Mr. Andrus's guilt in closing argument, and that the State had proven all elements of the capital murder charge. 45 RR 16–18. Incredibly, he did so without consulting with his client regarding this critical decision. 2 SHRR 63–64. Under *Cronic*, no prejudice or harm assessment is required because this violation is structural error. 466 U.S. at 658

In *Cronic*, the Supreme Court held that some Sixth Amendment right-to-counsel violations "are so likely to prejudice the accused" that a specific showing of harm is unnecessary. *Id.* at 658. This can occur even when the defendant has counsel, because when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* at 659. The Sixth Amendment requires "that the accused have 'counsel acting in the role of an advocate.'" *Id.* at 656 (quoting *Anders v. California*, 386 U.S. 738, 743 (1967)). This requires "the prosecution's case to survive the crucible of meaningful adversarial testing," or a Sixth Amendment violation has occurred. *Id.*

A *Cronic* violation occurs only when the attorney's failure is "complete." *Bell v. Cone*, 535 U.S. 685, 696–97 (2002); *see also United States v. Holman*, 314 F.3d 837, 839 n.1 (7th Cir. 2002) ("*Cronic* only applies if counsel fails to contest *any* portion of the prosecution's case; if counsel mounts a partial defense, *Strickland* is the more appropriate test.") (emphasis in original). When trial counsel argues to the jury "that it is his view of the evidence that there is no reasonable doubt regarding the only factual issues that are in dispute," counsel "has utterly failed to 'subject the prosecution's case to meaningful adversarial testing.'" *United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir. 1991) (quoting *Cronic*, 466 U.S. at 659). The Tenth Circuit has held that "an attorney who adopts and acts upon a belief that his client should be convicted 'fail[s] to function in any meaningful sense as the Government's adversary.'" *Osborn v. Shillinger*, 861 F.2d 612, 625 (10th Cir. 1988), *abrogated on other grounds by Colman v. Thompson*, 501 U.S. 722 (1991) (quoting *Cronic*, 466 U.S. at 666). This is because "[a] defense attorney who abandons his duty of loyalty to his client and effectively joins the state in an effort to attain a conviction . . . . [and] represents the defendant only through a tenuous and unacceptable legal fiction." *Id.* at 629 (internal quotation omitted).

However, *Cronic* does not apply if trial counsel's failure is not complete, where counsel contests an element of the charged offense. If trial counsel concedes that their client commits murder, but not capital murder, *Cronic* is not applicable. *Haynes v. Cain*, 298 F.3d 375, 381–82 (5th Cir. 2002) (en banc). Similarly, if trial counsel argues that the defendant lacked the culpable mental state to commit capital murder, *Cronic*

106

does not apply. *Barbee v. Davis*, 728 F. App'x 259, 264 (5th Cir. 2018). In these scenarios, the familiar two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984) applies and the petitioner must establish prejudice. None of these scenarios apply in this instance.

Trial counsel cannot make a complete concession of their client's guilt without consulting them. *See Wiley v. Sanders*, 647 F.2d 642, 650 (6th Cir. 1981) (reversing a conviction when trial counsel conceded their client's guilt without consulting the client). In *Florida v. Nixon*, 543 U.S. 175 (2004), trial counsel told their client on multiple occasions he intended to concede guilt; the client was unresponsive and did not protest or approve of the strategy. *Id.* at 181. The Supreme Court held that even a full concession of guilt does not automatically mean that "counsel has entirely failed to function as the client's advocate," if counsel has informed the client of the decision to concede. *Id.* at 189–91. Yet, the Supreme Court explained that "[a]n attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Id.* at 187 (citing *Strickland*, 466 U.S. at 688). And "certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate." *Id.* The court explained that trial counsel was "obliged" to inform the client of his strategy to concede guilt, and did so. *Id.* at 189. *Nixon* stands for the proposition that, while trial counsel does not necessarily need explicit consent to concede guilt, they must at least inform the defendant of that plan.

In this instance, Mr. Andrus received no meaningful advocacy at the guilt/innocence phase of trial. Trial counsel offered no opening statement, conducted extremely limited cross examination of the State's witnesses, called no witnesses for the defense, made no objections to the jury charge, and offered a complete concession of all charged elements in a closing argument that takes up less than three pages of the transcript. 38 RR 38; 44 RR 4; 45 RR at 15–18.

In light of trial counsel's wholesale failure to mount any defense, the State began its closing argument by asking "[l]adies and gentlemen, you have to be thinking to yourself right now, what are we doing? For three days of testimony, what's the issue?" 45 RR 7. Mr. Crowley then told the jury that "[y]ou've heard pretty overwhelming evidence" of guilt, and that he was not intending to argue that Mr. Andrus was "not guilty because he was drunk, he was on drugs, anything like that." *Id.* at 16. Mr. Crowley thought then that the jurors "might ask, why did you not just plead guilty?"[7] He implored the jury to "[l]ook at the whole case" and the statement from Mr. Andrus, which, "even under those facts . . . it still established their elements." *Id.* In final summation, the State repeatedly commended Mr. Crowley for conceding Mr. Andrus's guilt. "Thank you, Mr. Crowley. I appreciate your comments.

---

[7] Mr. Crowley operated under a significant misunderstanding of the law. He told the jury that "under the law, certain pretrial matters were raised that if we plead guilty, then we can't preserve that error to later take up on appeal." Trial counsel did not understand the governing legal principles correctly. "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland.*" *Hinton v. Alabama*, 571 U.S. 263, 274 (2014). Texas law permits a defendant to "appeal rulings on written, pre-trial motions after a plea of guilty[.]" *Young v. State*, 8 S.W.3d 656, 666 (Tex. Crim. App. 2000). Thus, Mr. Andrus would have been able to appeal the ruling on the suppression motion, even had he pled guilty, despite trial counsel's subjective—and more importantly, incorrect—belief to the contrary. *See* Claim Three, *infra.*

Sid and I go back a long way. And he's right. . . . guilt or innocence is really not going to be an issue." *Id.* at 18; *see also id.* at 25 ("Mr. Crowley, I appreciate your comments."). The State argued that Mr. Andrus "did exactly what he is charged with, and even Mr. Crowley knows that." *Id.* at 25.

As reflected in the record, Mr. Crowley admitted during the state post-conviction hearing that he conceded Mr. Andrus's guilt. 2 SHRR 59–60. Inconceivably, he admitted that he did so without consulting with Mr. Andrus in regards to this decision, or without gaining his consent to concede his guilt. Mr. Crowley unequivocally testified "no" when asked whether he had asked Mr. Andrus for consent to do so, and instead said that "[b]asically I [just] made my argument." *Id.* at 63–64. It is perhaps unsurprising that Mr. Crowley did not bother to consult with Mr. Andrus regarding this decision, given that lack of contact that Mr. Crowley had with his client: only recording meetings with Mr. Andrus at the jail a mere six times over the four years he was appointed in his billing records—the first of which occurred nearly eight months *after* his appointment. 1 SHRR 188–90; 2 SHRR 59.

Mr. Crowley's actions constitute a *Cronic* violation because he entirely failed to subject the State's case to any meaningful adversarial testing. After mounting no type of defense at the guilt/innocence phase, trial counsel completely conceded that the State had proven all elements of capital murder—which the State repeatedly thanked Mr. Crowley for doing. 45 RR 16–18, 25. This occurred without consulting with Mr. Andrus. 2 SHRR 63–64. Mr. Crowley's actions were a constructive denial of

counsel, as he entirely abdicated his role as advocate for Mr. Andrus, and instead, joined the State in ensuring Mr. Andrus would be convicted.

Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

## B. Any default is excused by state habeas counsel's failure to raise this substantial claim.

This claim was not presented to the state courts. State habeas counsel did not raise this substantial ineffective assistance of counsel claim in state habeas proceedings. State habeas counsel's ineffectiveness excuses any default of the claim that the Director may allege. *See Trevino*, 569 U.S. at 429. Section (A), *supra,* demonstrates the substantiality of the underlying claim.

## Claim 2    Mr. Andrus's Sixth Amendment right to insist that trial counsel maintain his innocence under *McCoy v. Louisiana* was violated.

During closing argument at the guilt phase, Mr. Andrus's trial counsel conceded that he was guilty of capital murder. 45 RR 16–18. Trial counsel admitted that this concession occurred without consultation with or consent from Mr. Andrus. 2 SHRR 59, 62–63. Because Mr. Andrus made express statements of his desire not to concede guilt, his Sixth Amendment right as interpreted in *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), was violated. This claim is unexhausted and Mr. Andrus anticipates filing a motion to return to state court to exhaust this claim. This violation entitles Mr. Andrus to a new trial.

### A.     Mr. Andrus's Sixth Amendment right was violated.

Under the Sixth Amendment, a client has the right to control the objectives of his defense. In *McCoy v. Louisiana*, the Supreme Court held that "[w]hen a client expressly asserts that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." 138 S. Ct. 1500, 1509 (2018) (emphasis in original). Therefore, "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." *Id.* at 1505. While it is counsel's duty to make "strategic choices about how to best achieve a client's objectives," the client determines what the objectives of the defense are. *Id.* at 1508. The Supreme Court explained that:

> Counsel may reasonably assess a concession of guilt as best suited to avoiding the death penalty, as [the trial lawyer] did in this case. But the client may not share that objective. . . . When a client expressly asserts that the objective of "*his* defence" is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt. U.S. Const. Amdt. 6 (emphasis added); see ABA Model Rule of Professional Conduct 1.2(a) (2016) (a "lawyer shall abide by a client's decisions concerning the objectives of the representation").

*Id.* at 1508–09.

Because this Sixth Amendment right is one of the client's autonomy to control the objectives of the defense, not the competency of trial counsel, jurisprudence relating to ineffective assistance of counsel—including the need to show prejudice— does not apply. 138 S. Ct. at 1504. Instead, this violation is a structural error that does not require the defendant to show prejudice. *Id.* at 1511. Therefore, courts should

not assess the likelihood that counsel overriding client's wishes and conceding guilt impacted the outcome of trial.

In *McCoy*, trial counsel conceded that the defendant was guilty in opening and closing statements, over the client's objection. 138 S. Ct. at 1506–07. Trial counsel conceded guilt to try and build credibility with the jury, which he felt increased the chances of the client receiving a sentence less than death. *Id.* at 1510. However, because counsel was on notice that the client did not want him to concede his guilt, the concession violated the defendant's Sixth Amendment right to control the objectives of his defense. As it was structural error, the Supreme Court reversed the conviction for a new trial with no assessment of prejudice. *Id.* at 1512.

To establish that his Sixth Amendment right to control the objective of his defense was violated, Mr. Andrus must show that he made an express statement to his trial counsel that he wished to maintain his innocence, and that trial counsel overrode this stated desire and conceded his guilt. *See McCoy*, 138 S. Ct. at 1508–09. Despite Mr. Andrus making express statements that indicated he wished to maintain his innocence, trial counsel conceded his guilt. Because Mr. Andrus's Sixth Amendment right to maintain his innocence was improperly overridden by his trial counsel, he is entitled to a new trial. This violation is structural, and no harm analysis is required. Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

### 1. Mr. Andrus made express statements of his will to maintain his innocence.

Mr. Andrus received no meaningful advocacy during the guilt/innocence phase of trial. *See* Claim One, *supra*. Trial counsel unequivocally conceded Mr. Andrus guilt. 2 SHRR 59–60. During closing argument, Mr. Crowley told the jury that "[y]ou've heard pretty overwhelming evidence" of guilt, and that he was not intending to argue that Mr. Andrus was "not guilty because he was drunk, he was on drugs, anything like that." 45 RR 16. Mr. Crowley thought then that the jurors "might ask, why did you not just plead guilty?" He implored the jury to "[l]ook at the whole case" and the statement from Mr. Andrus, which, "even under those facts . . . it still established their elements." *Id*. This argument was a clear concession of guilt.

### 2. Trial counsel overrode Mr. Andrus's will by conceding his guilt.

While Mr. Crowley conceded Mr. Andrus's guilt without consulting him, 2 SHRR 63–64, Mr. Crowley was, or should have been, aware of Mr. Andrus's express desire not to concede guilt for the following non-exhaustive reasons. *See McCoy*, 138 S. Ct. at 1508–09. Mr. Andrus *himself* had to file a motion to suppress his confession—a clear indication that he did not want to concede his guilt—and later a motion to remove Mr. Crowley. CR 14–18; 34 SHRR 86–95. During Mr. Andrus's testimony, the State cross-examined him by pointing out that he pled not guilty in an attempt to argue that he was not remorseful.[8] 51 RR 70. This also indicates Mr. Andrus's desire to maintain his innocence.

---

[8] While trial counsel's objection to this question was sustained and it has no evidentiary value, it can still be considered in this context.

### 3.   This Sixth Amendment violation is structural error.

A Sixth Amendment violation that trial counsel overrode the client's express desire to maintain innocence is a structural error that does not require the defendant to show prejudice. *McCoy*, 138 S. Ct. at 1511. No harm analysis is conducted, and Mr. Andrus does not need to show that trial counsel's concession impacted the outcome of the case. Therefore, Mr. Andrus is entitled to a new trial in light of this Sixth Amendment violation, because his trial counsel overrode his will to maintain his innocence and conceded his guilt to the jury.

### B.      This claim is unexhausted.

This claim is unexhausted as it was not presented to the state courts. Mr. Andrus expects to seek a stay under *Rhines v. Weber*, 544 U.S. 269 (2005), so that he may return to state court and exhaust it. Because plausible arguments exist that could lead to the state court authorizing it to proceed as a successive state habeas application, it would be premature to determine this claim is procedurally defaulted and barred from federal review.

### Claim 3      Mr. Andrus's Sixth Amendment right to counsel was violated when trial counsel conceded that he was guilty.

During closing argument, trial counsel made a complete concession that Mr. Andrus was guilty of capital murder. 45 RR 16–18. Trial counsel made the declaration of guilt without ever consulting with Mr. Andrus about whether he agreed with the decision to completely concede guilt. 2 SHRR 63–64. In so doing, trial counsel entirely failed to subject the State's case to meaningful adversarial testing in violation of Mr. Andrus's Sixth Amendment rights. *See Strickland v. Washington*, 466 U.S. 668 (1984).

This claim was not presented to the state courts but any default can be excused by state habeas counsel's failure to raise this substantial claim. *Trevino v. Thaler*, 569 U.S. 413 (2013). This violation entitles Mr. Andrus to a new trial.

### A. Trial counsel's performance was prejudicially deficient.

To establish ineffective assistance of counsel, Mr. Andrus must show that trial counsel's performance was deficient and that the deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687. Trial counsel's concession that Mr. Andrus was guilty meets both prongs of this test. Therefore, Mr. Andrus's Sixth Amendment right to counsel was violated and his conviction should be reversed. Mr. Andrus's position is that prejudice should be presumed regarding this allegation. *See* Claim One, *supra*. He pleads this theory under *Strickland* only in the alternative. Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

### 1. Trial counsel's performance was deficient.

Trial counsel conceded Mr. Andrus's guilt in closing argument. 45 RR 16–18; *see Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) ("The right to effective assistance extends to closing arguments."). Incredibly, he did so without consulting with his client regarding this critical decision. 2 SHRR 63–64. Trial counsel cannot concede their client's guilt without consulting them. As the Supreme Court explained in *Florida v. Nixon*, 543 U.S. 175 (2004), "[a]n attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Id.* at 187 (citing *Strickland*, 466 U.S. at 688). And "certain decisions regarding the exercise or waiver of basic trial rights are of such

moment that they cannot be made for the defendant by a surrogate." *Id.* A decision to concede guilt requires consultation with the client.

Trial counsel's conduct is egregious in light of his misunderstanding of the law on a related point—his mistaken belief that Mr. Andrus could not appeal the denial of his suppression motion if he pled guilty. Mr. Crowley testified during the state habeas hearing that when he explained to the jury that Mr. Andrus could not plead guilty and preserve error, 45 RR 16, he was referencing preserving error on the motion to suppress. 2 SHRR 60. However, Mr. Crowley did not understand the governing legal principles correctly. "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014). Texas law permits a defendant to "appeal rulings on written, pre-trial motions after a plea of guilty[.]" *Young v. State*, 8 S.W.3d 656, 666 (Tex. Crim. App. 2000). Thus, Mr. Andrus could have appealed the ruling on the suppression motion, even had he pled guilty, despite trial counsel's subjective—and more important, incorrect—belief to the contrary.

### 2. The deficiency was prejudicial.

Trial counsel's deficient performance is a Sixth Amendment violation when it was sufficiently prejudicial—meaning it had a reasonably probable effect on the guilt phase outcome. *Strickland*, 466 U.S. at 698. Trial counsel's concession that Mr. Andrus was guilty would have, to a near certainty, had an impact on the jury's deliberations. *United States v. Swanson*, 943 F.2d 1070, 1075 (9th Cir. 1991) ("We cannot envision a situation more damaging to an accused than to have his own

attorney tell the jury that there is no reasonable doubt that his client was the person who committed the conduct that constituted the crime charged in the indictment."); *Wiley v. Sowders*, 647 F.2d 642, 650 (6th Cir. 1981) ("[F]or all practical purposes, counsel's admission of guilt on behalf of his client denied to petitioner his constitutional right to have his guilt or innocence decided by the jury."). Based on trial counsel's deficient concession of guilt, Mr. Andrus can establish a reasonable probability of a different outcome. *See Strickland*, 466 U.S. at 698.

**B.     Any default is excused by state habeas counsel's failure to raise this substantial claim.**

This claim was not presented to the state courts. State habeas counsel did not raise this substantial ineffective assistance of counsel claim in state habeas proceedings. State habeas counsel's ineffectiveness excuses any default of the claim that the Director may allege. *See Trevino*, 569 U.S. at 429. Section (A), *supra,* demonstrates the substantiality of the underlying claim.

**Claim 4         Mr. Andrus's Sixth Amendment right to counsel was violated when trial counsel failed to investigate and present mitigating evidence.**

Trial counsel's failure to investigate and present mitigating evidence violated Mr. Andrus's Sixth Amendment right to the effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). This claim is exhausted and satisfies the relitigation bar of 28 U.S.C. § 2254(d), because the state court's decision was legally and factually unreasonable. This violation entitles Mr. Andrus to a new punishment phase.

117

## A.     Trial counsel's performance was prejudicially deficient.

Under the Sixth Amendment, a criminal defendant is guaranteed the right to effective assistance of counsel. To establish ineffective assistance of counsel, Mr. Andrus must show that trial counsel's performance was deficient and that counsel's deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In assessing counsel's performance, courts look to the "[p]revailing norms of practice as reflected in [the] American Bar Association standards and the like." *See Strickland*, 466 U.S. at 688–89. To establish prejudice, Mr. Andrus must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Id.* at 693–94. Trial counsel's failure to investigate and present mitigating evidence meets both prongs of this test. Therefore, Mr. Andrus's Sixth Amendment right to counsel was violated and his sentence should be reversed. Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

### 1.  Trial counsel's performance was deficient.

Investigation is the backbone of trial defense, for all phases of the litigation. Under clearly established Supreme Court precedent, "[i]t is unquestioned that under the prevailing professional norms . . . counsel ha[s] an 'obligation to conduct a thorough investigation of the defendant's background.'" *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). Trial counsel's failure to make reasonable investigative decisions in light of available information

constitutes deficient performance. *See Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); *id.* at 523 (explaining that the focus of a deficiency inquiry is on "whether the investigating supporting counsel's decisions . . . itself was reasonable").

Trial counsel may not "ignore[] pertinent avenues for investigation of which he should have been aware." *Porter v. McCollum*, 558 U.S. 30, 40 (2009). Trial counsel's duty to investigate exists even if the defendant or his family tells counsel that no mitigation evidence exists. *Rompilla v. Beard*, 545 U.S. 374, 377 (2005). Courts cannot "condone unreasonable decisions parading under the umbrella of strategy," or "fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (internal quotation omitted).

Tracking the clearly established Supreme Court precedent, professional norms prevailing during Mr. Andrus's trial underscore defense counsel's paramount duty to investigate and prepare for the punishment phase. *See ABA Guidelines*, Guideline 10.7(A) ("[C]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."); *id.* at 10.11(A) ("[C]ounsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation.").

Among many other serious short comings, Mr. Crowley performed essentially no work on the case for three-and-a-half years. Mr. Crowley only began to prepare for trial roughly a month before the start of voir dire. 13 SHRR 50, 97; 14 SHRR 57. He did not conduct any mitigation investigation. He did not retain a mitigation specialist. 3 SHRR 119–20. While his temporary co-counsel, Jerome Godinich, retained a mitigation specialist, Amy Martin, Ms. Martin was only able to perform some initial investigative tasks before she resigned in protest to Mr. Crowley's actions. 14 SHRR 35. Although Ms. Martin forwarded her files to Mr. Crowley, he failed to follow up on the leads she developed.

There were numerous red flags that mitigation investigation would be worthwhile, not least of which was the fact that Mr. Andrus' mother was extremely unhelpful when counsel attempted to contact her and the fact that she told Ms. Martin she was hoping to cash in a life insurance policy on Mr. Andrus. 13 SHRR 237. Yet, Mr. Crowley failed to interview Mr. Andrus' family members. He also failed to interview people who would clearly have known Mr. Andrus well, such as his stepmother whose home he lived in for a time, or Sean Gilbow and Phyllis Garner, with whom Mr. Andrus also lived for a time. 3 SHRR 119–20, 135–36.

Mr. Andrus's records also suggested that he had serious problems in his home life as a child. Mr. Andrus' records indicated that he had been diagnosed with serious mental health conditions as young as 11, that he had been diagnosed with other mental health conditions when he was at TYC and in pretrial detention, and that he had been prescribed antipsychotic and psychotropic drugs. 41 SHRR 7–8. Moreover,

Terence's behavior in jail, including attempting suicide, indicated that Mr. Andrus's mental health would be an important issue. Yet, Mr. Crowley failed to contact a psychologist until a month before voir dire started and then refused to read the report the psychologist generated. 13 SHRR 32; 3 SHRR 131–32.

Due to the massive scandal that erupted at TYC shortly after Mr. Andrus was released, Mr. Crowley surely should have known that the conditions in which Mr. Andrus was confined were problematic, to say the least. Experts on TYC actually reached out to Ms. Olvera about providing testimony concerning TYC, but Mr. Crowley did not pursue such an expert. 3 SHRR 124. Mr. Crowley conducted no investigation concerning Mr. Andrus's confinement at TYC.

Mr. Crowley ultimately made Cynthia Andrus his star witness on mitigation, without having met or even interviewed her at all. Ms. Andrus told Mr. Crowley that her "life was not on trial" and that she would not "tell stories" about herself, but Mr. Crowley had her testify anyway. Mr. Crowley also never interviewed Mr. Andrus father, but likewise had him testify anyway.

Mr. Crowley did not provide adequate information to Dr. Roache, the one expert he did call to testify, and did not adequately prepare Dr. Roache for his testimony. 3 SHRR 98; 13 SHRR 98. He also asked Dr. Roache to speak with Mr. Felcman without Mr. Crowley being present. Mr. Crowley also failed to adequately prepare for Mr. Martin testimony and did not adequately prepare Mr. Martin to testify.

Ms. Olvera was appointed second-chair counsel in June of 2012, about three months before voir dire began. Ms. Olvera dedicated most of her time to simply getting up to speed on the case before trial. As she herself admitted, she "didn't do" mitigation. She did not perform any mitigation investigation besides speaking on the telephone with Cynthia and possibly one of Mr. Andrus's half-siblings. 4 SHRR 15–25.

Neither Mr. Crowley nor Ms. Olvera sought a continuance in order to complete an adequate mitigation investigation.

## 2.  The deficiency was prejudicial.

Deficient performance represents a Sixth Amendment violation when it was sufficiently prejudicial—i.e., when it has a reasonably probable effect on a guilt or punishment phase outcome. *Strickland*, 466 U.S. at 698. Regarding the punishment phase, the prejudice inquiry looks to "the totality of available mitigation evidence— both that adduced at trial, and the evidence adduced in the habeas proceeding[s]," and evaluates how the difference would have affected the sentencing phase. *Porter*, 558 U.S. at 41 (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)). The inquiry into whether a "facially deficient mitigation investigation might have prejudiced the [petitioner]" should never be foreclosed based on "counsel's effort to present some mitigation evidence." *Sears v. Upton*, 561 U.S. 945, 955 (2010); *see also Walbey v. Quarterman*, 309 Fed. App'x 795, 802 (5th Cir. 2009) ("This standard clearly contemplates that even when *some* mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete.") (emphasis in original).

As the trial court stated, Mr. Andrus presented a "tidal wave" of mitigation evidence during post-conviction review. 6 SHRR 101. Had Mr. Crowley performed an adequate investigation, he could have presented evidence that Mr. Andrus's mother, was a drug dealer and prostitute who had abused and abandoned her children, sold drugs out of her home where her five children slept in a single bed, brought dangerous men to live with them, and left Terence to feed and supervise his half-siblings when Terence was ten years old.

A competent mitigation would have also revealed the shocking conditions Mr. Andrus endured at TYC. The defense could have shown that Mr. Andrus was held either in a "Lord of the Flies" environment in the dormitories or in complete isolation. 5 SHRR 179, 189. The defense also could have shown that Mr. Andrus was suicidal, but that the mental health regime at TYC consisted on imposing "medical restraints" on youth using powerful psychotropic drugs. 5 SHRR 162. The defense also could have shown that TYC wholly failed to rehabilitate youth or provide an education. 5 SHRR 191.

Had the defense investigated Mr. Andrus's mental health, it could have shown that Mr. Andrus experienced serious mental health issues since he was a child. The defense could have explained that Mr. Andrus experienced severe childhood trauma and explained the effect of that trauma on Mr. Andrus's development. The defense also could have explained the effects of the numerous, powerful drugs that Mr. Andrus was given at both TYC and in pre-trial detention. The defense could have

shown how Mr. Andrus's mental health issues helped explain the tragic choices he made that left two people dead.

Finally, had Mr. Crowley performed competently, Cynthia Andrus would not have been presented as a defense witness and the jury would not have heard her untruthful testimony about Terence's childhood. Likewise, the jury would not have heard Michael Davis's inaccurate speculation about his son's childhood. Had Mr. Crowley prepared properly, he also either would not have had Dr. Roache testify or would have adequately prepared him so that he could offer meaningful testimony concerning Mr. Andrus. Competent defense counsel also would not have been permitted the prosecution to idly speculate with Dr. Roache about whether Mr. Andrus is a "sociopath." Competent defense counsel also would not have called a lay witness who volunteered the expert opinion that Mr. Andrus suffers from anti-social personality disorder.

Thus, had Mr. Crowley performed competently, not only would a "tidal wave" of mitigating evidence have been presented, but the jury would not have heard a substantial amount of aggravating and inaccurate evidence. With competent counsel, Mr. Andrus never would have taken the stand to testify, and the damage done by Mr. Felcman on cross-examination would not have happened.

Even if Mr. Andrus had testified, however, his testimony would have been corroborated by the other mitigation witnesses, not contradicted. An adequate mitigation investigation would have supported Mr. Andrus credibility. Without a competent mitigation investigation, Mr. Andrus's credibility was destroyed.

**B.   28 U.S.C. § 2254(d) does not preclude the relitigation of this claim.**

This claim is exhausted, as it was presented as Claim One of Mr. Andrus's state habeas application. 1 SHCR 53–113. After a lengthy evidentiary hearing was held, the trial court entered detailed findings of fact and conclusions of law on this claim, recommending that relief be granted. 1 Sup. SHCR 6–18. Those findings of fact included various credibility determinations regarding the witnesses presented. *Id.* Relying heavily on clearly established Supreme Court precedent, the trial court concluded its detailed findings with the following:

> (nnnn) The Court finds and concludes that in the present case, there was ample mitigating evidence which could have, and should have, been presented at the punishment phase of Applicant's trial. *Wiggins v. Smith*, 539 U.S. 510, 522 (2003).

> (oooo) The Court finds and concludes that relevant, available, and persuasive mitigating evidence was not presented at Applicant's trial because his lead trial counsel failed to conduct a thorough investigation into Applicant's background. *Wiggins v. Smith*, 539 U.S. 510, 522 (2003).

> (pppp) The Court finds and concludes that lead trial counsel's decision not to introduce mitigating evidence was unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003).

> (qqqq) The Court finds and concludes that just as in *Wiggins*, Applicant's lead trial counsel was ineffective in failing to investigate and present mitigating evidence regarding the defendant's abusive and neglectful childhood. *Wiggins v. Smith*, 539 U.S. 510, 517 (2003).

> (rrrr) The Court finds and concludes that Applicant's lead trial counsel was ineffective in failing to investigate and present all other mitigating evidence, including, but not limited to: mental health history, his incarceration at the Texas Youth Commission, the scandal at the Texas Youth Commission, educational history, the circumstances of Applicant's child development, Applicant's family history, and the diagnosis of serious mental illness, which was available at trial, as detailed above. *See Wiggins v. Smith*, 539 U.S. 510, 523 (2003).

(ssss) The Court finds and concludes that Applicant's lead trial counsel was ineffective in failing to retain the necessary experts to investigate and present all available mitigating evidence at the punishment phase of Applicant's trial. *See Wiggins v. Smith*, 539 U.S. 510, 523 (2003).

(tttt) The Court finds and concludes that Applicant is entitled to Habeas Corpus Relief with respect to his first claim. *See Wiggins v. Smith*, 539 U.S. 510, 523 (2003).

*Id.* at 17–18.

However, the CCA held that Mr. Andrus "fail[ed] to meet his burden under *Strickland*" and denied relief on the merits without further explanation. *Ex parte Andrus*, 2018 WL 622783 at *2. Further, it rejected all findings of fact and conclusions of law entered by the trial court judge. *Id.* at *3. It did not explain its wholesale rejection of the trial court's findings of fact and conclusions of law.

Because this claim was adjudicated on the merits in state court, an exception to the relitigation bar of 28 U.S.C. § 2254(d) must be present. This requires a finding that the state court decision was "(1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States'; or (2) 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (quoting 28 U.S.C. § 2254(d)). Only one exception to the relitigation bar need be present. In light of the evidence presented in the state proceedings, the state court decision rejecting this claim necessarily either involved an unreasonable application of the *Strickland* standard and its progeny regarding the investigation and presentation of mitigating evidence, or was based on an unreasonable determination of facts, thus an exception

to the relitigation bar is present. *See, e.g.*, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000).

**Claim 5**     **Mr. Andrus's Sixth Amendment right to counsel was violated when trial counsel failed to investigate the extraneous offenses the State presented.**

Trial counsel admitted, on record, that they did not investigate the State's case in aggravation in preparation for the penalty phase. 3 SHRR 64; 4 SHRR 37. Trial counsel's failure to do so constituted ineffective assistance of counsel, in violation of Mr. Andrus's Sixth Amendment rights. *See Strickland v. Washington*, 466 U.S. 668 (1984). This claim was not presented to the state courts but any default can be excused by state habeas counsel's failure to raise this substantial claim. *Trevino v. Thaler*, 569 U.S. 413 (2013). This violation entitles Mr. Andrus to a new punishment phase.

### A.     Trial counsel's performance was prejudicially deficient.

To establish ineffective assistance of counsel, Mr. Andrus must show that trial counsel's performance was deficient and that the deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687. Trial counsel's failure to investigate the State's case in aggravation meets both prongs of this test. Therefore, Mr. Andrus's Sixth Amendment right to counsel was violated and his sentence should be reversed. Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

#### 1.     Trial counsel's performance was deficient.

Trial counsel failed to conduct an objectively reasonable investigation into the State's case in aggravation at the punishment phase. Prevailing professional norms

at the time of Mr. Andrus's trial required counsel to conduct an independent investigation of the state's case in aggravation. The Supreme Court of the United States has noted the importance of defense counsel investigating extraneous offenses and that it is insufficient to merely accept the State's version of events at face value. *Rompilla v. Beard*, 545 U.S. 374, 389 (2005); *see also ABA Guidelines*, Guideline 10.7(A) ("[C]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."); *Texas Guidelines*, Guideline 11.1(A)(3)(b)(iii) ("The investigation for the punishment phase of the trial should generally encompass. . . [d]evelopment of rebuttal witnesses for State's extraneous offenses, if any[.]"). Prevailing professional norms also include discussing with the client the "strategy for meeting the prosecution's case in aggravation," to consider witnesses who "would rebut or explain evidence presented by the prosecutors," and to "determine at the earliest possible time what aggravating factors the prosecution will rely upon in seeking the death penalty and what evidence will be offered in support thereof." *Texas Guidelines*, Guideline 11.7.

Defense counsel "failed to make reasonable efforts" to review and rebut the impact of Mr. Andrus's prior convictions, arrests, and other extraneous offenses. *See Rompilla*, 545 U.S. at 389. Trial counsel was put on notice of the State's intent to present the aggravating evidence, yet failed to conduct an independent investigation into it.

### 2. The deficiency was prejudicial.

Trial counsel's deficient performance is a Sixth Amendment violation when it was sufficiently prejudicial—meaning that it had a reasonably probable effect on the

guilt phase outcome. *Strickland*, 466 U.S. at 698. Had trial counsel conducted an adequate investigation into the aggravating evidence the State provided notice it would be presenting, significant evidence was available to counter the State's narrative. Instead of conducting the independent investigation mandated by prevailing professional norms, trial counsel *conceded* that Mr. Andrus was a future danger. *See* Claim Eight, *infra*. The volume of easily-available evidence to counter the State's presentation establishes that this error was prejudicial. *See Lyons v. McCotter*, 770 F.2d 529, 534 (5th Cir. 1985) ("[T]o pass over the admission of prejudicial and clearly inadmissible evidence, as here, has no strategic value.").

### a. Farida Faheem.

Trial counsel's failure to conduct an independent investigation into the extraneous offenses the State intended on offering allowed the State to present in aggravation *a robbery that Mr. Andrus did not commit. See Johnson v. Mississippi*, 486 U.S. 578 (1988) (reversing death sentenced based on a felony conviction that was later vacated). Ms. Faheem had been robbed several times. At trial, she testified to a much more aggravated robbery than the one Mr. Andrus was involved with. 46 RR 30-32. Ms. Faheem testified that the robber followed her into a dark parking lot late at night, fought her for her purse, ran as she pursued him, and ultimately absconded with a substantial sum of money. *Id*. The event that concerned Mr. Andrus, by contrast, was much less serious. Mr. Andrus and his brother were caught sorting through the contents of a purse that another person had taken off a counter. The purse and its contents were returned to Ms. Faheem. Exh. 21.

### b. Tuan Tran.

The State presented evidence that Mr. Tran identified Mr. Andrus from a six-person photo array. 46 RR 75-77. This was the only evidence presented that tied Mr. Andrus to the offense. Had Mr. Crowley investigated the offense, he would have learned that Mr. Tran was actually given binders containing hundreds of photos and that he identified someone in one of those binders. Exh. 13. This was a completely different identification process than what Detective Williams testified to at trial. Detective Williams also inaccurately testified that he had not done any work on the case before showing Mr. Tran the purported photo array. Had Mr. Crowley showed that Detective Williams testified to an identification process that never happened, it is unlikely that the jury would have concluded that Mr. Andrus had in fact committed the offense.

### c. Koenig Robbery.

If Mr. Crowley had investigated the Koenig robbery, he would have known that, although Mr. Andrus was at first identified as the gunman, it was later determined that the gunman had been Derrick McGowan. 19 SHRR 101. Mr. Andrus pleaded guilty to solicitation and stipulated that he had encouraged Mr. McGowan to commit the robbery, which suggests that he also was not the person who took Ms. Koenig's bag.

Yet, the State asserted that Mr. Andrus had been the gunman in the Koenig Robbery. 52 RR 23–24. Mr. Crowley failed to use the available documents and information to show that was not true.

#### d. Context for issues in jail.

Mr. Crowley failed to investigate Mr. Andrus's experience at TYC, his multiple suicide attempts, his diagnoses of serious mental health conditions, his frequently changing and contra-indicated prescriptions of anti-psychotic and psychotropic drugs, and the effect on his emotional and cognitive development of repeated and severe childhood trauma. Had he done so, he could have presented evidence that would have provided critical context to Mr. Andrus's bizarre and at times unhinged behavior while in pretrial detention that would have substantially blunted the State's evidence of that behavior at the punishment phase.

### B. Any default is excused by state habeas counsel's failure to raise this substantial claim.

This claim was not presented to the state courts, as state habeas counsel did not raise this substantial ineffective assistance of counsel claim in state habeas proceedings. State habeas counsel's ineffectiveness excuses any default of the claim that the Director may allege. *See Trevino*, 569 U.S. at 429. Section (A), *supra,* demonstrates the substantiality of the underlying claim.

### Claim 6        Mr. Andrus's due process rights were violated when the State elicited false testimony.

Under the Fourteenth Amendment, the State may not elicit or fail to correct testimony that it knows or should know to be false. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citing *Alcorta v. Texas*, 355 U.S. 28, 78 (1957)). Here, the State elicited false testimony concerning the theft from Farida Faheem, the robbery of Tuan Tran, and the Koenig robbery. This claim is unexhausted and Mr. Andrus anticipates

filing a motion to return to state court to exhaust this claim. This violation entitles Mr. Andrus to a new punishment phase.

### A.     The State's presentation of false testimony violated Mr. Andrus's due process

Presentation of false testimony violates due process and is "inconsistent with the rudimentary demands of justice." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). To establish a due process violation, a petitioner must show that false testimony was presented to the jury, that the prosecution knew or should have known of its falsity, and that the false testimony "could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio v. United States*, 405 U.S. 150, 153–54 (1972) (quoting *Napue*, 360 U.S. 264, 271 (1959); *see also Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (finding the defendant's due process rights were violated where State's witness "gave the jury [a] false impression"). Moreover, "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Napue*, 360 U.S. at 269. Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

### 1.     The State presented false testimony.

The State presented testimony that was false, or at least gave the jury a false impression, concerning at least three different events. The State presented evidence from Farida Faheem that Mr. Andrus committed a robbery that he had nothing to do with. The State presented evidence from both Mr. Tran and Detective Williams as to

the identification regime for the robbery of the dry cleaners that was completely different from what Mr. Tran recalls. The State also presented grossly misleading evidence concerning the Koenig robbery in that it implied that Mr. Andrus was the gunman, when in fact the State had concluded years earlier that the gunman had been Derrick McGowan.

### 2. The State knew, or should have known, this testimony was false.

Whether the State intended to elicit the false statement or merely failed to correct it is immaterial; the State meets *Napue*'s knowledge criterion merely by allowing testimony that was false, or that it should have known to be false, to go uncorrected. *See United States v. Agurs*, 427 U.S. 97, 103 (1976); *Napue*, 360 U.S. at 269; *United States v. O'Keefe*, 169 F.3d 281, 292 (5th Cir. 1999).

Here, the State surely should have known that Ms. Faheem was not testifying to the events concerning Mr. Andrus. The offense report from that robbery describes events that occurred at a different time and in a different place from what Ms. Faheem testified to. Exh. 21. Rather than stating that Mr. Andrus pursued Ms. Faheem into a parking lot late at night and fought her for her purse, it states that, during the daytime, Mr. Andrus was found going through a purse with his brother that someone else had taken and that was subsequently returned to Ms. Faheem. The State certainly should have known what actual identification process was used with Mr. Tran since the State conducted the identification process. Finally, it was the State that determined that Mr. McGowan, not Mr. Andrus, had been the gunman in the Koenig robbery, so it certainly should have recognized that it was creating a false implication through the testimony of its witnesses concerning that robbery.

### 3. There is a reasonable likelihood that this false testimony affected the jury.

The standard for *Napue* materiality is whether, taking all the false testimony together, "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271). *Napue*'s "reasonable likelihood" standard is lower than the *Brady* materiality standard, and is akin to a harmless-error rule: "It is a brother, if not a twin, of the standard ('harmless beyond a reasonable doubt') for determining whether constitutional error can be held harmless. A strict standard is appropriate because, as the Supreme Court has explained, false testimony cases involve not only 'prosecutorial misconduct,' but also 'a corruption of the truth-seeking function of the trial process.'" *United States. v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979) (quoting *Agurs*, 427 U.S. at 104 and other internal citations omitted). Here, the State's false testimony related to each of the extraneous offenses that were presented at the punishment phase and created the impression that Mr. Andrus repeatedly engaged in violent crime, which would have affected the jury in making its sentencing decision.

### B. This claim is unexhausted.

This claim is unexhausted as it was not presented to the state courts. Mr. Andrus expects to seek a stay under *Rhines v. Weber*, 544 U.S. 269 (2005), so that he may return to state court and exhaust it. Because plausible arguments exist that could lead to the state court authorizing it to proceed as a successive state habeas application, it would be premature to determine this claim is procedurally defaulted and barred from federal review.

**Claim 7**      **Mr. Andrus's Sixth Amendment right to counsel was violated when his trial counsel failed to investigate the underlying offense.**

Trial counsel's investigation into the State's case against Mr. Andrus constituted ineffective assistance of counsel in violation of his Sixth Amendment rights. *See Strickland v. Washington*, 466 U.S. 668 (1984). This claim was not presented to the state courts but any default can be excused by state habeas counsel's failure to raise this substantial claim. *Trevino v. Thaler*, 569 U.S. 413 (2013). This violation entitles Mr. Andrus to a new trial, or at minimum a new punishment phase.

## A.      Trial counsel's performance was prejudicially deficient.

To establish ineffective assistance of counsel, Mr. Andrus must show that trial counsel's performance was deficient and that the deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687. Trial counsel's failure to investigate the State's case against Mr. Andrus meets both prongs of this test. Therefore, Mr. Andrus's Sixth Amendment right to counsel was violated and his conviction should be reversed. Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

### 1.  Trial counsel's performance was deficient.

Professional norms prevailing at the time of Mr. Andrus's trial underscore defense counsel's paramount duty to investigate and prepare guilt/innocence related defenses. *See ABA Guidelines*, Guideline 1.1 at cmt. ("With respect to the guilt/innocence phase, defense counsel must independently investigate the circumstances of the crime and all evidence—whether testimonial, forensic, or otherwise—purporting to inculpate the client."); *id.* at Guideline 10.7(A) ("[C]ounsel

at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.").

Trial counsel's failure to adequately investigate the state's case against Mr. Andrus was objectively unreasonable. Here, Mr. Crowley made no effort to investigate the offense that Mr. Andrus was tried for. 2 SHRR 64; 4 SHRR 37.

### 2. The deficiency was prejudicial.

Trial counsel's deficient performance is a Sixth Amendment violation when it was sufficiently prejudicial—meaning that it had a reasonably probable effect on the guilt phase outcome. *Strickland*, 466 U.S. at 698. Trial counsel failed to investigate evidence that supported that the shooting occurred consistent with Mr. Andrus's version of events. Had they done so, available evidence existed that could have both supported Mr. Andrus's testimony and undercut the State's arguments that he was fabricating what occurred.

The prosecution went to great lengths to show that the murders were not the result of a carjacking gone bad. Instead, the State argued that Mr. Andrus had come to the Kroger parking lot specifically for the purpose of murdering people. The State asserted that the physical evidence contradicted Mr. Andrus's version of events and that Mr. Andrus fabricated the carjacking story to try to reduce his moral blameworthiness. A competent shooting reconstruction expert could have shown that the physical evidence was consistent with Mr. Andrus version of events. That, in turn, would have established the imperfect self-defense argument the state was so eager to rebut. *Evans v. State*, 601 S.W.2d 943 (Tex. Crim. App. 1980) (fact that defendant did not intend to kill anyone when he initiated armed robbery was inherently mitigating

136

and exclusion of such imperfect self-defense evidence required a new trial). Moreover, by showing that Mr. Andrus was truthful in his confession, the State would have been unable to paint him as a remorseless liar.

### B. Any default is excused by state habeas counsel's failure to raise this substantial claim.

This claim was not presented to the state courts. State habeas counsel did not raise this substantial ineffective assistance of counsel claim in state habeas proceedings. State habeas counsel's ineffectiveness excuses any default of the claim that the Director may allege. *See Trevino*, 569 U.S. at 429. Section (A), *supra,* demonstrates the substantiality of the underlying claim.

### Claim 8    Mr. Andrus's Sixth Amendment right to counsel was violated when his trial counsel conceded the first special issue at sentencing.

During closing argument at the punishment phase, trial counsel conceded that the jury would find against Mr. Andrus on the first special issue—whether he would pose a continuing threat to society. 52 RR 35–37. Trial counsel's concession violated Mr. Andrus's Sixth Amendment right to the effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). This claim is exhausted and satisfies the relitigation bar of 28 U.S.C. § 2254(d), because the state court's decision was legally and factually unreasonable. This violation entitles Mr. Andrus to a new punishment phase.

### A. Trial counsel's performance was prejudicially deficient.

To establish ineffective assistance of counsel, Mr. Andrus must show that trial counsel's performance was deficient and that the deficiency prejudiced the defense.

*See Strickland*, 466 U.S. at 687. Trial counsel's concession on special issue one meets both prongs of this test. Therefore, Mr. Andrus's Sixth Amendment right to counsel was violated and his sentence should be reversed. Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

### 1. Trial counsel's performance was deficient.

The first special issue is part of Texas's unique sentencing scheme, which requires the jury to predict "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1). A Texas jury must unanimously find a probability that a defendant will commit future acts of violence before reaching the question of mitigation. *Id.* at § 2(b)-(e). This sentencing structure places the first special issue of future dangerousness "at the center of the jury's punishment decision." *Jurek v. Texas*, 428 U.S. 262, 274–75 (1976) (reviewing Texas's first special issue).

Trial counsel's concession on the first special issue was objectively unreasonable. Here, trial counsel failed to both present evidence that the State had not carried its burden on the first special issue and then conceded that the jury would find against Mr. Andrus on this question. 52 RR 35 ("You've heard evidence, even from some of our own witnesses, that Mr. Andrus was probably a violent kind of guy."); *id.* at 36 ("There is probably a good probability that you're going to answer this question yes."); *id.* at 37 ("[Y]ou will probably answer this question, okay, in affirmative, based on all you've heard."). While at the state habeas hearing Mr. Crowley claimed he did not concede the first special issue, 2 SHRR 84, the record

reflects that he did. 52 RR 35–37. Mr. Crowley's insistence at the state habeas hearing that he was not trying to concede the first special issue is not credible, as he expressly told the jurors he was focusing on the mitigation question. *See* 2 SHRR 83–85, 175.

### 2. The deficiency was prejudicial.

Trial counsel's deficient performance is a Sixth Amendment violation when it was sufficiently prejudicial—meaning that it had a reasonably probable effect on the outcome of the trial. *Strickland*, 466 U.S. at 698. Similarly to when Mr. Crowley conceded that Mr. Andrus was guilty, Claim Three, *supra*, Mr. Crowley's concession on special issue one would have, to a near certainty, had an impact on the jury's deliberations. *United States v. Swanson*, 943 F.2d 1070, 1075 (9th Cir. 1991) ("We cannot envision a situation more damaging to an accused than to have his own attorney tell the jury that there is no reasonable doubt that his client was the person who committed the conduct that constituted the crime charged in the indictment."); *Wiley v. Sowders*, 647 F.2d 642, 650 (6th Cir. 1981) ("[F]or all practical purposes, counsel's admission of guilt on behalf of his client denied to petitioner his constitutional right to have his guilt or innocence decided by the jury."). Based on trial counsel's deficient concession, Mr. Andrus can establish a reasonable probability of a different outcome. *See Strickland*, 466 U.S. at 698.

### B. 28 U.S.C. § 2254(d) does not preclude the relitigation of this claim.

This claim is exhausted, as it was presented as Claim Four of Mr. Andrus's state habeas application. 1 SHCR 123–28. The CCA held that Mr. Andrus "fail[ed] to meet his burden under *Strickland*" and denied relief on the merits without further

explanation. *Ex parte Andrus*, 2018 WL 622783 at *2. Because this claim was adjudicated on the merits in state court, an exception to the relitigation bar of 28 U.S.C. § 2254(d) must be present. This requires a finding that the state court decision was "(1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States'; or (2) 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (quoting 28 U.S.C. § 2254(d)). Only one exception to the relitigation bar need be present. Because of the evidence presented in the state proceedings, the state court decision rejecting this claim necessarily either involved an unreasonable application of the *Strickland* standard or was based on an unreasonable determination of facts, thus an exception to the relitigation bar is present. *See, e.g.*, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000).

**Claim 9**     **Mr. Andrus's due process rights were violated when the bailiff informed the jury that Mr. Andrus was wearing a shock belt and that the bailiff could activate it to keep the jurors safe.**

Just before Mr. Andrus testified during the punishment phase of trial, the bailiff told the jury that Mr. Andrus was wearing a shock belt and that he could press a button to activate it to keep the jury safe from Mr. Andrus. This comment from the bailiff violated Mr. Andrus's due process rights, as interpreted in *Deck v. Missouri*, 544 U.S. 622 (2007). This claim is exhausted and this Court conducts de novo review of the merits of the claim as the procedural bar enforced by the state court is

inadequate to bar federal review, or alternatively cause and prejudice exists for the default. This violation entitles Mr. Andrus to a new punishment phase.

## A. Mr. Andrus' due process rights were violated by the bailiff's comments.

Under Supreme Court precedent, a defendant's due process rights are violated when they are visibly shackled during the punishment phase of a capital murder trial, absent a case-specific determination that they are necessary. *Deck*, 544 U.S. at 629. A capital defendant appearing in shackles impacts his ability to receive a meaningful defense, offends the dignity of the proceedings, and "almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community." *Id.* at 632–33. Shackling is inherently prejudicial, and when a court allows the shackling to occur without adequate justification, the State must prove "beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained." *Id.* at 635 (internal quotations omitted); *see also United States v. Banegas*, 600 F.3d 342, 347 (5th Cir. 2010) (placing the burden on the government to establish that the shackles could not have been seen by the jury "as part of its general burden to show, beyond a reasonable doubt, that the shackles did not contribute to the jury verdict."). Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

Mr. Andrus was wearing a shock belt during trial. At a pretrial hearing, the trial court granted a defense motion requesting that Mr. Andrus not appear before the jury in visible restraints, in part because he "behaved like a gentleman" at the

hearing, but determined that he would wear an electronic shock belt during trial. Exh. 18 at 25. According to one bailiff, Mr. Andrus wore a device "called a 'Bandit' . . . . [which] provide[s] an electric shock to the person wearing it when activated remotely." 2 SHCR 788. The shock belt was placed on Mr. Andrus's leg under his clothes. *Id.* No specific finding of the necessity of this restraint was ever made on the record.

During trial, a bailiff informed the jury that Mr. Andrus was wearing the shock belt. Multiple jurors recall that the bailiff told them he could shock Mr. Andrus in order to keep the jury safe from him. Juror Modi stated in an affidavit that "the bailiff told us that we were safe because he had a taser button that he could push to tase" Mr. Andrus and juror Modi "felt safer knowing that during the trial Andrus was wearing a taser." 1 SHCR 305. Similarly, juror Moon averred that "the bailiff told us not to worry" because Mr. Andrus "was wearing a taser," and that there was a button he "could push if Andrus did anything and Andrus would be tased." *Id.* at 308. Juror Patrick remembers this too, specifically recalling that "the bailiff told us about a taser button on his holster. He told us that if Andrus did anything, all he would have to do was push the button and Terence would drop to the ground." *Id.* at 312. In addition, jurors Flakes and Guilbeau also remember the bailiff telling them about the shock belt. *Id.* at 296 ("[T]he bailiff told the jurors that he had a button he could push to tase Andrus if he needed to."); *id.* at 302 ("I remember the bailiff at some point making a comment about Andrus wearing a taser."). Most jurors remembered hearing about this just before Mr. Andrus took the stand at the punishment phase of trial, although not all of the jurors remembered exactly when the bailiff made this comment. *Id.* at

305 ("The bailiff told us about the taser before Andrus took the stand."); *id.* at 312

("[B]efore Andrus testified, the bailiff told us about a taser button on his holster.");

*id.* at 296 ("I think the bailiff made this comment around the time Andrus was going

to get on the stand.").

Mr. Andrus did not discover that the bailiff had made these comments until

post-conviction investigation. Trial counsel were not aware at the time of trial that

the bailiff made these comments to the jury, and it does not appear in the record.

Similarly, no evidence was presented during the state court proceedings to suggest

that the jurors were able to physically see the shock belt during trial. As trial counsel

were unaware that the bailiff had told the jury about the shock belt and its purpose,

they had no way of objecting to the bailiff's comments, meaning it was impossible for

the claim to be litigated on direct appeal. Thus, the first instance this claim could

have been raised was during the state post-conviction proceedings. 1 SHCR 117.

The factual basis for this claim was not disputed in state court. At the post-

conviction evidentiary hearing, the State did not contest that the bailiff informed the

jury he could activate the shock belt to keep the jurors safe from Mr. Andrus. "Just

to make clear," the State told the court, they were "conceding the jurors did become

aware of the restraints at some point," which occurred "either from the bailiff telling

them or some other way." 2 SHRR 12; *see also id.* (explaining to the court that

"[t]here's no factual question" about the shock belt claim). This concession was based

on the State's own independent investigation, which also adduced various juror

affidavits supporting the fact that the bailiff told the jury about the shock belt and

his ability and willingness to activate it. 2 SHCR 699 ("[B]oth Applicant's and the State's investigation revealed that the jury became aware of some form of restraint on Applicant at some point during the trial.").

Here, the rule announced in *Deck* was violated when the bailiff informed the jury that Mr. Andrus was wearing a shock belt that he could activate to keep the jurors safe. There was no case-specific determination that the shock belt was necessary. *See Deck*, 544 U.S. at 629. Indeed, the opposite occurred at the pretrial hearing, where the trial court noted that Mr. Andrus "behaved like a gentleman." Exh. 18 at 25.

The comments by the bailiff that Mr. Andrus was wearing a shock belt elicited the same fears and prejudice in the minds of the jurors that would have come about had they seen the shackles for themselves. In both scenarios, it is implied to the jury "that court authorities consider the offender a danger to the community." *Deck*, 544 U.S. at 633. The fact that a state actor found it necessary to draw the jury's attention specifically to this was likely far more prejudicial than had they simply viewed it for themselves. *See Parker v. Gladden*, 385 U.S. 363, 470 (1966) (reversing for a new trial after the bailiff told the jury the defendant was guilty and emphasis that his comment "carrie[d] great weight with the jury" because of his official character as an officer of the court); *Turner v. Louisiana*, 379 U.S. 466, 473 (1965) (explaining that "it would be blinking reality not to recognize the extreme prejudice inherent" in the misconduct of a bailiff). The bailiff's comments went far beyond a mere implication that Mr. Andrus was dangerous—he directly told them so when he explained to them that they

"were safe" because Mr. Andrus was wearing a shock belt, and when he suggested that Mr. Andrus might act in a way that necessitated him being tased. 1 SHCR 305, 308, 312.

This error is particularly harmful in a Texas capital case, where the jury is tasked with assessing "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1). The bailiff's comments inevitably implied to the jury "as a matter of common sense, that court authorities consider the offender a danger to the community." *Deck*, 544 U.S. at 632–33. That the State considered it necessary to have a remote-activated shock belt on Mr. Andrus certainly implied that he was a danger—particularly when the bailiff informed the jury that this device kept them safe from Mr. Andrus. 1 SHCR 305.

When a court allows the shackling to occur without adequate justification, the State must prove "beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained." *Deck*, 544 U.S. at 635 (internal quotations omitted). In *Deck*, the defendant was a repeat offender; had killed two people to avoid arrest, to which he had confessed; and had aided prisoners in an escape attempt. *Id.* at 637; *id.* at 648 (Thomas, J., dissenting). Yet even in the face of this aggravating evidence, the Supreme Court found the State had not proven that using visible shackles was harmless beyond a reasonable doubt at the punishment phase of trial.

*Id.* at 635. The same result is appropriate here and Mr. Andrus should therefore receive a new punishment phase.[9]

### B.    This Court reviews this claim de novo.

This claim is exhausted, as it was presented as Claim Two of Mr. Andrus's state habeas application. 1 SHCR 113–18. The CCA found this claim to be procedurally barred and denied relief "without reaching the merits" of the claim, asserting that it could have been raised on direct appeal.[10] *Ex parte Andrus*, 2018 WL 622783 at *2. However, the CCA's application of a procedural bar is not adequate to bar this claim from federal review.

In habeas corpus actions, federal courts will not address the merits of a petitioner's claims if the state court decision rests on an adequate and independent state law ground. *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). Adequacy itself is a federal question for this Court to resolve. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). To be adequate, a state procedural ground must be strictly or regularly followed, the rule must serve a legitimate state interest, the rule must not have been substantially complied with, and the rule's application in the case must not have been

---

[9] This error is particularly egregious in light of the fact that the jury also saw Mr. Andrus wearing physical restraints, in addition to the bailiff's comment. *See* Claim Eleven, *infra*.

[10] In this instance, the CCA's declining to adopt the trial court's findings of facts and conclusion of law on this claim was appropriate. *Ex parte Andrus*, 2018 WL 622783 at *2. The trial court findings violated Rule 606(b) of the Texas Rules of Evidence, as they explicitly relied on evidence of the jurors' deliberative process. FFCL. Under state law, jurors' retroactive statements suggesting that awareness of the physical restraints did not affect their verdict cannot be considered. TEX. R. EVID. 606(b) ("[A] juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.")

146

exorbitant. *Lee v. Kemna*, 534 U.S. 362, 375–76 (2002); *Osborne v. Ohio*, 495 U.S. 103, 125 (1990); *Johnson*, 486 U.S. at 587; *Douglas v. Alabama*, 380 U.S. 415 (1965). Procedural rules that are arbitrary, unforeseen, or deprive a petitioner of a reasonable opportunity to raise or discriminate against a federal right are inadequate to bar federal review. *Walker v. Martin*, 562 U.S. 307, 320–21 (2011); *Lee*, 534 U.S. at 376; *Ford v. Georgia*, 498 U.S. 411, 423 (1991); *see generally Dobbs v. Zant*, 506 U.S. 357, 359 (1993) (petitioner permitted to rely on the State's erroneous assertions that the transcript was unavailable as justification for not presenting it previously).

At issue here is Texas's rule that a claim is procedurally barred in state post-conviction if it could have been raised on direct appeal. *See Ex parte Andrus*, 2018 WL 622783 at *2. Mr. Andrus does not challenge this rule generally, but instead challenges its application in his case specifically. Here, the procedural rule should not bar federal review because, the factual basis was not ascertainable during direct appeal and the claim could therefore not be raised. *See generally Wellons v. Hall*, 558 U.S. 220 (2010) (refusing to enforce a procedural bar when the defendant only learned of interactions between jurors and a bailiff after trial). The procedural rule, as applied to this situation, is arbitrary, exorbitant, discriminates against the federal right, and does not serve a legitimate state interest. *See Walker*, 562 U.S. at 320–21; *Lee*, 534 U.S. at 376; *Johnson*, 486 U.S. at 587.

It was impossible for Mr. Andrus to comply with the state procedural rule, making the rule inadequate to enforce a default in this Court. *Cf. Ford v. Georgia*, 498 U.S. 1, 16 (1984) (not applying a state procedural rule "because the defendant . . .

could not be deemed to have been apprised of its existence.") (internal quotation omitted). While a *Deck* claim in the generic sense can be raised on direct appeal, this claim relies on extra-record evidence only adduced during the state post-conviction investigation. The bailiff's comment to the jury was not on record and trial counsel was unaware that it occurred. Thus, there was no basis for trial counsel to object to the comment, which would have been necessary to raise the issue on direct appeal. There was no way for Mr. Andrus to litigate this claim on direct appeal, and the enforcement of a default in federal court would therefore be arbitrary and frustrate Mr. Andrus's ability to secure merits review of the claim at any stage. Similarly, enforcing the default in federal court would be exorbitant and would impose a sanction of forfeiture on Mr. Andrus for a circumstance he did not create. *See Lee*, 534 U.S. at 366, 380, 394.

Even if this Court determines this claim to be procedurally defaulted, Mr. Andrus can overcome that finding if cause and prejudice exists for his failure to raise the claim on direct appeal in state court. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). Here, trial counsel was not aware of the bailiff's comment to the jury and that comment was an external factor that impeded the ability of Mr. Andrus to raise this claim on direct appeal. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."). Because the bailiff's comment was an external factor and the underlying claim is meritorious, Mr. Andrus

can establish that cause and prejudice exits for his failure to raise this claim on direct appeal.

Regardless of which route this Court takes regarding the procedural default question, this Court can conduct de novo review of this claim.

**Claim 10      Mr. Andrus's Sixth and Fourteenth Amendment rights to a trial by an impartial jury were violated.**

Under the Sixth and Fourteenth Amendments a defendant has the right to a trial by an impartial jury. *Morgan v. Illinois*, 504 U.S. 719 (1992). The right was violated when the bailiff told the jury that Mr. Andrus was wearing a shock belt and that he could press a button to activate it to keep the jury safe from Mr. Andrus. *See Parker v. Gladden*, 385 U.S. 363, 470 (1966) (reversing for a new trial after the bailiff told the jury the defendant was guilty and emphasis that his comment "carrie[d] great weight with the jury" because of his official character as an officer of the court); *Turner v. Louisiana*, 379 U.S. 466, 473 (1965) (explaining that "it would be blinking reality not to recognize the extreme prejudice inherent" in the misconduct of a bailiff). Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts and Claim Nine, *supra*. This violation entitles Mr. Andrus to a new punishment phase.

This claim is unexhausted as it was not presented to the state courts. Mr. Andrus expects to seek a stay under *Rhines v. Weber*, 544 U.S. 269 (2005), so that he may return to state court and exhaust it. Because plausible arguments exist that could lead to the state court authorizing it to proceed as a successive state habeas

application, it would be premature to determine this claim is procedurally defaulted and barred from federal review.

**Claim 11      Mr. Andrus's Sixth Amendment right to counsel was violated when trial counsel failed to object to his visible shackles.**

While investigating Mr. Andrus's allegation that the bailiff told the jury that Mr. Andrus was wearing a shock belt, Claim Eight, *supra*, the State uncovered an independent shackling violation—that the jury saw Mr. Andrus wearing visible restraints. Trial counsel failed to object to these visible shackles in violation of the Sixth Amendment. *See Strickland v. Washington*, 466 U.S. 668 (1984). This claim was not presented to the state courts but any default can be excused by state habeas counsel's failure to raise this substantial claim. *Trevino v. Thaler*, 569 U.S. 413 (2013). This violation entitles Mr. Andrus to a new trial.

### A.      Trial counsel's performance was prejudicially deficient.

To establish ineffective assistance of counsel, Mr. Andrus must show that trial counsel's performance was deficient and that the deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687. Trial counsel's failure to object to Mr. Andrus's visible shackles meets both prongs of this test. Therefore, Mr. Andrus's Sixth Amendment right to counsel was violated and his conviction should be reversed. Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

#### 1.      Trial counsel's performance was deficient.

Under Supreme Court precedent, a defendant's due process rights are violated if they are visibly shackled during the punishment phase of a capital murder trial,

absent a case-specific determination they are necessary. *Deck v. Missouri*, 544 U.S. 622, 629 (2007). A capital defendant appearing in shackles impacts his ability to receive a meaningful defense, offends the dignity of the proceedings, and "almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community." *Id.* at 632–33. Shackling is inherently prejudicial, and when a court allows the shackling to occur without adequate justification, the State must prove "beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained." *Id.* at 635 (internal quotations omitted); *see also United States v. Banegas*, 600 F.3d 342, 347 (5th Cir. 2010) (placing the burden on the government to establish that the shackles could not be seen by the jury "as part of its general burden to show, beyond a reasonable doubt, that the shackles did not contribute to the jury verdict.").

Here, trial counsel failed to object when the jury saw Mr. Andrus in visible restraints. The State's independent investigation into Claim Eight, *supra*, showed that the bailiff not only informed the jury about a shock belt that Mr. Andrus was wearing, the jurors saw visible restraints on him, including during the guilt/innocence phase. Juror Velasquez "was aware [Mr. Andrus] was in restraints" and saw them "early on in the guilt/innocence phase of trial." 2 SHCR 763. Similarly, juror Guilbeau saw visible restraints on Mr. Andrus during the guilt/innocence phase because he "walk[ed] in with restraints, handcuffs." *Id.* at 771. Juror Grenier saw visible restraints on Mr. Andrus's ankles, but could not recall when. Juror Patrick "could see" visible restraints on Mr. Andrus while he testified. *Id.* at 767. Jurors

Martino and Smith saw visible restraints, but not until after the judge read Mr. Andrus's sentence. *Id.* at 769, 775. Trial counsel's failure to object to the jury seeing Mr. Andrus's visible restraints was objectively unreasonable.

### 2. The deficiency was prejudicial.

Trial counsel's deficient performance is a Sixth Amendment violation when it was sufficiently prejudicial—meaning that it had a reasonably probable effect on the outcome of the trial. *Strickland*, 466 U.S. at 698. This error was prejudicial. When a jury sees the defendant in physical restraints, it is an injury to a bedrock principle of the justice system—the presumption of innocence. *Deck*, 544 U.S. at 630. "Visible shackling undermines the presumption of innocence and the related fairness of the fact-finding process." *Id.* Specifically, visible shackles or restraints "suggest[] to the jury that the justice system itself sees a 'need to separate a defendant from the community at large.'" *Id.* (quoting *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986)).

Use of restraints is only permitted when "justified by an essential state interest specific to each trial." *Holbrook*, 475 U.S. at 568–69. Under Texas law, to use visible restraints, a trial court must identify specific reasons on the record supporting its decision to restrain a defendant. *Cooks v. State*, 844 S.W.2d 697, 722 (Tex. Crim. App. 1992). The decision to use restraints may not be based on a general concern for safety or the severity of the charged offense. *Long v. State*, 823 S.W.2d 259, 282 (Tex. Crim. App. 1991) ("[T]he record must clearly and affirmatively reflect the trial judge's reasons therefore."). No such finding occurred in Mr. Andrus's case; in fact the *opposite* occurred, as the judge ordered that the jury not see any visible restraints.

Exh. 18 at 25. However, trial counsel did not object when those restraints became visible. Mr. Andrus should receive a new trial based on this error.

### B. Any default is excused by state habeas counsel's failure to raise this substantial claim.

This claim was not presented to the state courts. State habeas counsel did not raise this substantial ineffective assistance of counsel claim in state habeas proceedings. State habeas counsel's ineffectiveness excuses any default of the claim that the Director may allege. *See Trevino*, 569 U.S. at 429. Section (A), *supra,* demonstrates the substantiality of the underlying claim.

### Claim 12 Mr. Andrus's Sixth Amendment right to counsel was violated when trial counsel failed to challenge that his confession was not voluntary.

Investigating officers engineered an elaborate extradition process designed to isolate Mr. Andrus and coerce him into confessing, yet trial counsel did not challenge the voluntariness of Mr. Andrus's confession. Trial counsel's failure to move to suppress his confession as not voluntary violated Mr. Andrus's rights under the Sixth Amendment. *See Strickland v. Washington*, 466 U.S. 668 (1984). This claim was not presented to the state courts but any default can be excused by state habeas counsel's failure to raise this substantial claim. *Trevino v. Thaler*, 569 U.S. 413 (2013). This violation entitles Mr. Andrus to a new trial.

### A. Trial counsel's performance was prejudicially deficient.

To establish ineffective assistance of counsel, Mr. Andrus must show that trial counsel's performance was deficient and that the deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687. Trial counsel's failure to challenge Mr. Andrus's

confession as not voluntary meets both prongs of this test. Therefore, Mr. Andrus's Sixth Amendment right to counsel was violated and his conviction should be reversed. Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

### 1. Trial counsel's performance was deficient.

Trial counsel's failure to move to suppress Mr. Andrus's confession because it was involuntary was objectively unreasonable. Under the Due Process Clause of the Fourteenth Amendment, a statement can be involuntary—and inadmissible—if it is based on coercive police activity. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.") The federal due process standard focuses on whether the "defendant's will was overborne" by the coercive police activity. *Dickerson v. United States*, 530 U.S. 428, 434 (2000).

Texas law provides significantly broader protections than the federal due process standard for defendants asserting that their statement was involuntary. TEX. CODE CRIM. PROC. art. 38.22; *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008) ("A statement that is 'involuntary' as a matter of constitutional law is also 'involuntary' under Article 38.22, but the converse need not be true."). First, a statement can be inadmissible under Texas law regardless of whether the defendant was in custody. *Oursbourn*, 259 S.W.3d at 171. Second, statements can be inadmissible under Texas law even if they do not involve police coercion, unlike the federal standard announced in *Connelly*. *Id.* at 172 ("Claims of involuntariness under

Article 38.22 can be, but need not be, predicated on police overreaching, and they could involve the 'sweeping inquiries into the state of mind of a criminal defendant who has confessed' found in *Connelly* that are not of themselves relevant to due process claims.").

Article 38.22, § 6 is designed to "protect[] people from themselves." *Oursbourn*, 259 S.W.3d at 172. A defendant can use factors unrelated to police action to argue that they did not voluntarily confess. This could include age, intoxication, mental illness, mental capacity, and the actions of private individuals. *Id.* at 172–73. While these factors would not be relevant in a federal due process claim, they are viable means under Texas law for challenging the voluntariness of a confession.

Prevailing professional norms require trial counsel to preserve potentially meritorious appellate issues. *See ABA Guidelines*, Guideline 10.8 at cmt. ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review.") (internal quotations omitted). Here, trial counsel failed to argue that Mr. Andrus's confession should have been suppressed because it was not voluntarily given. During the pretrial suppression hearing, the State asserted that "[t]here is no issue regarding voluntariness on this one," which trial counsel never disputed. Exh. 18 at 25. On direct appeal, the CCA refused to review a claim that Mr. Andrus's confession should have been suppressed based on impermissible pressure tactics used by the State. Exh. 1 at 24. Presumably, this was direct appeal counsel's

attempt to argue that the confession was not voluntary, but trial counsel's failure to press this argument during the suppression hearing rendered it forfeit.

Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts by reference. These facts show that the State engineered an elaborate and coercive environment to force a confession from Mr. Andrus, who was vulnerable to confessing based on his age and the coercive environment created by the officers.

### 2.   The deficiency was prejudicial.

Trial counsel's deficient performance is a Sixth Amendment violation when it was sufficiently prejudicial—meaning that it had a reasonably probable effect on the outcome of the suppression hearing. *Strickland*, 466 U.S. at 698. This error was prejudicial, as Mr. Andrus's confession would have been suppressed if the voluntariness of it was challenged. The admission of Mr. Andrus's confession was not harmless, as it was a crucial and necessary part of the State's case against him that they referenced repeatedly in closing argument. 45 RR 18 ("He did exactly what he said he did."); *id.* at 19 ("I don't know how much more strong of a case I could have with the defendant himself admitting to what he did.").

In *United States v. Hernandez*, 574 F.2d 1362 (5th Cir. 1978), a comparable case to Mr. Andrus's, the Fifth Circuit ruled a confession invalid because of the coercive nature surrounding it. *Id.* at 1368. There the defendant was held in close quarters with officers inside a police vehicle for five hours after being read his *Miranda* rights and invoking his right to remain silent at least four times. *Id.* at 1365. After five hours inside the police vehicle, the defendant was brought into the police

station where he confessed. *Id*. The court held that this time spent in the car effectively made the defendant "incommunicado without any possible access to an attorney." *Id*. The defendant's situation was "ripened for influence" by the pressures of an interrogation because he was held incommunicado and subject to five hours of close presence with the same police officers. *Id*. at 1368. Mr. Andrus's confession could have been suppressed, similar to what occurred in *Hernandez*.

> **B.   Any default is excused by state habeas counsel's failure to raise this substantial claim.**

This claim was not presented to the state courts. State habeas counsel did not raise this substantial ineffective assistance of counsel claim in state habeas proceedings. State habeas counsel's ineffectiveness excuses any default of the claim that the Director may allege. *See Trevino*, 569 U.S. at 429. Section (A), *supra,* demonstrates the substantiality of the underlying claim.

**Claim 13   Mr. Andrus's Fifth Amendment right to remain silent was violated when the State did not scrupulously honor Mr. Andrus's invocation of that right.**

The state courts held that Mr. Andrus unambiguously invoked his right to remain silent. Exh. 1 at 23.[11] Yet, despite the investigating officers engineering an elaborate extradition process designed to isolate Mr. Andrus and coerce him into confessing, the state courts found his confession admissible. *Id* at 23–24. The investigator's actions violated Mr. Andrus's Fifth Amendment right to remain silent

---

[11] The CCA withdrew its original opinion and substituted a new opinion, while also denying rehearing, on March 23, 2016. That opinion is unreported and included as Exhibit 1.

when they failed to scrupulously honor his invocation of that right. This claim is exhausted and satisfies the relitigation bar of 28 U.S.C. § 2254(d), because the state court's decision was legally and factually unreasonable. This violation entitles Mr. Andrus to a new trial.

### A.  Mr. Andrus's Fifth Amendment right to remain silent was violated.

During custodial interrogation, an individual being questioned has a Fifth Amendment right to remain silent. *Miranda v. Arizona*, 384 U.S. 436 (1966). "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74. Any statements obtained after the individual has invoked their right to remain silent are admissible only if the State has "scrupulously honored" the invocation. *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). Here, the state courts found that Mr. Andrus unambiguously invoked his right to remain silent. The State failed to scrupulously honor this request, instead engineering an atypical and extraordinary extradition process designed to isolate Mr. Andrus, and prevent him remaining silent or speaking to an attorney. As this error was not harmless, Mr. Andrus is entitled to a new trial.

### 1.  The State engineered an atypical and extraordinary extradition process designed to coerce Mr. Andrus into confessing.

Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

### 2.  Mr. Andrus invoked his right to remain silent.

If an individual indicates that he wishes to remain silent during a custodial interrogation, questioning must cease. *Miranda*, 384 U.S. at 473–74. Here, the State

court correctly found that Mr. Andrus unambiguously invoked his right to remain silent when he terminated the officers's questioning when the investigating officers questioned him in the jail before driving him back to Texas. Exh. 1 at 23.

### 3. The State failed to scrupulously honor Mr. Andrus's invoking his right to remain silent.

After an individual has invoked his right to remain silent, that invocation must be scrupulously honored. *Mosley*, 423 U.S. at 104. Rather than scrupulously honor Mr. Andrus's invocation of this right, the investigating officers engineered an elaborate scheme to coerce Mr. Andrus into confessing. Not surprisingly, that was the end result.

In *United States v. Hernandez*, 574 F.2d 1362 (5th Cir. 1978), a comparable case to Mr. Andrus's, the Fifth Circuit ruled a confession invalid because of the coercive nature surrounding it. *Id.* at 1368. There the defendant was held in close quarters with officers inside a police vehicle for five hours after being read his *Miranda* rights and invoking his right to remain silent at least four times. *Id.* at 1365. After five hours inside the police vehicle, the defendant was brought into the police station where he confessed. *Id.* The court held that this time spent in the car effectively made the defendant "incommunicado without any possible access to an attorney." *Id.* The defendant's situation was "ripened for influence" by the pressures of an interrogation because he was held incommunicado and subject to five hours of close presence with the same police officers. *Id.* at 1368. The same result is appropriate here—that Mr. Andrus's confession was not admissible.

### 4.  The admission of Mr. Andrus's confession was not harmless.

When a confession is admitted in violation of a defendant's constitutional rights, harmless error analysis applies. *Jones v. Davis*, 927 F.3d 365, 370–71 (5th Cir. 2019). This requires the beneficiary of the error to establish that the error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). The admission of Mr. Andrus's confession was not harmless. The admission of Mr. Andrus's confession was not harmless, as it was a crucial and necessary part of the State's case against him that they referenced repeatedly in closing argument. 45 RR 18 ("He did exactly what he said he did."); *id.* at 19 ("I don't know how much more strong of a case I could have with the defendant himself admitting to what he did.").

### B.  28 U.S.C. § 2254(d) does not preclude the relitigation of this claim.

This claim is exhausted, as it was presented as part of Point of Error One on direct appeal. Exh. 1. The CCA held that Mr. Andrus unambiguously invoked his right to remain silent, but found the confession admissible because Mr. Andrus reinitiated conversation with the interrogating officers. *Id.* at 23–24. Because this claim was adjudicated on the merits in state court, an exception to the relitigation bar of 28 U.S.C. § 2254(d) must be present. This requires a finding that the state court decision was "(1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States'; or (2) 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (quoting 28 U.S.C. § 2254(d)). Only one exception to the relitigation bar need be present. In light of the evidence presented in the state

proceedings, the state court decision rejecting this claim necessarily either involved an unreasonable application of the *Miranda* and *Mosley*, standard or was based on an unreasonable determination of facts, thus an exception to the relitigation bar is present. *See, e.g.*, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000).

Furthermore, the state court entered numerous unreasonable factual determinations based on the available record, including that (1) "[t]he officers did not pose *any* questions to Andrus on the drive back to Texas," Exh. 1 at 23; (2) "officers scrupulously honored his *Miranda* rights," *id.*; (3) "Andrus is the one who re-initiated discussion of his case with the officers on the drive back to Texas," *id.*; and (4) after reading Mr. Andrus his *Miranda* rights "the officers did not question Andrus about the details of the offense" until Mr. Andrus repeatedly brought it up, *id.* at 23–24. However, all four of these factual findings are directly controverted by the available record.

The state court decision on this claim was objectively unreasonable based on the evidence presented to the state court and thus § 2254(d)(2) is met.

## Claim 14   Mr. Andrus's Fifth Amendment right to counsel was violated when the State interrogated Mr. Andrus after he asked for an attorney.

Mr. Andrus invoked his right to counsel during custodial interrogation, yet the investigating officers continued to interrogate him without an attorney present in violation of his Fifth Amendment rights. *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). This claim is exhausted and satisfies the relitigation bar of 28 U.S.C. §

2254(d), because the state court's decision was legally and factually unreasonable. This violation entitles Mr. Andrus to a new trial.

### A.    Mr. Andrus's Fifth Amendment right to counsel was violated.

During custodial interrogation, an individual being questioned has a Fifth Amendment right to counsel. *Miranda v. Arizona*, 384 U.S. 436 (1966). Once an individual invokes his right to counsel, they are "not subject to further interrogation by the authorities until counsel has been made available," unless the individual reinitiates further communication with the investigating officers. *Edwards*, 451 U.S. at 484–85. After invoking the right to counsel, the individual cannot be questioned regarding any offense until their attorney is present. *Minnick v. Mississippi*, 498 U.S. 146 (1990). To invoke, the individual must make an unambiguous request for counsel that is "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994)

Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

Mr. Andrus invoked his right to counsel twice. First, during the hearing on the motion to suppress, Mr. Andrus testified that he told the officers "I'm going to need that attorney" as they were leaving the Orleans Parish Jail.[12] Exh. 18 at 19. Second, during the drive to Texas the following exchange took place:

---

[12] The officers testified that this did not occur, Exh. 18 at 22, and the state courts credited the officers' version.

[Mr. Andrus]: I don't got a court date yet?

RANGER: No. They got to get you in the system first.

[Mr. Andrus]: An attorney?

RANGER: Yeah, they'll do that, too.

Exh. 1 at 18.[13] However, the investigating officers did not respect the invocation of his rights, and instead continued to interrogate him. Additionally, Mr. Andrus not only invoked his right to counsel at the extradition stage, but he was actually appointed an attorney.

When a confession is admitted in violation of a defendant's constitutional rights, harmless error analysis applies. *Jones v. Davis*, 927 F.3d 365, 370–71 (5th Cir. 2019). This requires the beneficiary of the error to establish that the error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). The admission of Mr. Andrus's confession was not harmless, as it was a crucial and necessary part of the State's case against him that they referenced repeatedly in closing argument. 45 RR 18 ("He did exactly what he said he did."); *id.* at 19 ("I don't know how much more strong of a case I could have with the defendant himself admitting to what he did.").

### B.     28 U.S.C. § 2254(d) does not preclude the relitigation of this claim.

This claim is exhausted, as it was presented as part of Point of Error One on direct appeal. Exh. 1. The CCA held that Mr. Andrus's request for counsel on the

---

[13] The state courts found that this was not a clear invocation of his right to counsel. Exh. 1 at 22.

drive to Texas was ambiguous and rejected Mr. Andrus's testimony that he had requested counsel as he was leaving the Orleans Parish Jail. *Id.* at 22. Because this claim was adjudicated on the merits in state court, an exception to the relitigation bar of 28 U.S.C. § 2254(d) must be present. This requires a finding that the state court decision was "(1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States'; or (2) 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (quoting 28 U.S.C. § 2254(d)). Only one exception to the relitigation bar need be present. In light of the evidence presented in the state proceedings, the state court decision rejecting this claim necessarily either involved an unreasonable application of clearly established Supreme Court precedent regarding the invocation of the right to remain silent, including *Miranda*, *Edwards*, and *Davis* standard, or was based on an unreasonable determination of facts, thus an exception to the relitigation bar is present. *See, e.g.*, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000).

**Claim 15**      **Mr. Andrus's Sixth Amendment right to counsel was violated when trial counsel failed to preserve *Batson* error.**

Trial counsel failed to object to the State's removal of prospective jurors based on their race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Trial counsel's concession violated Mr. Andrus's Sixth Amendment right to the effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). This claim is exhausted and satisfies the relitigation bar of 28 U.S.C. § 2254(d), because the state court's

164

decision was legally and factually unreasonable. This violation entitles Mr. Andrus to a new trial.

### A.      Trial counsel's performance was prejudicially deficient.

To establish ineffective assistance of counsel, Mr. Andrus must show that trial counsel's performance was deficient and that the deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687. Trial counsel's concession failure to preserve Batson error meets both prongs of this test. Therefore, Mr. Andrus's Sixth Amendment right to counsel was violated and his sentence should be reversed. Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

### 1.      Trial counsel's performance was deficient.

Trial counsel's failure to preserve *Batson* error was objectively unreasonable. *See ABA Guidelines*, Guideline 10.8 at cmt. ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." (internal quotations omitted)). "The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)). Excluding jurors because of their race is particularly egregious because it "undermine[s] public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87. Yet here, trial counsel failed to object to multiple jurors struck by the State based on their race.

A *Batson* challenge follows a three-step analytical process. *Hernandez v. New York*, 500 U.S. 352, 358–59 (1991). First, the defendant must make a prima facie case

that the State engaged in intentional discrimination. *Batson*, 476 U.S. at 93–94. A prima facie case is established by demonstrating that "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 94. Second, the State must provide race-neutral reasons for using a peremptory challenge on the juror(s) in question. *Id.* at 94, 97. Third, the court must determine whether the defendant has established purposeful discrimination. *Id.* at 98; *see also Snyder*, 552 U.S. at 477; *Miller-El v. Dretke*, 545 U.S. 231, 239–40 (2005).

There was more than sufficient evidence available to trial counsel that a *Batson* objection was warranted. The State used three peremptory strikes to remove black potential jurors from the pool, and intended to strike a fourth black juror if the full complement of jurors had not been selected. *See* CR 287–99; 2 CR Supp. 16–27. The State struck 75% of the qualified black potential jurors, and intended to strike 80%, had the jury selection process progressed to the final black potential juror. Similarly, the State used two peremptory strikes to remove Hispanic jurors from the pool of the five qualified Hispanic jurors on the panel. *See* CR 287–99; 2 CR Supp. 16–27.

Mr. Crowley's failure to make a Batson challenge once the State used its peremptory strikes to eliminate three qualified black jurors and two qualified Hispanic jurors was objectively unreasonable. It was based on his erroneous belief that, because one African-American juror had been seated, he could not make a prima facie case that the State had used its strikes to remove minorities from the jury to constitute racial discrimination. 2 EHR at 191–93; 285–86. This was based on a

misunderstanding of the law; a *Batson* can occur if *one* potential jury is struck based on their race. *See Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."). The State's strike established a prima facie case of racial discrimination. *See Batson*, 476 U.S. at 93–94.

### 2. The deficiency was prejudicial.

Trial counsel's deficient performance is a Sixth Amendment violation when it was sufficiently prejudicial—meaning that it had a reasonably probable effect on the outcome of the trial. *Strickland*, 466 U.S. at 698. Here, there is a reasonable probability that the result of Mr. Andrus's direct appeal would have been different had *Batson* error been preserved, in that the CCA would have found that a *Batson* violation occurred. *See Smith v. Robbins*, 528 U.S. 259 (2000).

The purportedly race-neutral reasons offered by the State during the state habeas hearing were unavailing. The testimony of ADA Felcman at the state post-conviction hearing, who made the peremptory strikes on the State's behalf, shows that several strikes were based on race rather than being race-neutral. ADA Felcman testified about notes he made during the individual voir dire of an African-American woman that include several references to her race. HC36. ADA Felcman's explanation is that he was recording what the potential juror said, and he found her pride in her own race a basis for striking her. That she admitted to admiring Barack Obama as "the first African-American president" was a problem from the State's perspective. 4 EHR 53. Likewise, this potential juror had written that she saw Oprah Winfrey, as a

167

"well respected African-American woman that is a success" was a problem from the State's perspective. *Id.* As ADA Felcman stated, his reputedly constitutional basis for striking this juror was that being "African-American was important to her." *Id.* A race-specific reason, obviously, is not a race-neutral reason.

Additionally, the State's purportedly race-neutral reason for striking another African-American potential juror was facially unreasonable. ADA Felcman testified during this writ proceeding that the State used a strike against another African-American potential juror because she stated that she would give Mr. Andrus "a fair trial." 4 EHR 55. The State's suggestion that a promise to give the defendant a fair trial is a "race-neutral" basis to suspect them is facially unreasonable and thus does not overcome the presumption that the strike was fueled by an unconstitutional motive.

With yet another African-American potential juror, ADA Felcman testified that the purported "race-neutral" basis for striking her was a statement on her juror questionnaire that it "[s]eems like more African-American men receive the death penalty." 4 EHR 56. The position that a potential juror's view about racial disparities in applying the death penalty is a "race-neutral" basis to suspect that potential juror is facially unreasonable and thus does not overcome the presumption that the strike was fueled by an unconstitutional motive.

The testimony from ADA Felcman, elicited by the State, shows that, the State did not have credible, race-neutral reasons for striking at least three African-

American potential jurors. Therefore, had Mr. Andrus's trial counsel made a prima facie Batson challenge, that challenge would have succeeded.

### B.  28 U.S.C. § 2254(d) does not preclude the relitigation of this claim.

This claim is exhausted, as it was presented as Claim Three of Mr. Andrus's state habeas application. 1 SHCR 118–22. The CCA held that Mr. Andrus "fail[ed] to meet his burden under *Strickland*" and denied relief on the merits without further explanation. *Ex parte Andrus*, 2018 WL 622783 at *2. Because this claim was adjudicated on the merits in state court, an exception to the relitigation bar of 28 U.S.C. § 2254(d) must be present. This requires a finding that the state court decision was "(1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States'; or (2) 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (quoting 28 U.S.C. § 2254(d)). Only one exception to the relitigation bar need be present. Because of the evidence presented in the state proceedings, the state court decision rejecting this claim necessarily either involved an unreasonable application of the *Strickland* standard or was based on an unreasonable determination of facts, thus an exception to the relitigation bar is present. *See, e.g.*, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000).

**Claim 16**        **Mr. Andrus's Sixth Amendment right to counsel was violated when trial counsel failed to object to inadmissible victim impact evidence during the guilt/innocence phase.**

Trial counsel failed to object to inadmissible victim impact testimony during the guilt/innocence phase in violation of Mr. Andrus's Sixth Amendment rights. *See Strickland v. Washington*, 466 U.S. 668 (1984). This claim is exhausted and satisfies the relitigation bar of 28 U.S.C. § 2254(d), because the state court's decision was legally and factually unreasonable. This violation entitles Mr. Andrus to a new trial.

### A.    Trial counsel's performance was prejudicially deficient.

To establish ineffective assistance of counsel, Mr. Andrus must show that trial counsel's performance was deficient and that the deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687. Trial counsel's failure to object to inadmissible victim impact testimony meets both prongs of this test. Therefore, Mr. Andrus's Sixth Amendment right to counsel was violated and his conviction should be reversed. Mr. Andrus incorporates by reference each and every fact, statement, and assertion pertinent to this claim that is contained in the Statement of Facts.

### 1.    Trial counsel's performance was deficient.

Trial counsel's failure to object to inadmissible victim impact testimony elicited by the state during the guilt/innocence phase of trial was objectively unreasonable. Victim impact evidence is testimony that is "about the victim and the impact of the murder on the victim's family." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). The Supreme Court has delegated the decision to the states as to whether to admit such evidence at sentencing. *Id.* In Texas, victim impact testimony may be admissible during the sentencing phase of a capital murder trial. *Ford v. State*, 919 S.W.2d 107,

114 (Tex. Crim. App. 1996) (en banc) (citing *Payne*, 501 U.S. at 825). However, victim impact evidence is not admissible during the guilt/innocence phase because it is not relevant under the evidentiary rules. This type of testimony does not have "any tendency to make more or less probable the existence of any fact of consequence at the guilt stage of trial." *Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990) (citing TEX. R. EVID. 401 for the finding that victim-impact evidence is irrelevant at the guilt phase); *see also Mosely v. State*, 983 S.W.2d 249, 263 (Tex. Crim. App. 1998) (describing that victim impact evidence is "patently irrelevant" to even the question of future dangerousness).

Trial counsel ultimately objected to the relevance of the victim-impact evidence during Ms. Diaz's and Mr. Bui's extensive testimony, but only after substantial victim-impact testimony had been presented—and then failed to object after that as it continued. Patty Diaz described how she met her husband, the children they had together, the different jobs he held, 38 RR 39–40, and the decision she had to make to donate her husband's organs, *id.* at 61–62, but trial counsel objected only once during her entire testimony. *Id.* at 40. Ms. Diaz's testimony provided the jury with information about her relationship with her husband, his character, and the impact of his death on her family. Similarly, Steve Bui's description of his wife's immigration from Vietnam, her education and work background, and the experience of bringing his sons to the hospital to say good-bye to their mother served only to tell the jury of the impact his wife's death had on him and his family. 43 RR at 30–33, 53–54.

During the state habeas hearing, trial counsel admitted that he did not think that the testimony of the victims' spouses during the guilt phase of the trial was objectionable because he did not recognize it as victim-impact testimony. 2 SHHR 55–

57. Because their testimony did include multiple instances of victim-impact testimony, failing to object was objectively unreasonable.

### 2. The deficiency was prejudicial.

Trial counsel's deficient performance is a Sixth Amendment violation when it was sufficiently prejudicial—meaning that it had a reasonably probable effect on the guilt phase outcome. *Strickland*, 466 U.S. at 698. The victim impact testimony was irrelevant, inadmissible, and prejudicial. There is a reasonable probability that, had trial counsel properly objected to the admission of victim impact evidence at the guilt phase to properly preserve the issue for appeal, that the result of the state court proceedings would have been different.

### B. 28 U.S.C. § 2254(d) does not preclude the relitigation of this claim.

This claim is exhausted, as it was presented as Claim Six of Mr. Andrus's state habeas application. 1 SHCR 133–39. The CCA held that Mr. Andrus "fail[ed] to meet his burden under *Strickland*" and denied relief on the merits without further explanation. *Ex parte Andrus*, 2018 WL 622783 at *2. Because this claim was adjudicated on the merits in state court, an exception to the relitigation bar of 28 U.S.C. § 2254(d) must be present. This requires a finding that the state court decision was "(1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States'; or (2) 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (quoting 28 U.S.C. § 2254(d)). Only one exception to the relitigation bar need be present. In light of the evidence presented in the state

proceedings, the state court decision rejecting this claim necessarily either involved an unreasonable application of the *Strickland* standard or was based on an unreasonable determination of facts, thus an exception to the relitigation bar is present. *See, e.g.*, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000).

## PRAYER FOR RELIEF

WHEREFORE, Terence Tramaine Andrus, requests that this Court consider his Petition for Writ of Habeas Corpus and grant the following remedies and such other relief as the Court deems appropriate:

1.  Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and be relieved of his unconstitutional sentence of death;

2.  Allow Petitioner leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in his conviction and sentence;

3.  Conduct an evidentiary hearing pursuant to Rule 8 of the Rules Governing 28 U.S.C. § 2254 Cases; and

4.  That this Court grant such other relief as law and justice require.

Respectfully submitted,

DATE: February 13, 2020

JASON D. HAWKINS
Federal Public Defender

JEREMY SCHEPERS
Supervisor, Capital Habeas Unit

*/s/ David C. Currie*
David C. Currie (TX 24084240)
Assistant Federal Defenders

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746 (phone) 214-767-2886 (fax)
david_currie@fd.org

## VERIFICATION BY ATTORNEY

I, the undersigned, am an attorney at the office appointed by this Court pursuant to 18 U.S.C. § 3599 to represent Petitioner Terence Tramaine Andrus in these proceedings. I have met with Mr. Andrus, consulted with other staff in the Federal Defender's Office regarding the case and our co-counsel, and directed experts and investigators regarding the circumstances of Mr. Andrus's conviction and sentence of death. It is in that capacity that I verify this Petition. I declare under penalty of perjury that the foregoing allegations in this Petition are true and correct to the best of my knowledge and that this Petition for Writ of Habeas Corpus is being filed using this Court's CM/ECF system on February 13, 2020.

Subscribed by me February 13, 2020,
in Dallas, Texas.

*/s/ David C. Currie*
David C. Currie

175

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Petition for a Writ of Habeas Corpus has been served by CM/ECF upon counsel for Respondent on February 13, 2020:

Stephen Hoffman
Assistant Attorney General
Criminal Appeals Division
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548
Stephen.Hoffman@oag.texas.gov

/s/ *David C. Currie*
David C. Currie